IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

KEY WEST DIVISION

CASE NO. 08-10084-CIV- BROWN

PETER HALMOS, et al.,

       Plaintiffs,

vs.

INSURANCE COMPANY OF NORTH
AMERICA, et al.,

       Defendants.

_____/

**CORRECTED PLAINTIFFS' VERIFIED MOTION FOR OTHER RELIEF
REGARDING ORDER GRANTING MOTION FOR SANCTIONS AND REQUEST FOR
EXPEDITED BRIEFING [D.E. 1319][1]**

On March 22, 2011, this Court issued its Order Granting Motion For Sanctions (the "Order"). That Order grants relief neither justified by the facts, nor supported by case law. It should be withdrawn. In short, the Court has decided that a certain letter was not produced to INA, and as a result, INA has presumably been prejudiced. Then, once the Court has decided that, it then jumps to the conclusion that the failure to produce that letter undercut INA's entire discovery program regarding the seaworthiness of the Legacy. Having so found, amid multitudinous expressions of surprise amazement, disappointment and alleged unethical conduct, the Court then decided to restrict any ability by Plaintiffs to explain the letter, and then for good measure decided that such a ruling would apply to thousands of other documents without having bothered to determine whether they had been previously produced, were relevant, or if INA actually suffered any prejudice.

In reaching its findings, the Court erred for the following reasons, which require it to set aside, *in toto,* its Order, and conduct an evidentiary hearing to determine whether INA has misrepresented to the Court what it has suffered and sought in this motion:

---

[1] The Court's order was entered during a stay of the action. Plaintiffs waited until the end of the stay so that Mr. Halmos could assist in the preparation of this motion. Plaintiff requests an expedited briefing schedule, as the Court's ruling affects the course of the trial.

CASE NO. 08-10084-CIV- BROWN

1.      The Court misapplied the authority cited in its Order, *Flury*[2] and *OFS Fitel,*[3]

a.  in finding the predicate standard of conduct necessary to apply a sanction for failure to produce a document, willful or "stonewalling" delay, as phrased by *OFS Fitel,*[4] or a "showing of bad faith," as penned by Judge Fay in *Flury*[5] and then,

b.  fashioning disproportionately and inappropriate severe sanctions in the face of a failure to show any demonstrable harm to the "offended" party.

2.      The Court failed to entertain due process proceedings sufficient to justify the exercise of the type of sanctions imposed, as required by Rule 37, Rule 11, or the Court's inherent authority and by both cases cited by the Court.

3.      The sanctions levied by the Court were completely inappropriate and beyond any remedy properly exercised by the Court under either Rules 37(b), 37(c) or any other basis listed by the Court for sanctions including Rule 11 and the Court's inherent authority because:

a.  There is an issue as to whether the document was required to be produced in the first instance;

b.  The Court should have given the Plaintiffs a due process opportunity to be heard in writing *with sufficient amount of time to respond to the allegations* before hitting it with so severe a sanction;

c.  In fact, INA had all of the information it claimed it did not have in seeking the Order, because, at least two drafts *of the very same document*, with all of the same information and language, except for some information regarding an injury sustained after the drafts were written, had been previously produced, and there was no basis for ACE/INA to claim that anything in the final letter prejudiced them in any way *vis a vis* information it had in the two previously-produced drafts.

d.  The draconian nature of the sanction applied by the Court for the failure to produce one document, with information already known by ACE/INA in a case where thousands of documents have been produced, suggests both a prejudice by the Court against one or more of these Plaintiffs or a pre-determined result intended by the Court. There is no way that the Court's ruling is fair or justified.

---

[2] *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939 (11th Cir. 2005)("Flury").
[3] *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.,* 549 F.3d 1344 (11th Cir. 2008)("OFS Fitel").
[4] *OFS Fitel* at 1363.
[5] *Flury* at 944.

4.      The continual use of demeaning and insulting language in Court orders when dealing with the Plaintiffs and their counsel evinces a continuing prejudice against them inappropriate for the United States District Court.

5.      The fact that the Court entered this sanction order during a period when Peter Halmos was precluded from responding to it by order of this Court is itself improper and again suggests a prejudice by this Court against the Plaintiffs that is inappropriate for the United States District Court[6].

As a result, Plaintiffs, pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, request that this Court strike its Order Granting Motion For Sanctions and sanction INA for misrepresentations made to the Court.  In support thereof, Plaintiffs state the following:

## I.      The Court Failed To Properly Analyze The Alleged Injury Suffered By ACE/INA

The starting point in analyzing the Order is when the Court incorrectly concludes that "this motion addresses a serious matter that has serious consequences . . . ,"the failure to produce the final draft of the March 16, 2005, letter ("the letter"), citing to INA's claim that  the letter is " a significant document which is relevant, material, and of significance." *Order* at 1-2. INA incorrectly, but with the Court's blessing, claims to have identified numerous deficits in the vessel including but not limited to the fact that "*Legacy's* sailing system has not been operational since 2001" (see Exh. A, p. 13 (D.E. 1275-1)).

What neither INA nor the Court revealed was the fact that the information contained in the document, even if improperly not produced, was already in the possession of ACE/INA, including in the form of two "draft" letters which contained all of the material facts contained in the final version. Thus, ACE/INA had suffered no injury whatsoever by the failure to have produced this "final" draft. Instead, the Court concluded, without evidence or allowing Plaintiffs an opportunity to present evidence to show that at worst the alleged failure to produce the document was a technical omission, levied harsh, inappropriate, and unjustified sanctions in favor of ACE/INA,

---

[6] In mediation, and throughout the proceedings, despite an individual's right to represent himself pro se, this Court advised Mr. Halmos that he should retain counsel and really "wished" for Mr. Halmos to do so.  Apparently, when Mr. Halmos did not heed the Court's advice, given to him during mediation, the Court has now entered a sanctions order while Mr. Halmos is precluded from participating in the proceedings.

CASE NO. 08-10084-CIV- BROWN

as follows:

1. The letter (and all documents from the <u>Upham</u> case) will be admitted into evidence without the necessity of authentication, if offered, requiring only a supporting affidavit from the defense, under oath, that the documents being offered are from the <u>Upham</u> case.

2. Plaintiffs are precluded from challenging the letter or any such documents from the <u>Upham</u> case by offering any evidence or testimony to contradict, explain or otherwise distinguish any statements made within the letter or such documents or the significance of those statements.

3. Defendant is permitted to offer evidence or testimony regarding the significance of the letter or any such documents from the <u>Upham</u> case. However, defendant shall have through and including Friday, April 1, 2011, to file a supplemental witness list – only addressing any witnesses that will testify regarding said documents.

*Order* at 6.

In so doing, the Court exercised "discretion" well beyond any permitted by case law, including the two authorities cited by it, *Flury* and *OFS Fitel*. (*See Order at 6.*). Furthermore, the Court failed to even inquire whether the documents it has now "deemed admitted" were already in the hands of INA.

## II. INA WAS NOT AND IS NOT PREJUDICED; THE COURT SHOULD HAVE DETERMINED WHETHER IT DID OR DID NOT HAVE THE INFORMATION ALREADY *BEFORE* IT POURED OUT ITS WATERFALL OF SANCTIONS

INA alleges that the letter was critical as to S/Y Legacy's seaworthiness, and that "Plaintiffs knew that it was pertinent to INA's underwriting assessment and the document was not helpful to Plaintiffs' view of the case" and therefore did not produce the document. *See DE 1275 at 9.* Thus, INA claims, it was prejudiced as it could not investigate the veracity of Halmos's assertion in discovery and was "prevented from conducting additional discovery or depositions on this precise issue, and from presenting this and other evidence developed on this issue in a motion for summary judgment." *Id. at 8.* Those assertions are untrue. Because they are false, and INA knows that to be true, it is INA that should be sanctioned.

Not only was INA previously given the document in connection with the claims process, but even if it hadn't been, in this litigation *INA was given two previous drafts of the document* that are almost word for word the same as the final letter and contain the same information, as

- 4 -

well as mounds of other discovery that addressed all the issues in the document.

To claim that INA was deprived of avenues of discovery because this document has not been produced is as well false, and the fact that the Court is now allowing the document to be introduced and not subject to explanation through witnesses, and then for good measure, without determining whether any of the other documents are either relevant or have been previously produced, provides the same package of benefits to all other *Upham* –produced documents is simply wrong.

### The Document

The letter is from Peter Halmos & Sons, Inc. ("PHS") . It is not authored by IYC nor any of the other Plaintiffs. The copy that Mr. Halmos had was governed by a Confidentiality Order in *International Yachting Charters, Ltd., v. Christopher A. Upham*, et. al., Case No. 2003-CA-004410-AN, 15th Judicial Circuit, Palm Beach County, Florida ("Upham litigation"). The document was produced as a result of a third party subpoena directed at the defendants in the *Upham* litigation.

The only reason the defendants in *Upham* had the document was because Mr. Halmos was requested by the *Upham* litigants to produce all documents concerning communications with Pamela Harting-Forkey. See Exhibit A at Request 6 and 9. Yes, we are talking about the very same Pamela Harting-Forkey that has been, for all times material to this lawsuit, employed by ACE/INA, and who was the *primary claims manager for ACE/INA in the Legacy Wilma claim.*

#### A.  INA Had The Letter

In September of 2008, in response to Defendants' Request for Production To Plaintiff, Peter Halmos, in *Upham*, which called for "[a]ll documents, records . . . evidencing communications between Plaintiff's and Pamela Harting-Forkey," Mr. Halmos produced the 2005 Letter in *Upham*. *See id.*

Mr. Halmos produced the document in Upham since it was a previous document he is certain he gave to ACE through Pamela Harting-Forkey while she was monitoring the salvage operation in Key West in February of 2008.[7]

#### B.  The Two Previous Drafts of the Letter Were Produced

Attached as Exhibits B and C, are two drafts of the very same letter to Perini dated July 4,

---

[7] This motion is verified and the facts contained herein, and the truthfulness of the facts, have been attested to by Mr. Halmos' verification.

CASE NO. 08-10084-CIV- BROWN

2004, and July 5, 2004. These documents were produced to INA in August of 2009.   As the Court can see, all of the issues complained of in the purportedly withheld document are identified and expanded on by Mr. Halmos in the drafts, some of them word for word.

### (1) As to the Fresh Air System

| July 4, 2004 Draft | July 5, 2004 Draft | 2005 Letter |
|---|---|---|
| I am still grappling with the bilge odors in the starboard cabins. *Id at 1.* | I continue to grapple with the bilge odors, particularly concentrated in the starboard . . . and aft cabins, but also polluting the entire interior. *Id at 1.* | The bilge/sewage stench has rendered my cabin impossible to use and intermittently, the other stateroom, dining room bar and salon areas. *Id. at 1.* |
| There appears to be numerous causes. For example, the engine room air intake vents have two drain pipes to the bilge. The design allows bilge fumes to exit the drain pipes, resulting in the fumes being sucked into the engine . . . *Id. at 1-2.* | There appears to be numerous causes. For example, the engine room air intake vents have two drain pipes to the bilge. The design allows bilge fumes to exit the drain pipes, resulting in the fumes being sucked into the engine . . . Id. at 1-2. | The engine room air intake vents each have two drainpipes to the bilge. This design allows bilge fumes/odors to exit the drainpipes and be sucked into the engine room. *Id. at 2.* |
| Another example is the air intake by the main mast that fees the boat's air system. Bilge fumes are periodically released into the air intake . . . when the air intake hatch is opened. Leakage into this area could be from the bilge tank, the main mast bilge vent . . . ." *Id. at 2.* | Another example is the air intake by the main mast that fees the boat's air system. . . . Bilge fume intrusion into this area could be from the bilge tank, the main mast bile vent. . . ." *Id. at 2.* | We extensively examined the fresh air intake system . . . to prevent the bilge/sewage stench from invading the fresh air intake from the bilge tank, main mast bile vent . . . . *Id. at 2.* |
| Other instances include . . . the engineer ran the Alpha Laval fuel cleaner with the overflow tank empty . . . . The engine room immediately filled with bilge fumes . . . . *Id. at 3* | Other bilge fume intrusion instances include, for example, use of the Alpha Laval fuel cleaner with the overflow tank empty. . . . The engine room immediately filled the bilge fumes . . . . *Id at 3.* | It was then discovered that operation of the Alpha Laval fuel cleaner, with the overflow tank empty . . . caused the engine room to fill with bilge/sewage stench . . . . *Id. at 2.* |
| For another example, the pump room bilge appears to drain into the forward guest cabins via two tubes such that pump room bilge water and | For another example, the pump room bilge appears to drain into the forward guest cabins via two tubes such that pump room bilge water and | We then found that the pump room bilge drains toward the staterooms via two tubes. This caused pump room bilge fumes/odors to pollute the |

| fumes invade the cabins. *Id.* | fumes invade the cabins. *Id.* | staterooms . . . . *Id.* |

### (2) <u>As To The Fairing Compound</u>

| The fairing compound used on the hull is sub-standard; allows water to accumulate and erode the steel; and causes bubbling. *Id. at 4.* | The fairing compound used on the hull is sub-standard, according to an expert surveyor's report, causing water intrusion beneath the compound to erode the steel. This also causes bubbling of the paint. *Id. at 4.* | We have had extensive paint "bubbling" of the hull . . . . According to the post-Rybovich surveyor's report, the problem is caused by inappropriate quality faring compound permitting water intrusion. *Id. at 7.* |

### (3) <u>As To The Teak Decks</u>

| The rubber caulking between the teak deck planks does not extend to the underlying steel. This allows water to accumulate under the decks, rotting the wood and eroding the steel. *Id.* | The rubber caulking between the teak deck planks are insufficient to extend to the underlying steel. This allows water to accumulate under the decks, rotting the wood and eroding the steel. *Id.* | The rubber caulking between the teak deck planks is of insufficient quantity . . . . This caused expansion and contraction of the wood, with water accumulating on the underlying metal surface beneath the teak, rotting the wood and corroding the steel. *Id* |

### (4) <u>As To The Halon System</u>

| *Legacy's* Halon fire extinguisher system in the engine room has been periodically maintained as required by certified servicing agents. Just recently, since *Legacy's* Halon system is three years older than launch date, the Halon system undergoes a required major servicing. It turns out that the Halon fuel gauges do <u>not</u> measure the quantity of Halon but only the nitrogen-caused pressure. *Id. at 5-6.* | *Legacy's* Halon fire extinguisher system in the engine room has been periodically serviced, as required by certified servicing agents. Just recently, since *Legacy's* Halon system is three years older than her 1995 launch date, the Halon system had its required major servicing. *Id 5-6.* | The ABS inspector found *Legacy's* Halon 1301 system is three years older than the 1995 launch date. This required the 12-year servicing. . . . The 12-year servicing noted that *Legacy's* Halon gauges do <u>not</u> measure Halon quantity of Halon, the tanks must be emptied and weighed with and without Halon. *Id. 7-8.* |

### (5) <u>As To The Sailing System</u>

| | | |
|---|---|---|
| Our sail system has been inoperable for nearly three years despite extensive repairs, replacements, etc. On problem we now discover is that the computer is located in the engine room where the heat affects and/or destroys its functionality. *Id. at 4.* | Our sail system has been inoperable for nearly three years despite extensive repairs, replacements, etc. On problem we now discover is that the computer is located in the engine room where the heat affects and/or destroys its functionality. *Id. at 4.* | *Legacy's* sailing system has not been operational since 2001. . . . The cause has now been found. The sailing system computer is located in the engine room. The computer breaks-down due to heat exposure. *Id. at 8.* |

### (6) As To The Golden Years

| | | |
|---|---|---|
| As you know, the cornerstone of my "golden years" was supposed to be *Legacy* . . . I worked hard so my "golden years" could start at 50 . . . but now I'm 60 and bilge fumes continue to displace my ability to enjoy the boat and my "golden years." *Id. at 5.* | As you know, the cornerstone of my "golden years" was supposed to be *Legacy* . . . I worked hard so my "golden years" could start at 50 . . . but now I'm 60 and bilge fumes continue to displace my ability to enjoy the boat and my "golden years." *Id. at 5.* | We talked often how *Legacy's* 1995 launch is also the launch of my "golden years." It is now 2005. If the past 10 years were "golden years," next time I'll opt for lead. *Id. at 9.* |

The only items missing, of course, are the medical issues identified since they occurred a month after the attached drafts of the letter were written[8]. At the time, Mr. Halmos was blind and thus finalized the letter a few months later. Thus, why hide the final letter when the previous two versions were produced? The accusations of INA are baseless.

### III.    The Best Defense Is A Manufactured Offense

These drafts of the letter raise another issue – that is, why did INA, which represented to this Court that it hired "outside consultant" Kroll to do searches on the online database not inform the Court of the previous drafts of the letter? More importantly, why did INA's counsel, Michael Bowdoin "who reviewed almost all the documents produced," not inform the Court of such drafts? See DE 1303 at 4.

Clearly, a search of any online system would have turned up the drafts – the same language is used in both drafts and the final letter. The ethical and correct thing to have done would have been to file with the Court and notify the Court of such a fact – but, neither INA nor its counsel did so. Just like INA failed to inform the Court that it had the previous documents

---

[8] INA can't claim prejudice over such an omission, since notice of the injury was given to Strickland and INA. *See Exhibit D.*

CASE NO. 08-10084-CIV- BROWN

relevant to the previous motions for sanctions, it failed to alert the Court of these facts as well[9].

     **(A)    Strickland/INA Was Informed of the Faulty Halon System**

On March 1, 2004 Captain Collins of the S/Y Legacy sent a note to Mr. Vance Barker of Strickland Marine, INA's authorized agent for Legacy,  informing him, as earlier discussed, that tests would be run on the fire suppression system, disassembly and reassembly to ensure a functional system.  See Exhibit E.  That notice to Strickland was as a result of a February 2004 letter from Preventive Fire & Safety Equipment, Inc., that the system needed maintenance to ensure a functional system.  See Exhibit F.  On April 1, 2004, PFS issues its report and final invoice informing Captain Collins of the problem, and that the system was fixed.  See Exhibit G.

All of these documents were produced to INA in January or August of 2009.  And, more importantly, notice of the problem was given to Strickland, INA's agent.

     **(B)    The Contents Were Known To INA**

If the Court *chooses to ignore* Mr. Halmos's representation that the document was given to Pamela Harting-Forkey, as well as the two previously-produced drafts of the letter, and that notice of the Halon system was given to INA,  the following documents produced to INA, or which INA had (which even Plaintiffs did not have) all contain the information from which Mr. Halmos drafted the letter, or discuss the same issues detailed in the letter.

     **(1)    The Counterclaim in the *Patton* Case**

While the Court dismisses the counterclaim filed by Mr. Halmos as one that says "nothing about the problems of 2005," the 2005 deposition of Mr. Corness in that litigation, which Mr. Horan, current counsel for INA had during the deposition of Mr. Corness on July 6, 2010 in this litigation[10], goes into detail on each issue in the letter.

  In the 2005 deposition, the following topics/problems were covered extensively:

(1)    The fresh air system and sewage stench (Exhibit I at 217,218, 225, 228, 229);

(2)    The fairing compound (Id. at 231-236);

---

[9] As the Court will recall, INA's previous motion for sanctions claimed harm over nonproduction of documents that INA recently obtained, yet INA used those very same documents (previous depositions from the Upham case) in a deposition in this case, over eight months ago. INA's misrepresentation is detailed in Plaintiffs' response in D.E. 1264.

[10] **Mr. Horan**: "Let's see if I can help you refresh your recollection.  I am going to hand you volumes one and two of your deposition In Patton Marine versus Peter Halmos taken September 19, 2005. . . . We will go ahead and mark those as exhibits one and two . . . for the Corness deposition. *Exhibit H, Tr.23/15-24.5.*

CASE NO. 08-10084-CIV- BROWN

(3)     The teak decks (Id. at 239, 241);

(4)     The Halon system (Id. at 243-245); and

(5)     The sailing system (Id. at 245-246).

The above cites to the 2005 depositions, and the information therein, was used by Mr. Horan in the July 6, 2010 deposition of Mr. Corness (the same information that INA claims it did not and could not conduct discovery on since it didn't know of the letter);

### (a) The Sewage Stench

Q. Let's look at page 230 of the deposition . . . Question, and the point of – let's see, why don't they just make it use like a regular system like a house? Answer, because it's a better system, small piping, et cetera, and then the next question, whatever is causing it, you would agree that you shouldn't have to have sewage stench all over your new 30 million dollar yacht.  Did I read that correct?"  Exhibit H, Tr. 72/2-10.

### (b) The Halon System

Q. Was there a fatal flaw in the Halon Fire Protection System?  A.  Not to my knowledge."  Id. Tr. 47/18-19.

Q. This is an allegation appearing in an amended counter claim in November of 2007 that there was . . . installation of an outdated improperly configured Halon fire extinguisher . . . . Id. 53/14-20.

Q. If you were going to ensure a vessel that had known defects such as rusting underneath the steel because of inadequate caulking, a loss of steering capability because of improper circuitry and installation of outdated and improperly configured Halon fire extinguishers, do you think that an insurer of a boat like this would want that fixed before they would insure it?  Id.. 53/22-54/5.

Q. I would like you to turn over to paragraph 34 . . . .Discovery has revealed significant defects and noncompliance with specifications including defective fairing compound covering the entire hull, inadequate quantities of rubber caulking compound between the teak planks on the decks causing water intrusion and rusting of the underlying steel, chronically defective sailing computer systems and loss of steering capabilities due to improper circuitry, and most alarming of all, installation of an outdated and improperly configured Halon Fire Protection system . . . . Did I read that correctly.  Id. Tr.49/12-50/11

### (c) Warranty Work

Q. With regard to warranty work, was there warranty work that was not

CASE NO. 08-10084-CIV- BROWN

done by the time the sailboat left Perini Navi? Id. 47/7-10.

**(d) Caulking**

Q. Page 242, line 23, caulking on the teak deck, wasn't thick enough, it
allowed water intrusions, rust forms under the teak. Correct. . . .Okay.
And so you had been upset because they had done the second sanding
making the caulking so thin . . . . *Id. at 72/24-73/15.*

**(e) Sailing System**

Q. If in fact you went to an insurer and you told them that the boat was fit
and proper for its intended purpose and there were no major defects, and
you know there was a defective sailing computer system, . . .wouldn't that
be a misrepresentation? Id. at 54/25-55/8.

And, while Plaintiffs did not cite every single instance used by Mr. Horan in their prior

response, the above quotes from Mr. Corness' 2005 deposition and 2010 deposition, should be

more than sufficient for the Court to determine whether or not INA suffered any prejudice from

purportedly not having the letter, the previous drafts of the letter, or somehow claims that

Strickland never informed them of the Halon issue. *Significantly, and contrary to INA's*

*representations to this Court, INA clearly made use of information from the very letter it claims*

*it did not have, during the discovery process.*

Further, while the Court dismisses the Amended Counterclaim as one that says nothing of

the "problems of 2005" – the Court is mistaken. The events in the letter *did not occur in 2005,*

that is the date of the letter. The events were prior to 2005, and the defects were latent defects

existing as of 1995 which were actually fixed in early 2004. Be that as it may, the motion for

leave to file the amended counterclaim in *Patton Marine, Inc., v. Peter Halmos,* Case No: CL 96-

3674, attaching the Amended Counterclaim which according to this Court "mentions nothing"

states "[t]hese defects include: defective fairing compound covering the entire hull, inadequate

quantities of rubber caulking compound between the teak planks on the decks causing water

intrusion . . . chronically defective sailing computer systems, and installation of an outdated

Halon fire protection system . . . ." See Exhibit J at 2. Mr. Horan, INA's counsel, had the

Patton file, which is also public information, and thus had this motion.

**(C)   Extensive Documents Were Produced Detailing the Issues
Summarized in the 2005 Letter**

The letter was a summary of the latent defects requiring warranty work that Mr. Halmos

CASE NO. 08-10084-CIV- BROWN

and his crew experienced since the S/Y Legacy was launched.  To that end, the warranty issues
(which had been fixed by 2004 by Mr. Halmos and his crew) and documents relating thereto
were all produced by the Plaintiffs.  In fact, the knowledge derived by Mr. Halmos detailed in the
2005 Letter comes from the extensive documents that were produced, a sampling of which are
attached to this motion all of which identify the issues addressed in the 2005 Letter.  Some of
these documents were produced in January 5, 2009 as a result of Plaintiffs' initial disclosures.
*See Exhibit K.*  Others, were produced, and reproduced in response to requests for production.
*See Exhibits* L (as to the sail system), M (as to the Halon), and N (as to the fairing compound).

The point is, that while the Court, again, chastises Plaintiffs as being as helpful as "extra
ice to Eskimos," as the Court can see from the citations to Mr. Corness' deposition in 2005, and
the Patton Amended Counterclaim, which Mr. Horan, counsel for INA had, and the documents
that were produced, the information was already known to "the Eskimos".  To claim prejudice
over one single document that merely summarizes issues addressed in previous drafts and
documents is ianppropriate.

## IV.   PLAINTIFF's RESPONSE TO INA's INTERROGATORIES PROVIDED EVEN MORE OF THE SUPPOSEDLY "HIDDEN" INFORMATION

Additional information supposedly hidden until the "disclosure" of the final version of
the letter abound in the June 7, 2010, interrogatory answers as well:

(1)      In response to INA's First Set of Interrogatories Question number 8, Plaintiffs
produced in detail " all work performed on [the Legacy] since the date of manufacture [1995] . . .
including all maintenance, repairs, refits and upgrades whether performed at the Perini factory
and any other marine service, repair or refit facility."[11]

(2)      In Exhibit M to their response, Plaintiffs produced the daily logs of the S/Y
Legacy since 1995 detailing all issues, repair, refit and upgrades to the S/Y Legacy.  The
majority of these documents discuss in one way or another repair and refit to the sailing system,
the Halon system and the teak deck.  *See Exhibit O.*  Within these same documents, Plaintiffs
were able to find three letters sent to Perini which address in detail the issues with the Halon
system and the sailing system.  *See Exhibit P.*

Plaintiffs could go on and continue searching for more documents, yet, it should be

---

[11] Plaintiffs objected that the information was irrelevant to the issues at hand, and that requiring
Plaintiffs to produce such information was overly burdensome.  Be that as it may, Plaintiffs were
ordered to do so, and did.

CASE NO. 08-10084-CIV- BROWN

apparent, under an objective standard, that (1) INA has not suffered any prejudice from the
single 2005 Letter as all of the information (save some after-dated medical information regarding
Mr. Halmos, not at issue here) was contained in the earlier draft versions of the letter and many
other documents that detailed the very same facts, and (2) INA has once again misrepresented
facts to this Court.  Not having the document is one thing, informing the Court that they were
prejudiced by not having the document since they could not have known of its content through
discovery is an outright misrepresentation.

V.      **How Could INA Not Have Had Access To The Documents As It Claims
        When Its Counsel Informed Special Master Klein That  They Were In The
        Process Of Reviewing the Documents In June 2010?**

On June 7, 2010, during a telephonic hearing regarding INA's Motion To Compel
Production of the Upham documents, Special Master Klein asked the following:

> By the way, let me ask you another question . . . . I had required that
> the documents that were exchanged in the Upham file . . . be produced . . .
> were those documents . . . produced to you, Mr. Browning?"

> Mr. Browning, counsel for INA, responded: "We're reviewing those
> records currently, Judge.

*See Exhibit Q at Tr. 4/15-Tr. 5/2.*

Counsel for Plaintiffs, J.C. Antorcha, brought the matter to Special Master Klein's
attention that it could not be possible that INA would be reviewing the documents unless it had
inappropriately obtained the documents *prior to the Confidentiality Order being set aside.* Why?
Well, because at the time of the hearing, the Confidentiality Order was still in effect.   *Id. at Tr.
7/18-8/7.*  Counsel for INA, Robert Browning, back-tracked and stated "we were in the process
of reviewing these documents." *Id. at 8/8-10.*  How exactly could INA be in the process of
reviewing the Confidentiality Order-protected *Upham* documents in June of 2010 while claiming
to this Court in the motion for sanctions that they just recently obtained in February of 2011,
eight months after Mr. Browning's representation?

These documents that INA was reviewing in June of 2010, are the very same documents,
including the letter, this Court sanctioned Plaintiffs for not having produced and which INA
claimed prejudice over in February of 2011.  It just doesn't make sense.

VI.     **The Order Drips With Inappropriate And Unjustified Cynicism, Sarcasm,
        and Colloquial Slights Evidencing An Inappropriate Bias Against The
        Plaintiffs Inappropriate For a United States District Court Order**

CASE NO. 08-10084-CIV- BROWN

The Court's prejudices towards the Plaintiffs are dramatized by the colloquial, slanted, and stinging language of the *Order*

Plaintiffs next state…*without any equivocation whatsoever*…

the Bates stamp on the letter relied on by Plaintiffs to support production was not from this case, and that Mr. Halmos' affirmation, present on the other responses, was *notably* missing from this one.

*Incredibly*,

All this Court can say is *"simply amazing"*!

*Just when you think you've seen it all*….

In the first place – the complaint about two days to respond is *almost laughable*, coming from plaintiffs who have made no less than 40 motions for extension of time in this case…but not in this instance!

Secondly, and far more importantly, if plaintiffs weren't sure of their response, why didn't they say so…*before they got "caught with their hand in the cookie jar"?*

Paragraph 2 of the response…*apparently untrue.*

The statement on page 3 that "the document was produced inadvertently on July 23, 2010"…*apparently untrue.*

These representations are *serious violations* of Fed.R.Civ.P.11(b).

Signing a response to a pleading containing statements *that counsel or a party knows or should know may not be true is egregious.*

Plaintiffs employ the doctrine *of "the best defense is a good offense"*

Plaintiffs are quite careful to say that defendant knew about the issues, but never say it knew about the letter. *All of this, to this point – is not dissimilar to reoccurring matters in this case.*

*Plaintiffs have had previous problems with the Federal Rules of Civil Procedure, with the Local Rules for the Southern District of Florida, and with orders entered by the Court.*

Their conduct suggests *that they consider these things to be mere suggestions, at best.* Their own words support this conclusion.

Apparently a letter that is directly relevant to the issue of the seaworthiness of the vessel at the heart of this litigation, authored by the pro se plaintiff who is also the CEO of the two corporate plaintiffs, that is not produced when requested is a case of "no harm no foul" because, according to plaintiffs, defendant allegedly "knew about the issues".

The Court finds this *unconscionable.*

This is almost like *saying if plaintiff has a witness to a defendant's transgressions, then the defendant hiding its written admission of same doesn't matter.*

The information as to section "A" is relevant, *but the rest is more rhetoric than help.*

the pages cited by plaintiffs in support of their *position are about as helpful as extra ice to Eskimos.*

Plaintiffs *have also hidden behind the Agreed Confidentiality Protective Order in the Palm Beach case* of IYC v. Upham et. Al., Case No. 50-2003 CA004410 XXON AN ("the Upham case"). (Order, ¶ 3.D.).

This is just *another disingenuous argument by plaintiffs.*  (emphasis added)

Neither Plaintiffs, nor their counsel, operate by covering their tracks, nor do they "get caught with their hands in the cookie jar."  The suggestion that Plaintiffs or their counsel violated Rule 11, without an evidentiary hearing, determination of bad faith, or the Court objectively analyzing whether the Plaintiffs' actions were frivolous or should have known to be frivolous, is a clear violation of the Plaintiffs' and their counsel's rights, and a violation of established case law.[12]  Perhaps as significant, the Court's "sanction" is a clear indication that the Court has prejudged the issues before it, stretching to support the conclusion it wanted to reach. The far-reaching, improper sanction which it wanted to grant to defendant as a basis for any number of possible court determinations during what the Court has now decided will be a bench trial, includes ones that could effectively preclude appellate review.

Then, when Plaintiffs discovered they had made an error and filed a "Notice of

---

[12] See White v. Verizon Florida LLC, 2011 WL 806713 (M.D. Fla. 2011) citing Peer v. Lewis, 606 F. 3d 1306, 1313 (11th Cir. 2010); See also White v. Brenners, 2010 WL 5559220 (M.D. Fla. 2010) (stating "[t]he objective standard for conduct under Rule 11 is 'reasonableness under the circumstances' and 'what was reasonable to believe at the time' the pleading was submitted'" citing Worldwide Primates, Inc., v. McGreal, 87 F. 3d 1252, 1254 (11th Cir. 1996).

Clarification," it is greeted by the Court's "amazement." In the midst of trial preparation, the week before it was set to begin, this Court bombarded Plaintiffs with expedited briefing schedules on various motions filed by INA and Strickland,[13] motions which clearly distracted Plaintiffs' trial preparation.

In meeting the two day time limit for a reply, counsel candidly pointed out that part of its problem in replying to the motion was Mr. Halmos's health and ability to recall events, and his unavailability to counsel, as this Court had been informed of and knew.[14] As a result, Plaintiffs' counsel relied upon Mr. Halmos's assistant who informed counsel that the document was produced in response to the third party subpoenas to PHS. Mr. Halmos's assistant had made a mistake, which apparently is not possible in the Court's mind without a cloud of perfidy and malice. When Plaintiffs' counsel reviewed INA's response, they asked Mr. Halmos's assistant to look again, he did, and found that he had made a mistake.[15]

It is clear from the very tone of the Order and the language which the Court selected for use within it, that the Court's finding a sanctionable offense and in determining the appropriateness of sanctions and the severity to attach to them departed from established case law and the language of the appropriate rules themselves.

### VII.    The Sanctions Exceed The Outer Bounds Of Judicial Discretion And Conflict With Established Circuit Precedent

As a result of allegedly not producing one, specific document, the contents of which had been produced time and time again over the course of the litigation and before, the Court found an intentional, willful, and punishable failure to produce, and issued its draconian sanctions.

---

[13] In fact, the Court has yet to rule on the *Strickland* motion although it ordered the Plaintiffs to respond in an expedited fashion, just prior to trial, now over two months ago.

[14] Interestingly, the Court's solution to the two day time limit? Well, Plaintiffs could have filed a motion for an extension of time, despite the fact that that would have run into the trial, or perhaps later. To have to scramble in the midst of trial preparation to turn around a detailed response in two days is unnerving. To then have a judge say that the deadline was sort of fluid is, to borrow the Court's phrase, "amazing."

[15] Mr. Kirkpatrick believed that he had produced the documents for PHS as a result of the third party subpoena. The fact is that subsequent requests from INA on July 8, 2010, and order by Special Master Klein on July 13, 2010 (Exhibit R) ordered PHS to produce the documents that served as the back up to its invoices, not the boxes of documents produced during PHS's deposition on July 6, 2010. On January 6, 2011, this Court issued its order allowing INA to move forward with the deposition limited to the backup of the invoices as damages for the unjust enrichment claim to the extent those are damages being sought. *DE 1221*. Thus the 2005 Letter was not required to be produced by PHS.

CASE NO. 08-10084-CIV- BROWN

As support for its ruling, the Court cited *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939
(11th Cir. 2005), and *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344 (11th
Cir. 2008), cases which dealt with failure to provide expert witness opinions either at all or in a
timely fashion.[16] Of the two, *OFS Fitel* is perhaps the more instructive. But, this Court failed to
follow either the analysis or reasoning of either.[17]

Indeed, the Eleventh Circuit pointed out that where dismissal of an action was involved
for violation of a previously-entered court order, "bad faith or willful delay is required . . . ," thus
drawing the Court to the conclusion such a standard was clearly required "where there is only a
motion to compel . . . ." *Id. at 1366.* Furthermore, the Court pointed out that restrictions on the
admission of evidence required both the absence of "substantial justification" for the failure to
produce, and implicitly a harmful result to the offended party. Here there has been no harm at all
to INA, unless failure to believe its misrepresentation of what it did not know as being harm.

This same theme has been visited more than once in the courts of this circuit and others.
While a judge "has broad discretion to fashion appropriate sanctions for the violation of
discovery orders, that discretion is not unbridled." *See Swofford v. Eslinger*, 2009 WL 1025223
(M.D. Fla. 2009), *citing United States v. Certain Real Property*, 126 F.3d 1314, 1317 (11th Cir.
1997). Further, "the imposition of sanctions should be 'no more drastic than those actually
required to protect the rights of other parties." *Id.* In imposing these sanctions, this Court, has
deprived Plaintiffs of constitutional due process.

Furthermore, the "[p]reclusion of evidence is a harsh remedy and should be imposed only
in rare situations." *See Miracle Industries, Inc., v. Getty Petroleum Corp.*, 1992 WL 301268 *3
(E.D. Pa. 1992). It "raises substantial constitutional questions of due process and is a sanction
which should be imposed with the greatest circumspection, suggesting as always the desirability
of limiting the sanction to the least destructive forms." *Id.* (citations omitted). Consequently,
"[i]f application of discovery sanctions is shown to be arbitrary and in violation of due process
rights, the judgment is void." *See Cal Dive International, Inc., v. M/V Tzimin*, 127 F.R.D. 213,
215 (S.D. Ala. 1989). It is "a severe remedy raising substantial constitutional questions of due
process. The outright denial of a right to introduce evidence is a sanction which should be

---

[16] *Flury* actually dealt with the destruction of a vehicle, the examination of which as critical for
the determination of liability, after the retention of the vehicle had been repeatedly demanded.
[17] *OFS Fitel*, while critically highlighting the lower court's use of the term, "stonewalling," found an improper
application of the law by the district judge, and emphasized that sanctions must be cautiously granted, as opposed to
the more heavy-handed inclination of the district judge below.

imposed with the greatest circumspection, suggesting as always the desirability of limiting the sanction to the least destructive forms." *Id.*

Additionally, prior to issuing sanctions, this Court failed to make findings of any bad faith or willfulness on behalf of Plaintiffs. "The key to unlocking a court's inherent power is a finding of bad faith." *See Securities and Exchange Commission v. Creative Capital Consortium, LLC,* 2009 WL 5031353 (S.D. Fla. 2009) (Hurley, J.) citing *Barnes v. Dalton,* 158 F. 3d 1212, 1214 (11th Cir. 1998). In determining whether "sanctions should be awarded under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Id. citing Rothenberg v. Sec. Mgmt. Co., Inc.,* 736 F. 2d 1470, 1472 (11th Cir. 1984).

As it relates to Rule 37 sanctions, rule 37 contains limitations. "Any sanction must be "just" to represent general due process restrictions on the court's discretion. *See Insurance Corp. of Ireland, Ltd., v. Compagnie,* 456 U.S. 694, 102 S. Ct. 2099, 2107 (1982); *see also Malautea v. Suzuki Motor Company, Ltd.,* 987 F. 2d 1536, 1542 (11th Cir. 1993); *Devaney v. Continental American Insurance Company,* 989 F. 2d 1154 (11th Cir. 1993) ("Like other sanctions, attorney's fees should not be assessed lightly or without fair notice and an opportunity for a hearing on the record.") *citing Roadway Express, Inc., v. Piper,* 447 U.S. 752, 767, 100 S. Ct. 2455, 2464, 65 L.Ed.2d 488 (1980)(superseded by statute on other grounds). Lastly, "the plain language of Rule 37(b) provides that before a court can impose sanctions, the offending party must fail to obey an order to provide or permit discovery." *See Melendez-Garcia v. Sanchez,* 629 F.3d 25, 33 (1st. Cir. 2010); Fed. R. Civ. P. 37. The Order did not point to a discovery order which Plaintiffs' failed to obey that would warrant sanctions under Rule 37 or to conduct that would approach the level needed to support this Court's sanctions.

Both OFS Fitel and Flury teach that restraint is the order of the day, that willfulness is required, and there has to be some type of real prejudice. Clearly, a reference to the district judge's characterization of the offense in OFS Fitel and the Eleventh Circuit's reversal of the issue sanction is a powerful lesson in this case. This Court's sanction and the finding of underlying perceived sin run directly afoul of the OFS Fitel doctrine, and the Court ought reverse itself.

In the end, the issue is whether the document was produced or not, and if not, whether the information contained within the document had been produced. If either is the case, and harm resulted, then the sanctions imposed by the Court appear tied to a "gotcha" or rubrical concept of

justice. Thus, the failure to produce one letter, which contained no information not already in the possession of the defendant, somehow gave the Court *carte blanche* to allow thousands of pages of other documents to come in, without examining them. Thus, the old folklore tale of "But for a tack, the kingdom was lost" comes alive in the Order.

The fact remains, whether this Court wants to address it now or not, INA had access to the previous drafts of the letter because they were produced by Plaintiffs, and mentioned nothing of the like to the Court[18]. To add insult to injury, INA had access to Tom Corness' deposition in which counsel for Mr. Halmos in *Patton Marine, Inc., v. Peter Halmos*,[19] which went into detail of each and every single issue identified in the "withheld document."

Thus, while INA's response, D.E. 1303, plays victim and goes into INA's long winded discovery strategy session on issues it deemed relevant and thus the 2005 Letter precluded them from doing discovery on the seaworthiness issues, the fact is – they had all the information in both the previous drafts of the letter, hundreds of other documents that were produced, the Tom Corness deposition and the public court file in *Upham*.

There, in the end, was no harm to INA for the non-production of the final letter, nor any bad faith or intent on behalf of Plaintiffs, to warrant this Court, once again, stripping Plaintiffs of their due process rights and for sure an imposition of a sanction allowing all of the *Upham documents* into evidence without the Court having even seen them or their contents, is not just. In the end, the facts clearly show that the letter was either given to Pamela Harting-Forkey, or at the very minimum drafts of the letter and documents detailing the contents of the letter were in the hands of INA.

Moreover, even if there were something unique in the final draft not included in the earlier ones, which is note the case, what exactly is the harm? INA took Peter Halmos's depositions repeatedly. All someone had to do was to ask Mr. Halmos two questions at his deposition: (1) were these drafts ever put into a final letter?, and (2) was that final letter ever delivered to a representative of INA? Those two simple questions -- which are ridiculously suggested to be the "key" to INA's "seaworthiness/fraud" defense -- should have been asked of

---

[18] Clearly, Plaintiffs disagree with the Court on how to notify the Court of facts and corrections, needless to say, however, INA should have informed the Court it had the two previous drafts of the 2005 Letter. And, for that matter, sanctions should be issued by this Court for INA's intentional failure to not do so. Clearly, if Kroll did a search and INA's counsel did one as well, the drafts would have come up.

[19] In the 15th Judicial Circuit In And For Palm Beach County, Case No: CL 96-3674.

CASE NO. 08-10084-CIV- BROWN

Peter by any experienced litigator especially since by the time the deposition was taken, *INA HAD ALREADY RAISED THESE DEFENSES* and presumably had a passing interest in the topic. Had INA asked Peter those two questions, INA could have thereafter fully "vetted" the issues, and any alleged prejudice would have evaporated. Of course, the utter absurdity of INA's "prejudice" argument is that INA already knew the answers to these questions at the time they took Mr. Halmos's deposition, and at the time it misrepresented to this Court its lack of knowledge about the facts contained within the letter. Thus, for this Court to *assume* bad faith, or any ill intent on behalf of Plaintiffs is a leap that it is making with no solid footing nor support.

        The rules of restraint under Rule 37 are intended to guide the process of determining the appropriateness and degree of a sanction, not to backstop it. Not the law, the facts, not justice support this Court's sanction Order, which the Court should withdraw in total, or at the very minimum, conduct and evidentiary hearing as to what harm INA suffered and what documents exactly did  INA not have for them to claim prejudice.

        I DECLARE UNDER PENALTY OF PERJURY THAT THE FACTS CONTAINED HEREIN ARE TRUE AND CORRECT.

Dated: April 26, 2011

PETER HALMOS

## CERTIFICATE OF GOOD FAITH CONFERENCE

        Undersigned counsel hereby certifies that counsel for movant has conferred with Mr. Robert Browning, counsel for INA, who opposes the relief requested herein.

                                Respectfully submitted,

                                Joseph P. Klock, Jr. FBN 156678
                                Juan Carlos Antorcha FBN 0523305
                                RASCO KLOCK REININGER PEREZ
                                ESQUENAZI VIGIL & NIETO
                                283 Catalonia Avenue
                                Coral Gables, Florida  33134
                                Telephone: 305.476.7105
                                Facsimile: 305.476.7102

                                By: /s/ Joseph P. Klock, Jr.
                                -  20 -

CASE NO. 08-10084-CIV- BROWN

THE LAW OFFICE OF HUGH J. MORGAN
Hugh J. Morgan
P.O. Box 1117
Key West, Florida 33041
Telephone: (305) 296-5676
Facsimile: (305)296-4331
hugh@hjmorganlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on 26th day of April 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/ Juan Carlos Antorcha*

CASE NO. 08-10084-CIV- BROWN

## Service List

Frank J. Sioli
Zascha B. Abbott
BROWN SIMS P.C.
Datran One - Suite 908
9100 South Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 274-5507
Facsimile: (305) 274-551
fsioli@brownsims.com

Scott Bassman
Counsel for Defendant, Strickland
Cole, Scott & Kissane, P.A.
Dadeland Centre II
9150 S. Dadeland Blvd, Suite 1400
Miami, FL 33156
Facsimile: 305.373.2294
dara.jebrock@csklegal.com
scott.bassman@csklegal.com

Clinton Sawyer Payne
DeMahy Labrador Drake Payne &
Cabeza
Alhambra Center – Penthouse
150 Alhambra Circle
Coral Gables, FL 33134
Telephone: (305) 443-4850
Facsimile: (305) 443-5960

Kenneth G. Engerrand
Michael A. Varner
P. Michael Bowdoin
Brown Sims p.c.
1177 West Loop South
Tenth Floor
Houston, Texas 77027-9007
Telephone: (713) 629-1580
Facsimile: (713) 629-5027
kengerrand@brownsims.com
mvarner@brownsims.com

David P. Horan
HORAN, WALLACE &
HIGGINS, LLP
608 Whitehead Street
Key West, FL 33040
Telephone: (305) 294-4585
Facsimile: (305) 294-7822
dph@horan-wallace.com

4819-7694-8233, v. 1