UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO. 08-10084-CIV-BROWN

PETER HALMOS, INTERNATIONAL
YACHTING CHARTERS, INC., and
HIGH PLAINS CAPITAL,

       *Plaintiffs,*

v.

INSURANCE COMPANY OF NORTH
AMERICA and STRICKLAND MARINE
INSURANCE, INC., (f/k/a STRICKLAND
MARINE AGENCY, INC.),

       *Defendants.*
_____/

## PLAINTIFFS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Plaintiffs, Peter Halmos, International Yachting Charters, Inc. and High Plains Capital,

file their Findings of Fact and Conclusions of Law, as follows:

### I.      BACKGROUND

      In the period beginning in 2001 and ending in 2005, Plaintiffs, IYC, HPC and Peter

Halmos (*pro se*), suffered a series of losses with respect to certain vessels insured by Defendant,

Insurance Company of North America ("INA"). On October 22, 2008, Plaintiffs filed suit against

INA seeking both coverage and the recovery of expenses incurred as a result of the various

losses under INA's insurance policies. Peter Halmos sought damages for unjust enrichment and

quantum meruit as a result of the time and expense incurred by Mr. Halmos in his efforts to

protect the insured vessel and negotiate, procure and comply with the NOAA Agreements for the

release of all natural resource damage claims related to the Legacy-Wilma incident. The

operative pleading is the Fourth Amended Complaint, filed May 5, 2010 [D.E. 688].  On January 18, 2011, judgment was entered on various claims and affirmative defenses asserted in the instant action.   Order on Motions for Summary Judgment [D.E. 1237].   The claims that proceeded to trial were:   (a) the Sol Claim; (b) the Island Runner Claim; (c) the Mongoose Claim; (d) the Legacy – Wilma Claim; (e) Count 15 (Unjust Enrichment); and (f) Count 16 (Quantum Meruit).

This lawsuit was tried before the Court, without a jury, from May 3 to June 15, 2011.  In rendering judgment following a non-jury trial, Rule 52(a) requires a district court to make specific findings of fact and to state conclusions separately.  *See Inspiration Yacht Charters, Inc., v. Inspiration Yacht Charters, II,* 2010 WL 5014371 (S.D. Fla. 2010).  The Rule "'does not require a finding on every contention raised by the parties, but requires the court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decisions and providing 'sufficient particularity' to facilitate meaningful review."  *Id.* (*citing Feazell v. Tropicana Prods., Inc.,* 819 F. 2d 1036, 1042 (11th Cir. 1987)).  In accordance with the requirements of Rule 52(a), and having heard and considered all of the testimony, evidence, and arguments presented at trial, Plaintiffs ask the court to enter the following findings of fact and conclusions of law based on the substantive issues that are before the Court.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The principal issue before the Court is whether, based upon the trial record, INA can be permitted to escape its remaining obligations under the insurance contracts and other agreements it entered into with Plaintiffs.  Those agreements include compensation for the actions taken by Plaintiffs with the knowledge, consent, and acquiescence of INA, as well as at its direction, to

2

Case No. 08-10084-CIV-BROWN

undertake duties and services normally performed by third party contractors, which involved substantial expenditures of time and resources. Although INA was kept informed of the expenses and efforts undertaken by Plaintiffs, received all of the benefits of those services, and raised no contemporaneous objections as the services were being performed, it now disagrees with the costs.

INA is contractually obligated to reimburse Plaintiffs for all of the agreed-upon expenses, up to established limits. INA has not done so. Plaintiffs have submitted extensive documentation of their losses pursuant to INA's instructions and seek from the Court a judgment compelling INA to uphold its end of the bargain.

## II. THE INA POLICIES, BURDENS OF PROOF AND POLICY INTERPRETATION

### A. Findings of Fact Related to the INA Policies, Burdens of Proof and Policy Interpretation

1. INA issued a series of insurance policies to Plaintiffs IYC and HPC (the "INA Policies"). Joint Pre-Trial Stipulation [D.E. 1273] at 2.

2. At all material times, Peter Halmos served as the President and sole shareholder of both IYC and HPC, and was an insured under the INA Policies. Order on Motions for Summary Judgment [D.E. 1237] at 1.

3. In August of 2001, INA issued Windjammer Policy # YWR Y06973504 to IYC to insure the S/Y Legacy for the policy period effective August 7, 2001 through August 7, 2002, (the "2001 Policy"). Joint Pre-Trial Stipulation [D.E. 1273] at 10.

4. In August of 2002, INA issued Windjammer Policy # YWR Y06973504 to IYC to insure the S/Y Legacy and its tenders for the policy period effective August 7, 2002 through August 7, 2003, (the "2002 Policy"). Joint Pre-Trial Stipulation [D.E. 1273] at 10.

Case No. 08-10084-CIV-BROWN

5. In December of 2004, INA issued Windjammer Policy # YKR Y05031205 to HPC to insure the Mongoose for the policy period effective December 7, 2004 through December 7, 2005, (the "2004 Policy").  Joint Pre-Trial Stipulation [D.E. 1273] at 10.

6. In August of 2005, INA issued Windjammer Policy # YWR Y06973504 to IYC to insure the S/Y Legacy for the policy period effective August 7, 2005 through August 7, 2006, (the "2005 Policy").  Joint Pre-Trial Stipulation [D.E. 1273] at 10.

7. Each of the INA Policies afford coverage for:  (1) physical property; (2) salvage costs; (3) protection against loss; and (4) third party liability obligations.  Joint Pre-Trial Stipulation [D.E. 1273] at 2.

8. The "Part A: Property Damage Coverage" provision of the INA Policies provides:

> We will provide coverage for accidental, direct physical loss or damage to your insured vessel as well as salvage charges, except as specifically excluded in this policy.

Trial Exhibit No. 1, 2, 4 & 5.

9. The "Part B: Liability Coverage" provision of the INA Policies provides in relevant part:

> We will pay sums that you or a covered person become legally obligated to pay as a result of the ownership, operation or maintenance of your insured vessel because of:
> (a) attempted or actual raising, removal or destruction of the wreck of your insured property;
> (b) failure to raise, remove or destroy the wreck of your insured property;
> …
> (e) loss or damage to any property;
> (f) pollution or contamination of any kind.

Trial Exhibit No. 1, 2, 4 & 5.

10.     The "Salvage Charges" provision of the INA Policies provides:

> We will pay for salvage charges you incur arising from a covered loss. Payments for salvage charges will be in addition to any other payments we make for losses

covered by this policy. However, the most we will pay for salvage charges is the Part A: Property Damage Coverage limit shown on the Declarations Page. The Part A: Property Damage Coverage Deductible Amount does not apply to this coverage.

Joint Pre-Trial Stipulation [D.E. 1273] at 10.

11.    The "Protection Against Loss" provision of the INA Policies provides:

If your vessel or other property covered by this policy is damaged, you must take all reasonable steps to protect it from further damage. We will reimburse you for reasonable expenses for protecting the property from further damage. Payments for protecting damaged property will be in addition to any other payments we make for losses covered by this policy. However, the most we will pay for protecting damaged property is the coverage limit which applies to that property.

Joint Pre-Trial Stipulation [D.E. 1273] at 10.

12.    The "Notice of Loss" provision of the INA Policies provides:

You must report in writing to us, or our authorized agent, as soon as possible after the occurrence of any accident, loss, damage or expense that may be covered under this policy. This notice should state when, where and how the event occurred, and should include the names and addresses of any witnesses. You are also required to notify the police and file a police report as soon as you are aware that your property has been stolen or vandalized. If you do not provide the notice to us as required by this section as soon as possible, any claim for such loss under this policy will be voided.

Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 101:14-

102:20; Trial Exhibit No. 1, 2, 4 & 5.

13.    The "Proof-of-Loss" provision of the INA Policies provides:

You must file with us or our authorized agent, as soon as possible after our written request, a detailed proof-of-loss signed and sworn to by you setting forth to the best of your knowledge the facts of the loss. We may also require you to submit to an examination under oath.

Trial Exhibit No. 1, 2, 4 & 5.

14.    The INA Policies require the submission of a sworn proof of loss statement only

after written request by the insurer. Trial Exhibit Nos. 1, 2, 4 & 5.

Case No. 08-10084-CIV-BROWN

15.     The "Payment of Loss" provision of the INA Policies provides:

Unless a claim has been paid by others, we will pay for any loss covered under this policy within 30 days after both the detailed sworn proof of loss and proof of your interest in the insured property are given to us.

Trial Exhibit No. 1, 2, 4 & 5.

16.     The respective Policies were in full force and effect at the time of the loss claimed thereunder.  Joint Pre-Trial Stipulation [D.E. 1273] at 10.

## B. Conclusions of Law Related to the INA Policies, Burdens of Proof and Policy Interpretation

17.     It is well settled that an insurance contract is to be construed in accordance with the plain language of the policy. *Prudential Property and Casualty Ins. Co. v. Swindal*, 622 So.2d 467, 470 (Fla. 1993); *Stuyvesant Ins. Co. v. Butler*, 314 So.2d 567, 570 (Fla. 1975); *Poole v. Travelers Ins. Co.*, 179 So. 138, 141-42 (Fla. 1937). Moreover, "[a]mbiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Swindal*, 622 So.2d at 470.

18.     An insured has the initial burden of proving that a claim falls within a policy's coverage grant.  *Hudson Ins. Co. v. Double D Management Co., Inc.*, 768 F.Supp. 1542, 1545 (M.D. Fla. 1991).  Upon a showing that a claim is a covered claim, the burden then shifts to the insurance company to show that coverage is barred by some exclusion within the policy or the insured's failure to meet a policy condition.  *LaFarge Corp. v. Travelers Indemn. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997); *Key Custom Homes, Inc. v. Mid-Continent Cas. Co.*, 450 F.Supp.2d 1311, 1316 (M.D. Fla. 1991); *East Florida Hauling, Inc. v. Lexington Ins. Co.*, 913 So.2d 673, 678 (Fla. 3rd DCA 2005).  If the insurer meets its burden, the insured must prove that its failure to comply with a policy condition was not prejudicial to the insurer.  *French Cuff, Ltd. v. Markel American Ins. Co.*, 322 Fed.Appx. 669 (11th Cir. 2009).

6

Case No. 08-10084-CIV-BROWN

19.    Under Florida law,[1] late notice of an insured's claim creates a rebuttable presumption that the insurer was prejudiced by the untimely notice.  After the insurer shows that its insured breached the notice provision, the burden shifts to the insured to prove that the insurer was not prejudiced by the failure to timely notify its insurer.  If the insured carries this burden, the claim is not precluded by reason of late notice.  *Eastpointe Condo. I Assoc., Inc. v. Travelers Cas. & Surety Co. of America*, 664 F.Supp.2d 1281, 1286 (S.D. Fla. 2009); *Lane v. Provident Life & Accident Ins. Co.*, 178 F.Supp.2d 1281, 1288 (S.D. Fla. 2001); *Tiedtke v. Fidelity & Casualty Co. of New York*, 222 So.2d 206, 209 (Fla. 1969).

20.    Under Florida law, an insured's breach of the cooperation provisions of a policy will only relieve an insurer from its obligation to pay a covered claim where such breach is deemed to be material and prejudicial; the insured's breach does not create a rebuttable presumption of prejudice to the insurer in this instance.  *Mid-Continent Cas. Co. v. American Pride Bldg. Co., LLC*, 601 F.3d 1143, 1149-1150 (11th Cir. 2010); *Ramos v. Northwestern Mut. Ins. Co.,* 336 So.2d 71, 75 (Fla. 1976).

**(i)    Fortuitous Loss**

21.    The INA Policies cover all fortuitous losses[2] except for those occasioned through a breach of warranty or otherwise specifically excluded under the policy. *Int'l. Ship Repair & Marine Services v. St. Paul Fire & Marine Ins. Co.*, 944 F. Supp. 886, 892 (M.D. Fla. 1996); *Great Lakes Reinsurance PLC v. Soveral*, 2007 U.S. Dist. LEXIS 13261 (S.D. Fla. 2007).  A fortuitous loss is one that can be attributed to accident or chance – those events that are beyond

---

[1] The parties agree that Florida law applies in this action.

[2] INA concedes that each loss was fortuitous and that, therefore, it is covered under the respective Policies.

the control of the insured. *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424 (5th Cir. Fla. 1980). A loss is not considered fortuitous "if it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured." *Int'l. Ship Repair, supra*, 944 F. Supp. 892-893). The Court in *Int'l. Ship Repair*, at page 893, quoting with approval from *Sipowicz v. Wimble*, 370 F. Supp. 442, 446 (S.D.N.Y. 1974) explained: "Fortuitous events are accidents or casualties of the seas, unforeseen and unexpected events, and [are not] . . . losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear." In a succinct summary of the development of the fortuity doctrine in *Insurance Co. of North America v. United States Gypsum Co.*, 678 F. Supp. 138, 141 (W.D. Va. 1988); *Affirmed*, 870 F.2d 148 (4th Cir. Va. 1989), the District Court observed: "Significantly, the underlying principle of the doctrine is public policy: it would encourage fraud to allow recovery on an insurance loss which is certain to occur." The insured bears the legal burden of demonstrating that the loss was fortuitous under an all risks policy. However, the burden of demonstrating a fortuitous event is not an onerous one. Courts that have considered the question have rejected the notion that the insured must show the precise cause of loss to demonstrate fortuity. *Morrison Grain, supra,* 632 F.2d at 430; *Int'l. Ship Repair, supra*, 944 F. Supp. at 891-892.

**(ii)  Proximate Cause**

22.     The U.S. Supreme Court instructs that the existence or non-existence of a casual connection between the loss and the peril insured against in a policy of marine insurance is determined by looking into the factual situation in each case and applying the concept of "proximate cause." *Standard Oil Co. v. United States,* 340 U.S. 54, 58 (U.S. 1950). "[T]he true meaning of that maxim is, that it refers to the cause which is most nearly and essentially

8

connected with the loss as its efficient cause." *Id*. The cause which is truly proximate is that which is proximate in efficiency. *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556, 563 (U.S. 1938); *see also*, *Tillery v. Hull & Co., Inc.*, 876 F.2d 1517, 1519 (11th Cir. 1989) ("Courts analyzing problems of marine insurance causation have, as a rule, applied strictly the doctrine of *causa proxima non remota spectator"* ("the immediate not the remote cause is considered").

23.     Although the concept of proximate cause does not necessarily refer to the cause nearest in point of time to the loss, the last cause is not excluded simply because of its position in the chain of events. As stated cogently by the Second Circuit in *Blaine Richards & Co. v. Marine Indemn. Ins. Co.*, 635 F.2d 1051, 1054-1055 (2d Cir. N.Y. 1980): "Determination of proximate cause in these cases is thus a matter of applying common sense and reasonable judgment as to the source of the losses alleged."

**(iii) Due Diligence**

24.     "Diligence" is defined as "[c]are; caution; the attention and care required from a person in a given situation." *Black's Law Dictionary* at 468 (7th ed.). "Due diligence" is defined as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal obligation." *Id.*; *see also Fireman's Fund Ins. Co. v. M/V Vignes*, 794 F.2d 1552, 1556 (11th Cir. (Fla.) 1986) (stating that in the context of the Carriage of Goods by Sea Act, due diligence "comprehends inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical, and the failure to discover defects which examination would necessarily have disclosed is the very absence of due diligence.") (quoting *Ionian S.S. Co. v. United Distillers of America, Inc.,* 236 F.2d 78 (5th Cir. 1956).

25.    In enunciating this principle, the court recited verbatim the definition from the Fifth Circuit in *Ionian S.S. Co. v. United States Distillers of America, Inc.*, 236 F.2d 78 (5th Cir. La. 1956). As succinctly emphasized in that decision: "[t]he exercise of due diligence envisages some activity." 236 F.2d at 84. Further, the exercise of due diligence requires more than simply the selection of a reputable repairman. As the court noted recently in *Chiquita Int'l., Ltd. v. MV Canis J*, 2001 U.S. Dist. LEXIS 12924, 6-10 (S.D.N.Y. 2001). There "must be due diligence in the work itself, and not merely in the selection of agents to do the work; otherwise, shipowners might escape all responsibility merely by selecting agents of good reputation, and would be relieve whether such agents exercised due care or not to make their vessel seaworthy, and any responsibility would be frittered away." (citing, *inter alia, Ionian S.S. Co., supra*).

**III.    INA'S ADMISSION OF COVERAGE AND CONFESSION OF JUDGMENT**

**A.    Findings of Fact Related to INA's Admission of Coverage and Confession of Judgment**

26.    INA's designated corporate representative, Mr. Joseph Smith, admitted that each of the claims at issue fall within the coverage grant and are not barred by any exclusion contained in the Policies.  Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5.

27.    INA asserted that Plaintiffs breached the "Notice of Loss" provision of the INA Policies with respect to the Sol Claim and the Island Runner Claim, and that Plaintiffs have breached the "Assistance and Cooperation" provision and "Concealment, Misrepresentation or Fraud" provision of the INA Policies with respect to each of Corporate Plaintiffs' Claims.  Joint Pre-Trial Stipulation [D.E. 1273] at 28-34.

28.    Notwithstanding INA's knowledge and assertion of the above-referenced coverage defenses, INA sent letters to Plaintiffs, both before and after suit was filed, enclosing

Case No. 08-10084-CIV-BROWN

partial payments of insurance proceeds with respect to the Island Runner Claim, the Mongoose Claim and the Legacy-Wilma Claim.  Trial Exhibit Nos. 256-1 to 256-15; Transcript of Bench Trial – Vol. 1 (May 3, 2011), Ken Engerrand testimony at 48:22-62:24.  In fact, at least 23 payments, totaling over $9,290,651.59, were paid after suit was filed on October 22, 2008 [D.E. 1].

29.     On February 23, 2006, INA issued payment in the amount of $23,463.38 to HPC for partial reimbursement[3] of property damage related to the Mongoose Claim.  Trial Exhibit No. 256.

30.     On March 6, 2006, INA issued payment in the amount of $204,000.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

31.     On April 28, 2006, INA issued payment in the amount of $200,000.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

32.     On June 2, 2006, INA issued payment in the amount of $130,000.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

33.     On July 6, 2006, INA issued payment in the amount of $15,069.09 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

---

[3] It is undisputed that with the exception of payments made under the hull coverage, all payments made by INA were to reimburse Plaintiffs for monies they had advanced.

11

34.     On July 6, 2006, INA issued payment in the amount of $14,498.74 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

35.     On July 6, 2006, INA issued payment in the amount of $88,940.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

36.     On July 13, 2006, INA issued payment in the amount of $154,400.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

37.     On August 9, 2006, INA issued payment in the amount of $60,120.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

38.     On August 18, 2006, INA issued payment in the amount of $7,750.75 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

39.     On August 31, 2006, INA issued payment in the amount of $74,293.64 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

40.     On October 17, 2006, INA issued payment in the amount of $31,487.50 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

Case No. 08-10084-CIV-BROWN

41.     On November 19, 2007, INA issued an unsolicited payment in the amount of $557,070.66 to IYC for partial reimbursement of costs related to the negotiation of the NOAA Agreement and the Legacy-Wilma Claim.  Trial Exhibit No. 256.

42.     On November 29, 2007, INA issued payment in the amount of $29,892.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

43.     On March 27, 2008, INA issued payment in the amount of $272,210.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

44.     On May 8, 2008, INA issued payment in the amount of $11,192,531.54 to IYC for partial indemnification for property damage related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

45.     On October 27, 2008, INA issued payment in the amount of $4,807,468.46 to IYC for partial indemnification for property damage related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

46.     This action was filed on October 22, 2008.  D.E. 1.

47.     On February 20, 2009, INA issued two separate payments, each in the amount of $196,517.17, to HPC for partial indemnification for property damage related to the Mongoose Claim.  Trial Exhibit No. 256.

48.     On February 27, 2009, INA issued payment in the amount of $848,493.90 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

Case No. 08-10084-CIV-BROWN

49.     On February 30, 2009, INA issued payment in the amount of $1,001,995.42 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.   Trial Exhibit No. 256.

50.     On July 6, 2009, INA issued payment in the amount of $467,814.61 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.   Trial Exhibit No. 256.

51.     On July 21, 2009, INA issued payment in the amount of $12,785.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.   Trial Exhibit No. 256.

52.     On July 23, 2009, INA issued payment in the amount of $9,295.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.   Trial Exhibit No. 256.

53.     On October 12, 2009, INA issued payment in the amount of $224,122.13 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.   Trial Exhibit No. 256.

54.     On October 26, 2009, INA issued payment in the amount of $5,400.00 to IYC for partial reimbursement of salvage costs related to the Island Runner Claim.   Trial Exhibit No. 256.

55.     On January 19, 2010, INA issued payment in the amount of $32,283.89 to IYC for partial reimbursement of protection against loss damages related to the Legacy-Wilma Claim. Trial Exhibit No. 256.

56.     On May 11, 2010, INA issued payment in the amount of $592.18 to HPC for partial reimbursement of salvage costs related to the Mongoose Claim.   Trial Exhibit No. 256.

14

57.     On June 9, 2010, INA issued payment in the amount of $19,331.02 to IYC for partial reimbursement of salvage costs and other costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

58.     On June 9, 2010, INA issued payment in the amount of $859,262.54 to IYC for partial reimbursement of salvage costs and other costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

59.     On June 17, 2010, INA issued payment in the amount of $362,150.92 to IYC for partial reimbursement of salvage costs and other costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

60.     On July 28, 2010, INA issued payment in the amount of $43,990.00 to IYC for partial reimbursement of salvage costs related to the Legacy-Wilma Claim.  Trial Exhibit No. 256.

**B.   Conclusions of Law Related to INA's Admission of Coverage and Confession of Judgment**

61.     An insurer's voluntary payment of an insurance claim after suit is filed conclusively establishes coverage under the policy and is treated as a confession of judgment. *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So.2d 217, 218 (Fla. 1983); *Saewitz v. Lexington Ins. Co.*, 133 Fed. Appx. 695, 699 (11th Cir. 2005) (holding that money paid by an insurer to insureds as partial settlement of the insured's claim constitutes an admission of liability by the insurer); *Plante v. USF&G Specialty Ins. Co.*, 2004 WL 741382, at *4-5 (S.D. Fla. 2004) (holding that insurer admitted liability under the policy by making even partial payment on the insured's claim); *Marraccini v. Clarendon Nat'l Ins. Co.*, 2003 WL 22668842, at *3 (S.D. Fla. 2003) (insurer's payment establishes that insured has valid claim and acts as verdict in favor of insured).

15

62.     Such payments resolve the issue of coverage in favor of the insured and preclude an insurer from raising any coverage defenses.  *Plante*, 2004 WL 741382, at *4 ("[o]nce an insurer has made payment on a plaintiff's claims, it has waived its coverage defenses that would otherwise exist regardless whether it pays the policy limits or an amount less than that").

63.     INA's post-litigation payments of insurance proceeds with respect to the Island Runner Claim, the Mongoose Claim and the Legacy-Wilma Claim constitute a confession of judgment and a waiver of INA's coverage defenses with respect to those claims.  Consequently, INA cannot rely on coverage defenses of fraud, lack of notice and/or lack of cooperation as a bar to coverage for the Island Runner, Mongoose, and Legacy-Wilma Claims.

## IV.     THE CORPORATE PLAINTIFFS' CLAIMS

**A.   Findings of Fact Related to the Sol Claim**

64.     On September 15, 2001, the Legacy was at anchor in West Palm Beach, Florida, when the Sol collided with it.  Joint Pre-Trial Stipulation [D.E. 1273] at 11; Order on Motions for Summary Judgment [D.E. 1237] at p. 2; and Fourth Amended Complaint at ¶ 18.

65.     The 2001 Policy was in full force and effect at the time of the Sol collision and provided coverage for the Legacy's collision-related damages.  Order on Motions for Summary Judgment [D.E. 1237] at p. 2; Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5; Trial Exhibit No. 1.

**(i) INA was on Notice of the Sol Loss**

66.     The INA Policies require notice of a loss, not the filing of a formal claim, as a condition precedent to coverage under the Policies.  Trial Exhibit Nos. 1, 2, 4 & 5.

67.     The INA Policies specifically permit an insured to give notice of a loss to an "authorized agent" of INA.  Trial Exhibit Nos. 1, 2, 4 & 5.

68.     The INA Policies do not require that notice of a loss be given by any certain date. Trial Exhibit Nos. 1, 2, 4 & 5.

69.     Notice of the Sol collision was provided to INA prior to April 30, 2002 by way of verbal communications between RV Johnson and Strickland Marine.  Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 133:20-134:3.

70.     Written notice of the Sol collision was provided to INA on or around April 30, 2002, February 12, 2003, and again on March 31, 2003 by way of documents transmitted to Strickland Marine through RV Johnson.  Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 103:10-12; 104:11-12; 105:4-113:4; 140:10-141:9; Trial Exhibit Nos. 9, 10 and 12.[4]

71.     The INA Policies identify Strickland Marine Agency Inc. as the agency responsible for producing the INA Policies.  Trial Exhibit Nos. 1, 2, 4, 5 and 19.

72.     Strickland Marine was at all material times a licensed and authorized agent of INA.  Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5; Transcript of Bench Trial – Vol. 7 (May 11, 2011), George Strickland testimony (via deposition designation) at 59:23-60:4; Transcript of Bench Trial – Vol.

---

[4] Exhibit 12, dated March 31, 2003, is titled "Second Request Sol Collision With Legacy."  Attached to Exhibit 12 is Mr. Halmos' first request, sent on February 2, 2003, in which Mr. Halmos specifically requests that INA "evaluate the damages, costs of repairs, etc."  Trial Exhibit No. 12 at BM 00012. That same day, on March 31, 2003, Bill Meyers informed Mr. Halmos that he had re-faxed the information to INA and that he had called the underwriter.  *See* Trial Exhibit No. 13. On April 2, 2003, Mr. Halmos faxed his third request to Mr. Meyers, demanding that INA perform an insurance survey. In that fax transmission, Mr. Halmos states that his "waiting since 2/12/03 is intolerable."  *See* Trial Exhibit No. 18.

1 (May 3, 2011), Bill Meyers testimony at 103:22-104:3; Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 109:2-17; Trial Exhibit Nos. 1, 2, 4, 5 and 19.

73.     Although Peter Halmos provided INA with notice of the Sol collision, he did not initially submit a formal claim for the Sol collision because he was attempting to have the Sol's owner's insurance company pay for the collision-related damages.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 82:12-25; Transcript of Bench Trial – Vol. 14 (May 27, 2011), Peter Halmos testimony at 44:6-45:8.

74.     Peter Halmos submitted a formal claim for the Sol collision on or around March 31, 2003.  Trial Exhibit No. 12, 13 and 14.

75.     On May 1, 2003, Bill Meyers received an email from Vance Barker at Strickland Marine which stated that Mr. Barker had just spoken with Dave Veith ("VP claims Ace Insurance Wilmington Delaware office"), and that David Veith is going to call, Plaintiffs' former counsel, Mr. Robert J. Arnold, directly regarding the Legacy.[5]  *See* Trial Exhibit Nos. 14 and 15.

76.     INA had notice of the Sol Collision as early as April 30, 2002 and was aware of both the Sol Collision and the collision-related damages.[6] Trial Exhibit Nos. 12, 13, 14 and 15.

**(ii) INA delayed in processing and/or evaluating the Sol Claim**

77.     Despite receiving notice of the Sol collision on April 30, 2002, and notice of the formal claim on March 31, 2002, the Sol claim was still pending in August 2005.  Mr. Halmos

---

[5] While Strickland Marine and INA may have been attempting to "avoid a claim" with respect to the Sol Collision. *See* Trial Exhibit No. 14 (wherein Vance Barker states: "[w]e are all trying to avoid a claim being posted against this policy"). Plaintiffs never prohibited the filing of a formal claim.

[6] Ms. Pamela Harting-Forkey testified that "[a] claim is registered whether or not, in the discussion of the claim, the individual decides they really want to make the claim…Once a call is made, a claim is registered." Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 136:11-16.

raised this with INA on two occasions, via two separate emails: (a) the first, written on August 27, 2005, with specific reference to the fact that INA was being copied, where Mr. Halmos states: "I'm still hassling with ACE about . . . two hit-and-run collisions to Legacy in 2004 and *the 2001*." (emphasis added) *See* Trial Exhibit No. 53; and (b) the second, written on August 29, 2005, where Mr. Halmos again identifies the pending claims, one of them being "a claim filed several years ago when during a storm *S/Y Sol collided with Legacy at anchor*." *See* Trial Exhibit No. 54 (*emphasis added*). Yet, as of August 2005, no survey had been conducted with respect to the Sol Collision-related damages, and INA made no effort to respond to Mr. Halmos or to suggest that it contested his statements and claims.

78.     The Legacy's Sol collision-related damages included damage to the side gangway, the cap rail, the hull, the paint work on the hull, and damage to some of the stanchions on the vessel.  Transcript of Bench Trial – Vol. 2 (May 4, 2011), Capt. James Cooper testimony at 34:9-35:22.

79.     INA was provided with documentary evidence of the amount of the Sol collision damages on or around April 30, 2002.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 71:19-80:20; 126:19-21; Trial Exhibit Nos. 10 and 12 (documenting transmission of the Rybovich Spencer Service Proposal[7] and the Robert J. Arnold, Esq. demand letter to Strickland Marine), and 288.

---

[7] Just prior to the SOL collision, the Legacy had been repainted, varnished, and repaired for ordinary wear and tear at the Rybovich Spencer yard in West Palm Beach (about ¼ mile from the collision site) at a total cost of approximately $4 million.

Case No. 08-10084-CIV-BROWN

80.     Peter Halmos followed up his initial request to INA for a damage survey with a series of faxes between him and Bill Meyers, which is forwarded to Vance Barker; Mr. Barker communicated the request to the INA claims department.  See  Trial Exhibit 13 dated March 31, 2003.  On April 9, 2003, Bill Meyers sent a fax to Peter Halmos (Trial Exhibit 16) stating that he advised Legacy Captain Ed Collins that an INA adjuster would be calling him for the purpose of doing a damage survey on the Legacy for the Sol Damages.  Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 159:14-160:14.

81.     On April 28, 2003, Bill Meyers followed up on the April 9, 2003, email (Trial Exhibit 16) by sending another email to Vance Barker, to which Barker responded on the same date.  *See* Trial Exhibit 15.  Vance Barker stated that "Janet Thomas was the head adjuster.  I called this morning and she left the Company.  The Vice President of Claims is David Veith.  1.866.820.4203.  I'm calling him now."  The response indicated to Bill Meyers that the SOL claim and the request for a damage survey had been communicated to David Veith.

82.     On April 30, 2003, Bill Meyers sent an email to Vance Barker, to which Vance Barker responded on May 5, 2003. *See* Trial Exhibit 14.  Vance Barker acknowledged that he spoke to David Veith and that Mr. Veith would call Bob Arnold.

83.     Bill Meyers testified that the word "we" contained in the statement made by David Veith ("we are trying to avoid a claim being posted") does not include either he or IYC, that he and Peter Halmos were attempting to perfect the claim, and that neither he nor Peter Halmos had any incentive to avoid a claim. Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyer's testimony at 169:3-25.

84.     INA did not perform any post-collision survey of the Legacy until 2004; that survey was a "valuation" survey.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 103:13-17.

85.     INA never requested a proof of loss with respect to the damages related to the Sol incident, and although IYC requested that INA conduct a damage survey, INA never sent anyone to examine or document the damages specifically related to the Sol incident.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at, 126:2-14; Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyer's testimony at 174:8-22.[8]

---

[8] The above-referenced communications establish notice of the Sol Claim. INA nonetheless asserts that IYC never intended to make a claim for the Sol Collision damages. INA bases this assertion on discovery taken in two Palm Beach circuit court cases, *IYC v. Christopher A. Upham*, *et. al.,* Case No: 2003 CA 004410 AN (the "Sol Litigation"), (Trial Exhibit No. G7); and *IYC v. Spencer Boat Co.,* Case No: 50 2003 CA 009573XXONAH, (Trial Exhibit No. F7); as well as a deposition taken of Mr. Halmos in the Sol Litigation.  None of this unrelated discovery is sufficient to counter the evidence submitted by Plaintiffs establishing Plaintiffs' intent to submit the Sol Claim and INA's knowledge of same. First, the discovery taken in the Sol Litigation and introduced as evidence as Trial Exhibit No. Exhibit G7 are addressed to Peter Halmos, individually.  The interrogatory responses are not by IYC, the owner of the S/Y Legacy and the named insured. Peter Halmos, individually, has never made an insurance claim for the Sol collision. Second, as to the discovery conducted in *International Yachting Charters LTD., v. Spencer Boat Co., et. al.,* (Trial Exhibit No. F7), on its face this action does not include the Sol and is a different style than the "Sol Litigation."  There was no record evidence presented by INA establishing that this action had anything to do with the Sol Litigation. Third, while it is true that Mr. Halmos stated in his deposition in the Sol Litigation that he had not made a claim to his insurance company for the collision, Mr. Halmos did subsequently indicate that he had not made a claim *at the time* of the collision, but later did. This is consistent with Mr. Halmos' statement in Trial Exhibit No. 12 wherein Mr. Halmos informs Mr. Meyers in March of 2003 that he is making a claim "now."  *See* Trial Exhibit No. 12 at BM 00011. The Sol Collision occurred a year and three months prior to that date, during which time Mr. Halmos was keeping his insurance company informed of his actions against the S/Y Sol.  *See* Trial Exhibit Nos. 9 and 10. Mr. Halmos' intent to submit a formal claim for the Sol Collision was conveyed to INA in March 31, 2003. *See* Trial Exhibit No. 12.  Finally, there is nothing in the record to suggest that INA did or did not do anything because of those two cases.

Case No. 08-10084-CIV-BROWN

86.     INA was not prejudiced by any delay on Plaintiffs' part in submitting notice or documentary evidence of the loss because INA was provided with an opportunity to evaluate the damages and elected not to.  Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 153:19-154:6; and Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 83:21-86:6; 87:11-88:23; 96:1-12; Trial Exhibit Nos. 9 and 12 (series of faxes between Peter Halmos and RV Johnson).

87.     To date, INA has issued no payment for the Legacy's Sol collision damages. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 127:19-21.

88.     Plaintiffs' damages with regard to the Sol claim are as follows:

Estimated Direct Expenses to Repair Hull…………………….…..…$410,500.00

Actual Costs Incurred to Date………………………………..…………$69,135.00

Contingent Estimated Costs Based on Rybovich Bills and Prior Nine-Month Upgrade Expenses………………………………………….…………..$70,000.00

Other Known Costs…………………………………………………..$66,500.00

Rybovich Estimates for other Collision Damage Repairs…...…..……..$40,800.00

Estimated Removal/Repair/Replace/Paint Damaged Hydraulic Starboard Gangway Components…………………………………….…………$27,000.00

Estimated Other Direct Costs………………………………...……..$245,000.00

Total…………………………………………………….……..$928,935.00

Plaintiffs also claim:  Carrying and Replacement Costs

Direct Costs Incurred, 4 Months Down Time @ $10,000.00/day….$1,600,000.00

Estimated Cost of Providing Equal and Comparable Replacement for Owner Use @ $17,500.00/day……………………………………………....$2,135,000.00

22

Case No. 08-10084-CIV-BROWN

Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 71:19-80:20;

Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 111:5-18; 114:9-

13; Trial Exhibit Nos. 8, 10 and 288.

**B.   Conclusions of Law Related to the Sol Claim**

89.    The Sol Claim falls within the coverage grant of the 2001 Policy, and there is no

policy exclusions shown by INA to bar coverage.  Transcript of Bench Trial – Vol. 7 (May 11,

2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5.

90.    An insurer is bound by the producing agent's acts when it has clothed the agent

with the apparent authority to bind the insurer.  *Eddy v. Continental Cas. Co.*, 2011 WL 1835851

at *7 (M.D. Fla. 2011).  And, where an entity has been designated as the "producing agency" in a

policy, that entity will be deemed an insurer's agent for purposes of notification where the

agency was designated as the "producing agency."  *American Casualty Co. of Reading,*

*Pennsylvania v. Castellanos*, 203 So.2d 26 (Fla. 3rd DCA 1967).  Finding that the producing

agent which submitted the original application for the liability policy, delivered the policy,

secured amendments to the policy, and handled the renewal of the policy had apparent authority

to receive the insured's written notice of an accident and, by doing so, obligated the insurer to

defend the suit and pay any judgment against the insured for damages arising out of the accident.

91.    The record shows that INA identified Strickland Marine as the "producing agent"

of the INA Policies; that the INA Policies were issued by INA through Strickland Marine; and

that Strickland Marine accepted payment of the Policies' premiums and handled the renewals of

the Policies on behalf of INA.  Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith

testimony (via deposition designation) at 37:15-24; 38:2-5; Transcript of Bench Trial – Vol. 7

(May 11, 2011), George Strickland testimony (via deposition designation) at 59:23-60:4;

23

Transcript of Bench Trial – Vol. 1 (May 3, 2011), Bill Meyers testimony at 103:22-104:3; Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 109:2-17; Trial Exhibit Nos. 1, 2, 4, 5 and 19.  Accordingly, Strickland Marine was INA's "authorized agent" for purposes of receiving notice of Plaintiffs' Claims.

92.    Plaintiffs complied with the terms of the Policy when they submitted notice of the Sol collision to Strickland Marine on or around April 30, 2002.  Any delay in providing notice to Strickland Marine/INA had no prejudicial effect on INA's ability to investigate the claim at issue and/or inspect the damages to the Legacy.

93.    Generally, once an insurer receives notice of a loss, it has a duty to inquire and/or seek information, and its failure to do so cannot be permitted to imperil its insured.  *Cox v. American Pioneer Life Ins. Co.*, 626 So.2d 243, 246 (Fla. 5th DCA 1993) ("where an insurer is on notice that it must make further inquiries ... it is bound by what a reasonable investigation would have shown"); *see also Crown General Stores, Inc. v. Ultra Meat Market, Inc.*, 843 So.2d 287, 289 (Fla. 3rd DCA 2003) ("a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice; that it will not suffice the law to remain willfully ignorant of a thing readily ascertainable by whatever party puts him on inquiry, when the means of knowledge is at hand").  Accordingly, once INA received notice of the Sol Collision, it had a duty to investigate and adjust the loss and/or seek additional information concerning the loss.

94.    Plaintiffs complied with the cooperation provision of the Policy by providing documentary proof of the loss to INA on April 30, 2002, February 12, 2003 and March 31, 2003. Trial Exhibit Nos. 9, 10 and 12. INA never exercised its right to request a proof of loss or other documentation of the loss.  Thus, any delay in submitting documents had no prejudicial effect on

INA's ability to investigate the Claim at issue and assess Plaintiffs' damages prior to issuing payment(s).

95.    Moreover, the Record contains no proof of prejudice to INA due to any alleged non-compliance by Plaintiffs.  INA was afforded an opportunity to investigate the Claim at issue, and the Record also shows that Plaintiffs provided INA with substantial proof of its damages. Accordingly, INA's assertion of Plaintiffs' breach of the notice and/or cooperation provisions of the Policy does not relieve INA of its responsibilities under the Policy. *See Bankers Ins. Co. v. Macias*, 475 So.2d 1216, 1218 (Fla. 1985) (holding that if the insured can demonstrate that the insurer has not been prejudiced as a result of being deprived the opportunity to evaluate its rights and liabilities, then the notice condition can be avoided); *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Harris*, 197 So.2d 567, 570 (Fla. 3rd DCA 1967) (holding that where an insurer suffers no harm from its delayed ability to investigate the facts of a claim and examine the insured, the insurer has not been prejudiced; accordingly, there was no prejudice to an insurer as a result of an insured's 4-month delay in giving notice of suit because the insurer nonetheless had an opportunity defend its insured, but chose instead to decline coverage).

96.    A valid claim for breach of contract exists where a plaintiff establishes:  (1) the existence of a contract; (2) breach thereof; and (3) damages flowing from the breach.  *Hostway Services, Inc. v. HWAY FTL Acquisition Corp*, 2010 WL 3604671 (S.D. Fla. 2010); *Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters, III, Inc.,* 2010 WL 5014371 (S.D. Fla. 2010).

97.    The facts on record establish:  (1) that the 2001 Policy was a valid and legally enforceable contract and that it provided coverage for the claim and damages at issue; (2) INA breached the Policy by failing to pay or reimburse Plaintiffs for any of the collision-related damages within the time provided for under the Policy; and (3) Plaintiffs have been damaged by

INA's breach of the Policy because they have expended money and rendered services to repair the Legacy without being reimbursed for the full amount of those expenditures as required by the terms of the Policy.  Accordingly, judgment should be entered in favor of Plaintiffs on Count 1 of the Fourth Amended Complaint.

98.     Plaintiffs' damages with regard to the Sol Claim total $1,253,332.89. Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 111:5-18; 114:9-13; Trial Exhibit Nos. 8, 10 and 288.

99.     Under a breach of contract claim, the policyholder bears the burden of establishing its actual damages or expenditures within a reasonable degree of certainty; the insurer bears the burden of establishing that the damages are unreasonable or unnecessary. *Centex-Rooney Constr. Co., Inc. v. Martin County*, 706 So.2d 20, 27 (Fla. 4th DCA 1997); *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98, 100 (Fla. 5th DCA 1980).

100.     The Record shows that INA has not established that Plaintiffs' claimed damages are unreasonable or unnecessary.

**C.   Findings of Fact Related to the Island Runner Claim**

101.     On or about July 28, 2003, the Island Runner was lost at sea while being towed behind the Legacy in inclement weather.  Joint Pre-Trial Stipulation [D.E. 1273] at 11; and Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 134:23-135:6.

102.     The 2002 Policy was in full force and effect at the time the Island Runner was lost and provided coverage for the Island Runner's property loss and salvage costs.  Order on Motions for Summary Judgment [D.E. 1237] at p. 2; Transcript of Bench Trial – Vol. 7 (May 11,

2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5; Trial Exhibit No. 2.

103.    Written notice of the loss of the Island Runner was provided to INA on or around February 24, 2004 by way of documents transmitted to Strickland Marine through RV Johnson.[9] Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 135:4-6; 136:209 and 155:25-156:2; Trial Exhibit No. 266 (Property Loss Notice dated February 24, 2006).

104.    Plaintiffs did not submit a notice of loss initially because they did not know what had happened to the Island Runner.  Once the Island Runner was located, Plaintiffs submitted the notice of loss.  Transcript of Bench Trial – Vol. 105 (May 18, 2011), Peter Halmos testimony at 9:25-10:2.

105.    The 2002 Policy provided coverage for property damage to the Island Runner in the amount of $88,940[10] and coverage for salvage costs in the amount of $14,000,000.  Trial Exhibit Nos. 2 and I9.

106.    INA did not engage a surveyor to inspect the Island Runner until May 2, 2005, fifteen months after its receipt of the notice of loss. Transcript of Bench Trial – Vol. 18 (June 3, 2011), Stewart Hutcheson testimony at 27:5; Trial Exhibit No. I9.

107.    The Island Runner was deemed to be a "constructive total loss" by INA's surveyor of choice, Stewart Hutcheson.  Transcript of Bench Trial – Vol. 18 (June 3, 2011), Stewart Hutcheson testimony at 23:14-18; 40:1-4.

---

[9] Plaintiffs did not submit a notice of loss initially because they did not know what had happened to the Island Runner. Once the Island Runner was located, Plaintiffs submitted the notice of loss. Transcript of Bench Trial – Vol. 105 (May 18, 2011), Peter Halmos testimony at 9:25-10:2.

[10] The property damage coverage limit was initially and incorrectly recorded as $14,000. The coverage amount was later corrected to reflect the $88,940 value of the vessel.

108.   INA nonetheless delayed in the processing of Plaintiffs' claim related to the Island Runner. Trial Exhibit No. 52.

109.   Plaintiffs submitted documentary evidence of the Island Runner's salvage costs. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 138:7-14; 177:21-178:1; Trial Exhibit Nos. 260, 48 and 65.

110.   On July 3, 2006, INA paid what it purported to be the policy limits for the Island Runner's property damage,[11] but did not issue payment for the Island Runner's salvage costs. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 151:1-2; 156:8-14.

111.   The Island Runner's salvage costs totaled $64,531.17.  Trial Exhibit No. 260.

112.   On October 26, 2009, more than five years after its receipt of the notice of loss and four years after its surveyor's report, INA issued payment in the amount of $5,400.00 to IYC for partial payment of salvage costs related to the Island Runner Claim.  Trial Exhibit No. 256.

113.   Of the Island Runner's salvage costs, $59,131.17 remain unpaid to date. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 151:10-16.

**D.   Conclusions of Law Related to the Island Runner Claim**

114.   The Island Runner Claim falls within the coverage grant of the 2002 Policy and INA has raised no Policy exclusions which apply as a bar to coverage for Plaintiffs' Claim. Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5.

115.   Any coverage defenses raised by INA have been waived by virtue of INA's post-litigation partial payment of the Island Runner's salvage costs, which operate as a confession of

---

[11] Pursuant to the Policy, the property damage payment should have been equal to the Island Runner's actual cash value.

liability.[12] Trial Exhibit No. 256; *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So.2d 217, 218 (Fla. 1983); *Saewitz v. Lexington Ins. Co.*, 133 Fed. Appx. 695, 699 (11th Cir. 2005); *Plante v. USF&G Specialty Ins. Co.*, 2004 WL 741382, at \*4-5 (S.D. Fla. 2004); *Marraccini v. Clarendon Nat'l Ins. Co.*, 2003 WL 22668842, at \*3 (S.D. Fla. 2003).

116.    INA was not prejudiced by any delay on Plaintiff's part in submitting notice or documentary evidence of the claim because it was afforded an opportunity to evaluate the claim prior to issuing any payment. *Bankers Ins. Co. v. Macias,* 475 So.2d 1216, 1218 (Fla. 1985); *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Harris,* 197 So.2d 567, 570 (Fla. 3rd DCA 1967)

117.    A valid claim for breach of contract exists where a plaintiff establishes:  (1) the existence of a contract; (2) breach thereof; and (3) damages flowing from the breach.  *Hostway Services, Inc. v. HWAY FTL Acquisition Corp*, 2010 WL 3604671 (S.D. Fla. 2010); *Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters, III, Inc.,* 2010 WL 5014371 (S.D. Fla. 2010).

118.    The facts on record establish:  (1) the 2002 Policy was a valid and legally enforceable contract and that it provided coverage for the claim and damages at issue; (2) INA breached the Policy by failing to pay or reimburse Plaintiffs for the covered damages within the time provided for under the Policy; and (3) Plaintiffs have been damaged by INA's breach of the Policy because they have expended money and rendered services to repair the Legacy without being reimbursed for the full amount of those expenditures as required by the terms of the Policy. Accordingly, judgment should be entered in favor of Plaintiffs on Count 2 of the Fourth Amended Complaint.

---

[12] INA was not prejudiced by any delay on Plaintiffs' part in submitting notice or documentary evidence of the claim because it was afforded an opportunity to evaluate the claim prior to issuing any payment. *Bankers Ins. Co. v. Macias*, 475 So.2d 1216, 1218 (Fla. 1985); *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Harris*, 197 So.2d 567, 570 (Fla. 3rd DCA 1967).

Case No. 08-10084-CIV-BROWN

119.    Plaintiffs' remaining covered damages with regard to the Island Runner Claim total $59,131.17.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 151:10-16.

120.    Under a breach of contract claim, the policyholder party bears the burden of establishing its actual damages or expenditures within a reasonable degree of certainty; the insurer bears the burden of establishing that the damages are unreasonable or unnecessary. *Centex-Rooney Constr. Co., Inc. v. Martin County*, 706 So.2d 20, 27 (Fla. 4th DCA 1997); *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98, 100 (Fla. 5th DCA 1980).

121.    INA has set forth no evidence establishing that Plaintiffs' claimed damages are unreasonable or unnecessary.

**E.  Findings of Fact Related to the Mongoose Claim**

122.    In August and October of 2005, the Mongoose suffered damages as a result of Hurricanes Katrina and Wilma.  Joint Pre-Trial Stipulation [D.E. 1273] at 11.

123.    The 2004 Policy was in full force and effect at the time of the hurricanes, and provided coverage for the Mongoose's hurricane-related damages.   Order on Motions for Summary Judgment [D.E. 1237] at p. 2; Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5; Trial Exhibit No. 4 and 102.

124.    INA received timely notice of the Mongoose claim and acknowledged the claim submitted by HPC.  Joint Pre-Trial Stipulation [D.E. 1273] at 11.

125.    The 2004 Policy provided coverage for property damage to the Mongoose in the amount of $660,000.00 and a like amount for salvage costs.

126.    The parties agreed that HPC would be paid its reasonable expenses to protect the Mongoose from further damage, which monies would be in addition to the compensation due under the Policy.  Trial Exhibit No. 102 at ¶12.

127.    Plaintiffs submitted documentary evidence of the Mongoose's salvage costs to INA.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 163:1-5; 166:20-22; Trial Exhibit No. 286.

128.    INA inspected the Mongoose with its own surveyor and produced its own repair estimate(s). Transcript of Bench Trial – Vol. 16 (June 1, 2011), Pamela Harting-Forkey testimony at 65:3-10; 66:17-22.

129.    The Mongoose's salvage costs totaled $86,569.43.  Trial Exhibit No. 286A.

130.    INA tendered payment in the amount of $592.18 for the Mongoose's salvage costs on or around May 11, 2010 (after suit was filed).  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 169:17-170:4.  Trial Exhibit No. 256.

131.    Of the Mongoose's salvage costs, $85,977.25 remain unpaid to date.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 169:17-170:4; Trial Exhibit Nos. 286A and 256.

**F.   Conclusions of Law Related to the Mongoose Claim**

132.    The Mongoose Claim falls within the coverage grant of the 2004 Policy, and there are no policy exclusions shown by INA to bar coverage for Plaintiffs' Claim.  Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5.

133.    Any coverage defenses raised by INA have been waived by virtue of INA's post-litigation partial payment of the Mongoose's salvage costs, which operates as a confession of

liability.  Trial Exhibit No. 256; *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So.2d 217, 218 (Fla. 1983); *Saewitz v. Lexington Ins. Co.*, 133 Fed. Appx. 695, 699 (11th Cir. 2005); *Plante v. USF&G Specialty Ins. Co.*, 2004 WL 741382, at *4-5 (S.D. Fla. 2004); *Marraccini v. Clarendon Nat'l Ins. Co*., 2003 WL 22668842, at *3 (S.D. Fla. 2003).

134.    A valid claim for breach of contract exists where a plaintiff establishes:  (1) the existence of a contract; (2) breach thereof; and (3) damages flowing from the breach.  *Hostway Services, Inc. v. HWAY FTL Acquisition Corp*, 2010 WL 3604671 (S.D. Fla. 2010); *Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters, III, Inc.,* 2010 WL 5014371 (S.D. Fla. 2010).

135.    The facts on record establish:  (1) that the 2004 Policy was a valid and legally enforceable contract, and that it provided coverage for the claim and damages at issue; (2) INA breached the Policy by failing to pay or reimburse Plaintiffs for the covered damages within the time provided for under the Policy; and (3) Plaintiffs have been damaged by INA's breach of the Policy because they have expended money and rendered services to repair the Mongoose without being reimbursed for the full amount of those expenditures as required by the terms of the Policy. Accordingly, judgment should be entered in favor of Plaintiffs on Count 4 of the Fourth Amended Complaint.

136.    Plaintiffs' remaining covered damages with regard to the Mongoose Claim total $85,977.25.  Trial Exhibit Nos. 286A and 256; Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 169:17-170:4.

137.    Under a breach of contract claim, the policyholder bears the burden of establishing its actual damages or expenditures within a reasonable degree of certainty; the insurer bears the burden of establishing that the damages are unreasonable or unnecessary. *Centex-Rooney Constr. Co., Inc. v. Martin County*, 706 So.2d 20, 27 (Fla. 4th DCA 1997);

Case No. 08-10084-CIV-BROWN

*Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98, 100 (Fla. 5th DCA 1980).

138.   INA has set forth no evidence establishing that Plaintiffs' claimed damages are unreasonable or unnecessary.

**G.   Findings of Fact Related to the Legacy-Wilma Claim**

139.   On or about October 23, 2005, the Legacy was severely damaged as a result of Hurricane Wilma when the Hurricane caused the Legacy to be grounded in an environmental sanctuary.  Joint Pre-Trial Stipulation [D.E. 1273] at 11.

140.   The 2005 Policy was in full force and effect at the time of Hurricane Wilma and provided coverage for the Legacy's hurricane-related damages.  Order on Motions for Summary Judgment [D.E. 1237] at p. 3; Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5; 42:8-43:14; Trial Exhibit No. 5.

141.   INA received timely notice of the Legacy-Wilma claim and acknowledged the claim submitted by IYC.  Joint Pre-Trial Stipulation [D.E. 1273] at 11.

142.

**(i) INA Made Representations That Plaintiffs Were Entitled to Rely On and Did Rely On**

143.   The Policy provides that IYC's reasonable expenses to protect the Legacy from further damage would be reimbursed, and that such reimbursement would be in addition to the property damage coverage due under the Policy.  Trial Exhibit No. 102 at ¶ 12.

144.   The parties also agreed that reasonable costs and expenses, including those of IYC's surveyors, project manager, experts, representatives of Perini Navi and counsel, would be reimbursed.  Trial Exhibit No. 102 at ¶ 3.

Case No. 08-10084-CIV-BROWN

145.    INA represented to Peter Halmos that the salvage operation would conclude when the Legacy reached the repair shipyard of his choice.  Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 125:14-19.  Trial Exhibit No. 374.

146.    INA also represented to Plaintiffs that: "[w]hen a boat is no longer navigable by its own power, it is considered a salvage operation." Trial Exhibit No. 291.

147.    INA further represented that: "[i]n maritime law there is no simple tow … when taken into consideration the sea grass and environmental issues, the simple tow becomes a salvage operation." Trial Exhibit No. 309.

148.    Accordingly, INA represented to Plaintiffs that the towing of the Legacy qualified as a "salvage operation" for purposes of the Policy. Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 125:14-19.  Trial Exhibit Nos. 374, 291 and 309.

149.    During the removal process, Peter Halmos was instructed by INA not to abandon the Legacy and to take all steps necessary to protect the vessel and to mitigate damages to the vessel and to the environment.  Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 18:17-21; Trial Exhibit No. G-12, 74 and 276.

150.    Pamela Harting-Forkey told Peter Halmos that if he remained on the Legacy, then there would be "[n]o recriminations" and "[n]o Monday morning quarterbacking," (Trial Exhibit No. 499 at PH-IYC-HPC 032371), but if he wanted out of the "salvage loop" he would relinquish control and rights and position himself for possible recriminations. *Id.*  Transcript of Bench Trial – Vol. 14 (May 27, 2011), Peter Halmos testimony at 13:14-14:22; 17:17-18:9.

151.    Peter Halmos and IYC were entitled to rely on the representations made by INA and its representatives.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos

34

testimony at 100:25-101:1; and Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 47:10-48:9.

152.    Peter Halmos followed INA's instructions and remained on the Legacy and/or Aqua Village during the removal process, and took all necessary and reasonable steps to protect the Legacy and the environment from further damage.  Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 19:4-5; 20:3-24; 90:4-10.

153.    INA was kept continuously informed as to the services being performed and costs being incurred by Plaintiffs throughout the extraction process.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 175:25-176:9; 177:10-15; Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 68:24-69:6; Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 90:25-92:3.

154.    INA either implicitly or explicitly authorized or approved of, and/or expressly directed or encouraged Plaintiffs' removal and mitigation efforts, including expenses incurred for same.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 56:21-57:3; 58:24-59:9.

155.    On several occasions throughout the removal process, representatives of INA commended Plaintiffs on their removal efforts, the services they were providing, and the measures they undertook to mitigate losses, which served both their and INA's purposes and benefits.  Trial Exhibit Nos. 83, 88, 170, 174, 181, 186, 207.

**(ii) Plaintiffs Are Entitled to Reimbursement of Their Salvage and Removal Costs**

156.    Peter Halmos advanced millions of dollars of his own monies for expenses incurred for the removal and salvage of the Legacy out of his own pocket with the understanding that he would be reimbursed for same.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter

Case No. 08-10084-CIV-BROWN

Halmos testimony at 177:13-18; Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 29:2-13; 44:19-45:2; 63:25-64:2; Trial Exhibit No. 157 and 178.

157.    Plaintiffs incurred Hurricane Wilma removal and salvage costs totaling $12,574,151.78.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 42:17-18; Trial Exhibit No. 289.

158.    Plaintiffs submitted documentary evidence of the Legacy's damages to INA and provided INA with further backup of same.[13]  Transcript of Bench Trial – Vol. 2 (May 4, 2011), Gail Meyers testimony at 146:5-147:13; 151:19-152:4; Transcript of Bench Trial – Vol. 3 (May 5, 2011), Lisa Feagans testimony at 7:22-8:25; 9:2-9; 9:15-10:15; 10:9-11:5; 11:6-17; Trial Exhibit Nos. 255 and 289.

159.    The out-of-pocket expenses incurred by Plaintiffs were both reasonable and necessary to remove the Legacy from the sanctuary and into a ship yard that was competent to make the repairs.[14]  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 42:23-25; 58:14-17; 60:20-61:5.

160.    INA issued payments for some of the Legacy's removal and salvage costs, but a substantial portion remains unpaid.[15]  Trial Exhibit No. 256.

---

[13] Plaintiffs also made the Legacy available for inspection and rendered its accountants available for INA's benefit.

[14] Courts have generally held that proof of paid bills serves as *prima facie* evidence of the "reasonable value and necessity of such services."  *Gonzalez v. CNLD Corp.*, 437 N.Y.S.2d 910, 911 (N.Y. Civ. Ct. 1981) (rule applies to attorney's fees).  INA has set forth no guidelines, billing format or approved rate regarding its insureds' incurrence of defense costs and fees.

[15] Mr. Smith testified: (a) the Policy does not define "salvage chartes;" (b) he does not know exactly what "salvage charges" are; (c) his definition of "salvage charges" is rescuing a vessel from imminent peril.  If Legacy was in imminent peril hard aground on October 24, 2005, is there any doubt Legacy continued in imminent peril once afloat after being aground for 2½ years and being dragged over a mile through 10-feet deep sand?

161.   For example, included in Plaintiffs' removal and salvage costs are the legal fees expended by Plaintiffs with respect to the negotiation, procurement and performance of the NOAA Agreements.  Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 164:24-165:4; Trial Exhibit No. 255.

162.   Plaintiffs submitted bills to INA showing that they had paid the Pillsbury law firm for services rendered with regard to the NOAA Agreement.  Transcript of Bench Trial – Vol. 17 (June 2, 2011), Pamela Harting-Forkey testimony at 15:23-16:1; Trial Exhibit No. G-17.

163.   Pamela Harting-Forkey received the Pillsbury law firm bills on November 3, 2007.  Transcript of Bench Trial – Vol. 17 (June 2, 2011), Pamela Harting-Forkey testimony at 14:2-4; 20:17-19; Trial Exhibit Nos. G-17 and I-3.

164.   Pamela Harting-Forkey obtained permission from INA's management to advance Plaintiffs half ($557,070.66) of the bills for the services of the Pillsbury law firm.  Transcript of Bench Trial – Vol. 17 (June 2, 2011), Pamela Harting-Forkey testimony at 17:6-11; 23:6-24:3; Trial Exhibit Nos. M17 and 256.

165.   Approximately half of the legal expenses that Plaintiffs incurred with respect to the negotiation and performance of the NOAA Agreement remains unpaid. Transcript of Bench Trial – Vol. 17 (June 2, 2011), Pamela Harting-Forkey testimony at 17:6-11; 23:6-24:3.

166.   Several of the payments that were eventually tendered by INA were nonetheless in breach of the Policy's terms, due to INA's delay in issuing payment. For example:

(1) *The Toyo Pump*: On June 27, 2007, Mr. Halmos requested permission from Pamela Harting-Forkey for the purchase of a Toyo Pump. *See* Trial Exhibit No. 185. Ms. Harting-Forkey approved the purchase stating "[a]gree on pump absolutely -- you are so very wise." *Id.* at INA 000003491. The Toyo Pump was critical for the Legacy's

removal.  *See* Trial Exhibit Nos. 406 and 295.  Mr. Halmos, on that same day, forwarded the invoice to Ms. Harting-Forkey, along with the backup, and once again requested permission.  *Id.* at INA 000002521.  Once again, Ms. Harting-Forkey agreed.  *Id.* On February 10, 2009, in response to INA's inquiry and accusations that the Toyo Pump should have been rented rather than purchased (although its purchase was approved two years earlier), Mr. Halmos informed INA that he would be submitting the rental value (per day) of the Toyo Pump for its use.  *See* Trial Exhibit No. 233 at Control 002292. Without explanation, INA continued to delay payment.  Over a year later, on March 2, 2010, Mr. Halmos once again provided backup for the Toyo Pump, attaching the rental agreement from the pump's supplier at the time the pump was purchased in 2007, and a calculation of the amount owed by multiplying the rental amount/day for the amount of days the Toyo Pump was used.  *See* Trial Exhibit No. S15 at 3 and Exhibit D thereto. INA finally paid the Toyo Pump purchase price (not the rental value they had been demanding) in July 2010.[16]

(2) *The Fuel For The Legacy*: On March 30, 2006, Mr. Halmos informed Michael Pennekamp and INA that just prior to Wilma, the Legacy's tanks had been topped-off with 9,500 gallons of fuel.  *See* Trial Exhibit No. 368 and 336.  Mr. Halmos identified the actual fuel burn rate to cover the salvage and protection against loss operations *Id.* at INA 000030412.  On May 11, 2006, the majority of the fuel had been used and the

---

[16] Judgment based on INA's confession of coverage is proper on this item.  *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So.2d 217, 218 (Fla. 1983); *Saewitz v. Lexington Ins. Co.*, 133 Fed. Appx. 695, 699 (11th Cir. 2005); *Plante v. USF&G Specialty Ins. Co.*, 2004 WL 741382, at *4-5 (S.D. Fla. 2004); *Marraccini v. Clarendon Nat'l Ins. Co*., 2003 WL 22668842, at *3 (S.D. Fla. 2003).

Legacy was, according to INA representatives, "running on fumes." *See* Trial Exhibit No. 372. The fuel, according to INA, was needed to "power the vessel's essential machinery pending relocation." *Id.* at PH-IYC-HPC 066489. Despite knowledge of the amount of fuel and the use of the fuel, INA did not tender payment for the fuel until July, 2010.

(3) *Porsche, Dodge Pick-Up and Motorhome*: With respect to the Porsche, Dodge Pick-Up and Motorhome, no insurance proceeds were tendered by INA despite INA's knowledge and approval of their use. *See* Trial Exhibit No. 289.   While there were some allegations by INA of Mr. Halmos driving an exotic two seater sports car for these activities, it became clear that the Porsche in question was an SUV, and that Ms. Harting-Forkey had travelled in it when in Key West.  INA demanded that the items' rental value, instead of the purchase price, would be the reasonable method of calculating what was owed. *See* Trial Exhibit No. 233.  Mr. Halmos complied and provided the information. On March 2, 2010, the items had yet to be paid, and Mr. Halmos again provided the explanation of the usage of each items for salvage and calculated the rental amount as: (a) the fair market monthly rental value, plus insurance from an unrelated third party, for a heavy-duty pick-up truck as the rental equivalent for the Dodge pick-up and the Porsche (*See* Trial Exhibit No. 289); and (b) the fair market monthly rental value plus insurance of a similar motorcoach only for the months of August through October. *See* Trial Exhibit No. S15.  These items remain unpaid. *See* Trial Exhibit No. 289.

167.    INA "was comfortable denying the reimbursement claims" based on its hope of the future discussion of what would be reasonable and necessary.  Trial Exhibit No. 229 at INA 000232406.  But "the motor home was purchased shortly after Wilma, as there was little housing

available…"[17]  INA's decision was based upon "what you can get for this" and what "it was purchased for,"[18] as opposed to what was reasonable under the circumstances, or what had actually been agreed upon and/or ratified prior to and during the use of the vehicles.  INA further stated that it would "advise Mr. Halmos that he as an obligation to sell these assets and mitigate his loss if he intends to keep them in his claim."  *Id.* at INA 000232406.  Mr. Halmos must do this "until/if we agree to cover as per our prior agreement."  *Id.* at INA 000232405.[19]

168.    Of the Legacy-Wilma removal and salvage costs, $2,823,111.17 remains unpaid to date.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 42:15-22. Trial Exhibit No. 289.

**(iv) Plaintiffs Are Entitled to Liability Coverage, in Addition to Salvage Coverage, With Regard to Payments Made Pursuant to the NOAA Agreements**[20]

169.    The IYC NOAA Agreement, entered into by IYC on January 5, 2007, and consented to by INA, held IYC liable for the creation and replenishing of a fund to pay for the extraction of the Legacy from the Sanctuary and the relocation of the Legacy to Open Waters.

---

[17] *Id.* at INA000232404.

[18] *Id*.

[19] At trial, INA pointed out in its directed verdict motion that it would be impossible for the Court to decipher the receipts and what was due and owed to Plaintiffs.  It should be noted that it was INA's duty to adjust the claim. They failed in that regard, and the penalty for such failure should not fall on the insured. Plaintiffs submitted thousands of emails to INA detailing daily activities, purchases and services. INA's employees, agents, and lawyers (i.e., Pamela Harting-Forkey, Joseph Smith, Ron Milardo, Michael Pennekamp, among others) made numerous and routine on-site inspections; had full access to, and routinely communicated with, Plaintiffs' accountants; and directly and routinely communicated with Plaintiffs' lawyers regarding such activities, purchases and services.

[20] There are two NOAA Agreements, both dated January 5, 2007. The first is an Agreement between NOAA and IYC, Legacy, her tenders, and its owners, among others, but excluding Peter Halmos in his non-corporate individual capacity (the "IYC NOAA Agreement") (Trial Exhibit No. 166). The second is the Agreement between NOAA and Peter Halmos and Affiliates, among others, but excluding Peter Halmos in his capacity as owner of IYC, among others (the "Peter Halmos NOAA Agreement") (Trial Exhibit No. 167).

Case No. 08-10084-CIV-BROWN

170.    Section 4.3 of the IYC NOAA Agreement provides in relevant part:

…Within approximately four business days of execution by IYC and NOAA of this AGREEMENT, IYC will deposit Seven Hundred Fifty Thousand Dollars ($750,000.00) in cash, in escrow to cover estimated costs under the contract with Fas Dam with authorization for the Escrow Agent to pay Fas Dam, or other salvors as set forth in this paragraph, pursuant to the contract between Fas Dam and IYC, attached as Exhibit "A". or pursuant to a contract between other salvors and IYC…Until the termination of the escrow account in accordance with this paragraph, should the balance in the escrow account reach Two Hundred Thousand Dollars ($200,000.00) or below, IYC shall deposit sufficient funds in escrow to bring the balance back up to Seven Hundred Fifty Thousand Dollars ($750,000.00). Additionally, on the first day of each month after the escrow account is established, if the escrow account balance is below Seven Hundred Fifty Thousand Dollars ($750,000.00), IYC shall deposit sufficient funds in escrow to bring the balance of thee escrow account back up to Seven Hundred Fifty Thousand Dollars ($750,000.00)…

Trial Exhibit No. 166 at p. 5-6.

171.    Section 7.9 of the IYC NOAA Agreement provides in relevant part:

NOAA represents, warrants and stipulates that IYC is not directly or indirectly liable for any GOVERNMENTAL CLAIMS, or any damages or injuries as more comprehensively described herein…with the sole and exclusive exception being for IYC to reasonably enter into and pay for salvage charges incurred pursuant to such salvage charges contracts sufficient to remove *S/Y Legacy* to Open Water…

Trial Exhibit No. 166 at p. 11.

172.    The IYC NOAA Agreement also required IYC to obtain separate insurance coverage in the amount of $2,000,000 beyond all amounts reimbursed by INA. Section 4.11 of the IYC NOAA Agreement provides in relevant part:

IYC aggress to pay for insurance coverage up to a policy limit of $2,000,000 per occurrence, $3,000,000 aggregate, at a cost not to exceed $25,000, to be obtained by Fas Dam if reasonably attainable for the Exhibit "A" salvage/recovery/removal operations covering catastrophic damages to SANTUARY natural resources that may be caused by said operations, and will have NOAA as a beneficiary in said insurance contract.

Trial Exhibit No. 166 at p. 8.

41

Case No. 08-10084-CIV-BROWN

173.    Pursuant to the Agreement, IYC was also obligated to pay all of its expenses relating to the "investigation, negotiation, execution, and performance of the Agreement and the Subject Matter[21] of this Agreement, including the fees and expenses of its own financial, legal, technical, and tax advisors." Trial Exhibit No. 166 at p. 13.

174.    Pursuant to the Agreement, IYC was further required to release valuable claims against the NOAA; to comply with the Agreement; to remain subject to damages, injuries, and other relief "including reasonable attorney's fees and costs including but not limited to experts, researchers, consultants, investigators, and advisors through all available appeal," for any breach (Trial Exhibit No. 166 at p. 9); and pursuant to the Agreement, IYC continues to be liable for such stipulations, representations, obligations, and warranties contained in the Agreement, which explicitly "survive the execution and performance of [the] Agreement." Trial Exhibit No. 166 at 13.

175.    Section 6 of the IYC NOAA Agreement provides in relevant part:

…NOAA and IYC will cooperate in all respects to effectuate the purposes and performances specified in this Agreement.

Trial Exhibit No. 166 at p. 9.

176.    INA admits that Plaintiffs have continuously asserted claims for liability coverage under the Policy.[22]

_____

[21] The "Subject Matter" is defined as the grounding of S/Y Legacy in the Sanctuary on or about October 24, 2005; the time S/Y Legacy has remained grounded there; and the "salvage/recovery/removal operations to remove S/Y Legacy from the Sanctuary" to get Legacy to "Open Water."

[22] *See e.g.,* Transcript of Bench Trial – Vol. 1 (May 3, 2011), Opening Argument of Mr. DeMahy.

Case No. 08-10084-CIV-BROWN

177.    The express terms of the "Part B: Liability Coverage" provision only requires an obligation to trigger liability coverage under the Policy, not a "claim or suit," as INA has mistakenly led the Court to believe.[23] *Id.*

178.    The only predicate for Part B: Liability coverage is found in the Assistance and Cooperation provision of the Policy, which states in relevant part:

> Any person making a claim must:…(f) not assume any obligation or admit any fault or liability that you or we may be liable for without first obtaining our written consent.

Trial Exhibit No. 5 at p. 10.

179.    Any and all sums paid by IYC pursuant to the NOAA Agreement arose from the "ownership, operation or maintenance" of the Legacy because of the attempted and actual removal of the Legacy from where it was grounded in the Sanctuary and the prevention of further loss or damage to property. Accordingly, the 2005 Policy's liability coverage was triggered from the date of the Agreement (January 5, 2007) through the date of June 17, 2010, when Legacy was removed to Open Water.

180.    IYC has paid and incurred far more than its $2 million NOAA Agreement obligation beyond the amount reimbursed by INA, including, for expenses relating to the investigation, negotiation, execution, and performance of the NOAA Agreement and its Subject Matter, the amount of $11,308,513.00 (excluding the period from November 1, 2008 to June 17, 2010) not fully recovered by IYC. *See* Trial Exhibit Nos. 166, 167, A-4. Z-19, 289, 289-B, 255, 255 parts 2 and 3. Of this amount, $3,973,427.00 (s*ee* Trial Exhibit No. Z-19) is abated to the

---

[23] The Policy only requires a "claim or suit" for the separate and additional "cost of defense" coverage under the "Claim or Suit Against You" coverage provision. Trial Exhibit No. 5 at p. 10.

separate bad faith case against INA pursuant to the Court's Order (D.E. 1221). The outstanding balance in this case under Part B: Liability Coverage of $7,335,086 (excluding the period from November 1, 2008 to June 17, 2010):

> (a)   In addition, performance of the NOAA Agreement remediations of the "Rotation Area" at from $6,000,000. *See* Trial Exhibit Nos. 166, 167, A-4, 289, 289-B, 255, 255 parts 2 and 3.

**(v) Plaintiffs Had Continuing Obligations Pursuant to the NOAA Agreements**

181.   Performance of the NOAA Agreements, *i.e.* the remediation of the "rotation area" at Legacy's grounding site, is an incomplete and continuing obligation which Plaintiffs continue to be liable for. Trial Exhibit No. 8.

182.   On December 23, 2008, the U.S. Department of Commerce completed a "Legacy vessel post recovery injury assessment report" ("NOAA Damage Report") (Trial Exhibit No. 452) for "damages, losses, compensation, injuries, response costs, remediation, restoration, loss of use and/or ecological and other services flow, monitoring, repair evaluation," among others, pursuant to "16 U.S.C. § 1431, 1432, 1437, 1443; Florida Keys National Marine Sanctuary and Protection Act (104 Stat. 3089 and 15 C.F.R. Part 922)" among others, (Trial Exhibit No. 166 at § 1.8).

183.   The NOAA Damage Report identified the "Vessel Owner" as "International Yachting Charters, Inc. (c/o Peter Halmos)" and the "Seagrass Habitat Impacted" being 41,217.29 square meters (49,295.47 square yards). *Id.*

184.   In 2009, NOAA and the Florida Department of Environmental Protection jointly prepared a draft Legacy Restoration Plan ("Restoration Plan") (Trial Exhibit No. 321) in connection with the October 28, 2005 "Arrest" at "1600 hours" of "Christopher Edward

Collins," Legacy's captain, for "Vessel Ops/Damaging Resources Seagrass" in violation of 15 L.F.R. 922163 (a)(5)(j) (Trial Exhibit No. 80).

185.    The Restoration Plan described a three-year restoration, monitoring, oversight schedule for "primary restoration at the actual grounding site" and "compensatory restoration to compensate the public for ecological services cost during the time it takes the seagrass injury to recover to baseline conditions" based upon "recovered damages" pursuant to 16 U.S.C. § 1443 (d)(2)(A), (B) and (C).

186.    Attached to the Restoration Plan is a copy of the unexecuted NOAA "Permit Number: FKNMS-2006-074" dated July 29, 2006, that NOAA attempted to coerce Peter Halmos and IYC into signing after having authorized Fas Dam to mobilize to Key West (*See* Transcript of Bench Trial – Vol. 9 (May 17, 2011), at pp. 72-73). Had Peter Halmos and IYC signed NOAA's July 29, 2006 Permit, IYC would have been liable – having waived all objection and rights – for the full cost of the Restoration Plan. Peter Halmos and IYC refused to sign NOAA's July 29, 2006 Permit (*See* Transcript of Bench Trial – Vol. 9 (May 17, 2011), at p. 73).

187.    Rather than having to restore 41,217.29 square meters of seagrass habitat, the NOAA Agreement obligated IYC to "remediate the damage to the extreme east hole where Legacy's hull ran aground and where she was rotated. *See* Trial Exhibit No. 8; *see also* Transcript of Bench Trial – Vol. 9 (May 17, 2011), at p. 79:15-23.

188.    The Rotation Area encompasses 38,000 square feet (*see* Transcript of Bench Trial – Vol. 9 (May 17, 2011), at p. 84:18-19), or 3,900 square meters (*see* Transcript of Bench Trial – Vol. 9 (May 17, 2011), at p. 90:22-25), which is 9.5% of the damage area calculated in NOAA's Habitat Equivalency Analysis.

45

189.    Despite NOAA's general release of IYC and the benefit of having IYC's release of NOAA, on August 29, 2009, NOAA completed a Habitat Equivalency Analysis (*see* Trial Exhibit No. 324), at a cost of $130,227.41, which calculated the dollar amount necessary to complete the three-year Restoration Plan based upon the NOAA Damage Report.

190.    The Habitat Equivalency Analysis calculated the NRDA Claim against IYC using the NRDA claim asserted in 2009 against the owner of a 41-foot Sea Ray cabin cruiser, also grounded by Hurricane Wilma in 2005, at Long Key, Florida. The Sea Ray NRDA claim was brought jointly by NOAA and the State of Florida in the amount of $7,937,442.83 to restore a total area of 372.65 square meters. *See* Trial Exhibit No. 324. In comparison, the Legacy Restoration Plan total restoration area is 41,217.29 square meters. *See* Trial Exhibit No. 452.

191.    NOAA's Habitat Equivalency Analysis calculated the "recovered damages" against IYC for "Response and Damage Assessment; Primary Restoration and Oversight; and, Compensatory Restoration, Monitoring and Oversight," in the amount of $875,578,891.47. *See* Trial Exhibit No. 324. Accordingly, the Restoration Plan claim that NOAA and the State of Florida prepared against IYC, on August 29, 2009, is for approximately $875.5 million, or $21,243 per square meter of "Seagrass Habitat Impacted." *See* Trial Exhibit Nos. 324, 452, 321.

192.    Because of the due care that Plaintiffs used in managing the Legacy "recovery/removal/salvage" operation to get Legacy to Open Water pursuant to the NOAA Agreements, including the purchase of the Toyo Pump and re-depositing the pumped sea bottom ahead of Legacy immediately behind to fill the removal path, the amount of uncompleted remediation for which Plaintiffs, and thus INA, are liable is comparatively minimal to NOAA's $84 million "Habitat Equivalency Analysis." *See* Transcript of Bench Trial – Vol. 6 (May 10, 2011) Peter Halmos testimony 116:5-117:8.

Case No. 08-10084-CIV-BROWN

193.    INA has admitted that its liability for the NOAA/State of Florida claim is equal to the Policy's $25,000,000 liability coverage limit. Transcript of Bench Trial – Vol. 9 (May 17, 2011, Peter Halmos testimony at 72:5-11.

194.    INA, through Ms. Harting-Forkey, represented to Plaintiffs on numerous occasions that INA would pay for remediation of the Rotation Area. Plaintiffs relied on Ms. Harting-Forkey's representations. *See* Transcript of Bench Trial – Vol. 9 (May 17, 2010) at pp. 100-101.

195.    To date, INA has only paid approximately $150,000 for the remediation, and refuses to pay for pumps, equipment and personnel for which IYC has already paid. *See* Trial Exhibit No. 298.[24]

**H.   Conclusions of Law Related to the Legacy-Wilma Claim**

196.    The Legacy-Wilma Claim falls within the coverage grant of the 2005 Policy and INA has raised no Policy exclusions which apply as a bar to coverage for Plaintiffs' Claim. Transcript of Bench Trial – Vol. 7 (May 11, 2011), Joseph Smith testimony (via deposition designation) at 37:15-24; 38:2-5.

197.    INA waived any coverage defenses when it made post-litigation partial payments of the Legacy Wilma claim, which operates as a confession of liability.  Trial Exhibit No. 256; *Wollard v. Lloyd's & Companies of Lloyd's*, 439 So.2d 217, 218 (Fla. 1983); *Saewitz v.*

---

[24] INA took the position that the Legacy's hull only impacted an area of 15 x 60 feet, and prevented IYC and Peter Halmos from remediating the Rotation Area prior to getting the Legacy to Open Water on June 17, 2010. At trial, INA incorrectly represented that Legacy was in Open Water "in February of '08. Three years ago." *See* Transcript of Bench Trial - Vol. 9 (May 17, 2010), at p. 103. Legacy was at anchor in an environmentally protected zone, the Man-o-War Harbor, Key West, in February 2008, and remained there until she could be safely towed in June 2010.  Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 126:20-25; 127:1-4

47

*Lexington Ins. Co.*, 133 Fed. Appx. 695, 699 (11th Cir. 2005); *Plante v. USF&G Specialty Ins. Co.*, 2004 WL 741382, at *4-5 (S.D. Fla. 2004); *Marraccini v. Clarendon Nat'l Ins. Co.*, 2003 WL 22668842, at *3 (S.D. Fla. 2003).

198.    A valid claim for breach of contract exists where a plaintiff establishes:  (1) the existence of a contract; (2) breach thereof; and (3) damages flowing from the breach.  *Hostway Services, Inc. v. HWAY FTL Acquisition Corp*, 2010 WL 3604671 (S.D. Fla. 2010); *Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters, III, Inc.,* 2010 WL 5014371 (S.D. Fla. 2010).

199.    Under a breach of contract claim, the policyholder bears the burden of establishing its actual damages or expenditures within a reasonable degree of certainty; the insurer bears the burden of establishing that the damages are unreasonable or unnecessary. *Centex-Rooney Constr. Co., Inc. v. Martin County*, 706 So.2d 20, 27 (Fla. 4th DCA 1997); *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.*, 385 So.2d 98, 100 (Fla. 5th DCA 1980).

200.    The facts on record establish:  (1) that the 2005 Policy was a valid and legally enforceable contract and that it provided coverage for the claim and damages at issue; (2) INA breached the Policy by failing to pay or reimburse Plaintiffs for the covered damages within the time provided for under the Policy; and (3) Plaintiffs have been damaged by INA's breach of the Policy because they have expended money and rendered services to repair and salvage the Legacy and comply with the NOAA Agreement without being reimbursed for the full amount of those expenditures, as required by and pursuant to the terms of the Policy.  Accordingly, judgment should be entered in favor of Plaintiffs on Count 5 of the Fourth Amended Complaint.

201.    Plaintiffs' remaining salvage and removal damages with regard to the Legacy-Wilma Claim are covered under either the Policy's salvage or liability coverage provisions and

total $2,823,111.17.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 42:15-22.  Trial Exhibit No. 289.

202.    Because IYC was legally obligated to pay the sums it expended on removing the Legacy from the Sanctuary, such legal obligation constitutes a liability to a third-party under the Policy.  Pursuant to the Policy, INA is required to pay all sums that "a covered person become legally obligated to pay as a result of the ownership, operation or maintenance of your insured vessel because of…attempted or actual raising, removal or destruction of the wreck of your insured property…[or] loss or damage to any property." [25] Trial Exhibit No. 5.

203.    INA erroneously required the predicate of a "claim or suit" as a means of denying Plaintiffs' access to the liability coverage which they purchased and were entitled to.  INA's "claim or suit" predicate is entirely inconsistent with the plain language of the Policy.

---

[25] The Policy contains an exclusion for "liability assumed by you under any contract or agreement." Trial Exhibit No. 5 at p. 5.  The Agreement at issue, however, was expressly consented to and ratified by INA, and Plaintiffs were thus in compliance with the Policy's "Assistance and Cooperation" provision. Moreover, INA never raised the exclusion as bar to coverage and extended the liability coverage notwithstanding Plaintiffs' negotiation and procurement of the NOAA Agreement. *See* Trial Exhibit No. 147 at INA 000004244 (wherein Pamela Harting-Forkey states: "ACE stands with $25,000,000 limits for Liability" despite the context of Plaintiffs' negotiations with NOAA); and Trial Exhibit No. 499 at PH-IYC-HPC 032371 (wherein Pamela Harting-Forkey states: "[s]o let's see if we can get this done with Byrd…[t]hen move for Tom to work his magic with NOAA and the Byrd contract. When we all have agreed on contract terms, ACE and I will be with you) (emphasis in original). Consistent with these representations, INA issued partial payment of Plaintiffs' costs pertaining to the NOAA Agreement and never disclaimed coverage on the basis of the contractually-assumed liability. *See* Trial Exhibit No. 168. Moreover, with respect to the Legacy-Wilma Claim, INA represented: "[w]e get these claims all the time and this is a liability claim" (Trial Exhibit No. 291 at PH00480); and "there is liability coverage under your policy which is where all this coverage is going to be placed" (Trial Exhibit No. 290 at PH00645).

Case No. 08-10084-CIV-BROWN

204.    INA not only consented to the NOAA Agreements but very significantly benefited from them.  *See* Transcript of Bench Trial – Vol. 16, Pamela Harting-Forke transcript at 156:14-25.

205.    INA has set forth no evidence establishing that Plaintiffs' claimed damages are unreasonable or unnecessary.

206.    Although INA has couched Plaintiffs' Legacy-Wilma Claim as a salvage operation claim, restricted to the terms and conditions of the salvage-related provisions of the Policy, Plaintiffs are also entitled to coverage under the Part B: Liability Coverage provisions of the Policy for the Legacy-Wilma Claim.

## V.    PETER HALMOS' *PRO SE* CLAIMS

### A.   Findings of Fact Related to Count 15 (Unjust Enrichment)

207.    During the Legacy's extraction, INA instructed Peter Halmos to take all steps necessary to protect the vessel and to mitigate damages to the vessel and to the environment. Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 18:17-21; Trial Exhibit No. G12, 74 and 276.[26]

### (i) Peter Halmos' Contributions Were Essential to the Procurement and Performance of the NOAA Agreements

208.    Following INA's instruction, Peter Halmos remained on the Legacy during the extraction process and took all reasonable and necessary steps to protect the Legacy and the environment from further damage.  Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 19:4-5; 20:3-24; 90:4-10. *See* Trial Exhibit No. 175 at PH-IYC-HPC

---

[26] INA's October 24, 2005 directive (Trial Exhibit No. 74) implicates coverage under both the Protection Against Loss provisions ($16 million) and the Liability provisions ($25 million) of the Policy. Trial Exhibit No. 5.

030738 (wherein Peter Halmos states: "My point in repeatedly emphasizing 100% willingness to have ACE or NOAA take over salvage is to dispel any inference that my involvements are voluntary or somehow misconstrued as something I want to do. I've been here for going on two years, doing what I've done and am now doing, because Legacy is my boat. If anyone thinks they can do better and/or is willing to take over (consistent with all contracts), I will most gladly step aside.").

209.    By refusing to pay for IYC's obligations pursuant to the NOAA Agreements, which obligations were personally funded by Peter Halmos pursuant to the NOAA Agreements, INA has breached the Policy and the obligations to which it consented while retaining all of the benefits of same.

210.    In addition, INA's breaches have, in turn, forced Plaintiffs to breach the NOAA Agreements by preventing their compliance with the terms of the remediation provisions.

211.    In carrying out INA's instruction, Peter Halmos supervised all of the affairs having to do with the Legacy's extraction and the protection of the environment on a daily basis from the date of Hurricane Wilma through to the date of the Legacy's delivery to the shipyard in Grand Bahama.[27]  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 55:12-18.

212.    Peter Halmos participated in the negotiation of all contracts having to do with the salvage, remediation and protection of the Legacy.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 55:25-56:3.

---

[27] Peter Halmos arranged for the Legacy's transport to the repair yard in Grand Bahama, which is approximately 500 miles closer than the repair yard in Savannah, Georgia and out of U.S. waters.

Case No. 08-10084-CIV-BROWN

213.    Peter Halmos engaged Tom Campbell, the former general counsel of the U.S. Commerce Department's National Oceanic & Atmospheric Administration ("NOAA"), to join his effort to pre-empt any claims/litigation by NOAA and the State of Florida.

214.    With the assistance of Tom Campbell, Peter Halmos engaged in a six-month negotiation campaign, which culminated, at about 11 p.m. on December 31, 2006, with NOAA, IYC, Peter Halmos and INA's verbal agreement to the terms of the NOAA Agreements, which were then memorialized in writing and executed on January 5, 2007. *See* Trial Exhibit No. 166 and 167. [28]

215.    Peter Halmos personally undertook continuing obligations under the Peter Halmos NOAA Agreement, which extended beyond the date that the Agreement was executed. Transcript of Bench Trial – Vol. 21 (June 15, 2011), Peter Halmos testimony at 45:10-21; Trial Exhibit No. 175.

216.    The Peter Halmos NOAA Agreement personally obligated Peter Halmos to pay all expenses related to the investigation, negotiation, execution, and performance of the Agreement and the Subject Matter of the Agreement, including the fees and expenses of his own and his Affiliates' financial, legal, technical, and tax advisors; to give up valuable rights against NOAA; and, to fund IYC's obligations under its NOAA Agreement in order to prevent a breach of the Agreement. (Trial Exhibit No. 167).

--------

[28] INA formally consented to the NOAA Agreements and entered into other salvage operation agreements with Plaintiffs. By consenting to the NOAA Agreement to obtain benefits therefrom, INA agreed to pay and/or reimburse all obligations of Plaintiffs pursuant to the NOAA Agreements.

217.    On or about January 5, 2007, Peter Halmos advanced $750,000 of personal funds to IYC for IYC's escrow fund obligation, an advance for which INA never reimbursed principal or interest, but from which INA greatly benefited.

218.    The release by Peter Halmos of all rights and claims against NOAA was also a pre-condition and predicate for NOAA to enter into the IYC NOAA Agreement. Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 139:13-24.

**(ii) INA Has Acknowledged That the NOAA Agreements Conferred a Substantial Benefit Upon INA**

219.    INA admitted to the seriousness of the NOAA and other governmental claims for damage to natural resources and the costly litigation involved. *See* Trial Exhibit No. 516 at INA 000020228 (wherein Pamela Harting-Forkey states: "…they strike fear in my wee little heart. I've seen some simply awful and quite hefty claims with NOAA as a plaintiff; as ACE has defended other claims for our insureds with these folks, and they are always dead, dam (*sic*) serious and extremely contentious – as well as costly to litigate."; and Trial Exhibit No. 147 at INA 000004244 (wherein Pamela Harting-Forkey states: "…I see clearly NOAA is unlikely to budge."); and *Id.* at INA 000004245 (wherein Pamela Harting-Forkey admits that it is "certainly possible" that liability damages could exceed the $25 million policy limits and admits that there are "[r]isks present to both [Peter Halmos/IYC] and ACE." *See* Trial Exhibit No. X20 (wherein Pamela Harting-Forkey states: "I've seen some simply awful and quite hefty claims with NOAA as a plaintiff; as ACE has defended other claims … with those folks, and they are always dead, damn serious and extremely contentious – as well as costly to litigate.").

220.    INA acknowledged that the NOAA Agreements entered into between Plaintiffs and NOAA benefitted INA to the extent that NOAA could have charged Plaintiffs for property damage covered by INA.  Transcript of Bench Trial – Vol. 16 (June 1, 2011), Pamela Harting-

Case No. 08-10084-CIV-BROWN

Forkey testimony at 127:1-9; 156:14-157:7; Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:8-17; Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 155:13-156:25; Trial Exhibit No. 168 and 170.

221.   INA has acknowledged that the value of the benefits conferred upon INA with respect to the NOAA Agreements is equal to the $25 million policy limits available for liability coverage.   Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:8-17. Trial Exhibit No. 147.

222.   That INA greatly benefited from the NOAA Agreements is undisputable despite Pamela Harting-Forkey's trial testimony.[29]

223.   Upon execution of the NOAA Agreements, Ms. Harting-Forkey indicated her approval via her January 10, 2007 email to Peter Halmos, Tom Campbell (Pillsbury), Jack Reynolds (Pillsbury), John Kallen and Janet Thomas, which stated: "HOORAY!!!! No sweeter words to my ears!!!" Trial Exhibit No. 168.

**(iii) INA Authorized Peter Halmos' Efforts With Regard to the Procurement and Performance of the NOAA Agreements**

224.   Peter Halmos kept INA fully informed of his efforts and those of the team assembled to pre-empt the claims and litigation by NOAA/Florida.

225.   INA had full access to, and directly communicated with, the "team" including the Pillsbury law firm (Tom Campbell, Jack Reynolds, Vince Morgan, et al.); the Washington D.C.

---

[29] Although Pamela Harting-Forkey essentially stated at trial that she didn't think that the NOAA was a big deal (Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:24-35:23), her testimony is contradicted by documentary evidence which strongly suggests that Ms. Forkey believed that the opposite was true. *See* Trial Exhibit No. 516 at INA 000020228; Trial Exhibit No. 147 at INA 000004244 and INA 000004245; and Trial Exhibit No. X20.

law firm of David Merideth; New York maritime law firm Healy & Baillie (John Kimball); Florida law firm Alley Maass (Bruce McAllister, a lawyer from the well-established New York commercial shipping company McAllister Towing); Wall Street public relations firm Kekst (Robert Siegfried); corporate affiliates of Peter Halmos, PH&S and ISC, and their employees, agents, subcontractors (identified in emails as Peter Halmos et al.); Florida law firm Jorden Burt (criminal defense lawyer Richard Sharpstein), among others including immigration and tax advisors given that governmental litigants have fueled multi-faceted campaigns. *See* Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 175:25-176:9; 177:10-15; Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 68:24-69:6; Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 90:25-92:3; Transcript of Bench Trial - Vol. 9 (May 17, 2011), Peter Halmos testimony at pp. 75-77.

226. INA either implicitly or explicitly authorized or approved of, and/or expressly directed or encouraged, Plaintiffs' removal and mitigation efforts, including the expenses that Peter Halmos incurred for same. Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 56:21-57:3; 58:24-59:9; Trial Exhibit Nos. 174, 170, 186 and 207.

227. INA never explicitly instructed Peter Halmos not to take a certain course of action and/or never indicated disapproval of the course of action taken by Peter Halmos prior to this litigation. With respect to the salvage operation and the negotiation of the NOAA Agreements, Pamela Harting-Forkey expressly stated: "If I could think of anything to advise you, I would, on the part of ACE. If I had requests or questions or reservations, rest assured I would tell you, on the part of ACE." Trial Exhibit No. 499 at PH-IYC-HPC 032370. Further, with respect to the performance of the NOAA Agreement, Pamela Harting-Forkey stated: "I believe Ace and yourself have certainly had enough dealings with contracts. Further, I, on behalf of ACE, put our

trust in you and Tom to see this through. Let me know final and amount. If it is possible for draft circulation, so much the better. If not, do what you need to do." Trial Exhibit No. 276; see also Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 178:2-4; Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 112:21-24.

**(iii) INA Has Never Compensated Peter Halmos For His Services and Expenses Related to the Procurement and Performance of the NOAA Agreements**

228.    IYC, through Peter Halmos, has paid and incurred far more than its $2 million NOAA Agreement obligation beyond the amount reimbursed by INA, including expenses relating to the investigation, negotiation, execution, and performance of the NOAA Agreement and its Subject Matter, the amount of $11,308,513.00 (excluding the period from November 1, 2008 to June 17, 2010 not fully recovered by IYC. *See* Trial Exhibit Nos. 166, 167, A-4. Z-19, 289, 289-B, 255, 255 parts 2 and 3. Of this amount, $3,973,427.00 (s*ee* Trial Exhibit No. Z-19) is abated to the separate bad faith case against INA pursuant to the Court's Order (D.E. 1221). The outstanding balance in this case under Part B: Liability Coverage of $7,335,086 (excluding the period from November 1, 2008 to June 17, 2010) is composed of:

(a)    In addition, performance of the NOAA Agreement  remediation of the "Rotation Area" at $1,500.00 per square meter in the amount of $6,000,000. *See* Trial Exhibit Nos. 166, 167, A-4, 289, 289-B, 255, 255 parts 2 and 3.

229.    To date, INA has not reimbursed Peter Halmos for the fair value of the services he rendered on behalf of and/or at the direction of INA, nor has INA compensated Peter Halmos for the expenses and obligations he incurred as a result of the resources he expended in the procurement and performance of the NOAA Agreements. INA has nonetheless retained the benefits of the Agreements.

230.    INA has been unjustly enriched by: (a) its admitted liability for the $25 million Part B: Liability Coverage for any and all natural resource damage liability; and, (b) the unlimited defense cost coverage of the potential NOAA litigation to which Plaintiffs were undeniably entitled but which were obviated by the procurement and performance of the NOAA Agreements. *See* Transcript of Bench Trial - Vol. 9 (May 17, 2010), at p. 94).

231.    Having accepted the benefits of Peter Halmos' years-long efforts, INA has further been unjustly enriched by refusing to pay for salvage and protection costs.

232.    In addition to these amounts, INA owes Peter Halmos compensation related to the services and resources that Peter Halmos expended personally with regard to the procurement and performance of the NOAA Agreements.

233.    INA was aware that Peter Halmos' other businesses were suffering because he was devoting all of his time and attention to carrying out his obligation to take all reasonable and necessary steps to make sure that there wasn't any further harm to the Legacy or the environment following the Hurricane Wilma incident and to comply with the NOAA Agreement.  Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 30:5-11. Trial Exhibit No. L12 (wherein Peter Halmos states: "…my business affairs are in financial and operating disarray, as well as turning my employees and me inside out. As the saying goes, you can't build houses when you're fighting fires…It's becoming impossible for `me to hold together -- setting aside the issue of red ink -- far flung business activities while stuck in the mud flats off Key West"); and

Trial Exhibit No. 175 (wherein Peter Halmos states: "[t]he toll on my other business and financial interests is an unrecoverable sea of red ink.").[30]

234.    In addition to the six months of time Peter Halmos spent to procure the NOAA Agreements, Peter Halmos spent all his time on-site from the date of Hurricane Wilma (October 24, 2005) through the date Legacy reached Open Water on June 17, 2010.

235.    INA agreed to compensate Peter Halmos for his time, and the services of his corporate affiliates.  Pamela Harting-Forkey agreed to a base "daily rate."  *See* Trial Exhibit No. X-16 at p. 17. On May 19, 2006, Ms. Harting-Forkey expressly represented that Peter Halmos would  be compensated for his time. *See* Trial Exhibit No. 374 (6/15/06 Pam letter).

236.    Accordingly, in Count 15, Peter Halmos seeks amounts personally expended and not recovered by IYC pursuant to the NOAA Agreements, INA's directives in its October 24, 2005 letter by Janet Thomas (*see* Trial Exhibit No. 74), and representations by INA and its agents, i.e., Ms. Harting-Forkey, Mr. Joseph Smith, Mr. Ron Milardo, due to the fact that IYC relies entirely upon Peter Halmos' personal funding.

**B.    Conclusions of Law Related to Count 15 (Unjust Enrichment)**

237.    A claim for unjust enrichment exists where:  (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant appreciates or has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that

---

[30] Mr. Halmos also made personal sacrifices, which were acknowledged by Ms. Harting-Forkey: Good Heavens! My dear man, how horrible for you – I know you'd been so very busy, but I had no idea you have been sick … You will always and forever be my swashbuckler and hero to me and many, many others! … Alright, Mother Pamela here … Will fried chicken tempt you … but it sounds like you need my chicken soup right now.
*See*  Trial Exhibit No. P17.

Case No. 08-10084-CIV-BROWN

it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Treco Intern, S.A. v. Kromka*, 706 F.Supp.2d 1283, 1289 (S.D. Fla. 2010); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009).

238.    The facts on record establish:  (1) that Peter Halmos rendered services on behalf of and/or at the direction of INA with respect to the extraction and remediation of the Legacy; (2) that INA acknowledged the benefit conferred upon it by Peter Halmos; (3) that INA accepted and retained the benefit conferred upon it; and (4) that the circumstances are such that it would be inequitable for INA to have the benefit of the NOAA Agreement without compensating Peter Halmos for the substantial expenditures he made conferring said benefit.  Accordingly, judgment on Count 15 should be awarded in favor of Peter Halmos.

239.    The facts on record further establish:  (1) that INA instructed Peter Halmos to take all necessary steps to protect the Legacy and mitigate further damages; (2) Peter Halmos undertook a course of action at the instruction of INA with the confirmed understanding that he would be compensated for same; (3) INA has refused to fully compensate Peter Halmos for the services he rendered and other losses he incurred in carrying out INA's instruction; (4) INA's refusal to properly compensate Peter Halmos constitutes a breach of the quasi contract that Peter Halmos and INA entered into; and (5) Peter Halmos has been damaged by INA's breach to the extent that he has expended time and money, and rendered services without being adequately compensated for same pursuant to the terms of the Policies and INA's agreement.  Accordingly, judgment on Count 15 should be entered in favor of Peter Halmos.

**C.   Findings of Fact Related to Count 16 (Quantum Meruit)**

240.    Count 16 of the Fourth Amended Complaint, brought by Peter Halmos, is a quantum meruit cause of action stemming from the benefit conferred upon INA by services

Case No. 08-10084-CIV-BROWN

rendered by Peter Halmos in the negotiation and performance of the NOAA Agreement.  Fourth Amended Complaint [D.E. 688] at p. 32.

241.    As a result of Hurricane Wilma and the Legacy's grounding in the environmental sanctuary, both INA and Peter Halmos faced exposure to a very significant natural resource damage claim from NOAA.  Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 119:19-120:6; 134:22-25.

242.    Peter Halmos and Thomas Campbell (at the direction of Peter Halmos) negotiated an agreement with the NOAA that eliminated both Peter Halmos' and INA's liability for any natural resource damage claim by the NOAA.  Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 119:6-11; Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 75:11-24; Trial Exhibit No. 147, 166 and 167.

243.    The Peter Halmos NOAA Agreement obligated Peter Halmos, personally, to, among other things, pay all expenses related to the investigation, negotiation, execution, and performance of the Agreement and the Subject Matter of the Agreement, including the fees and expenses of his own and his Affiliates' financial, legal, technical, and tax advisors; to give up valuable rights against NOAA; and, to fund IYC's obligations under its NOAA Agreement in order to prevent a breach of the Agreement. (Trial Exhibit No. 167).

244.    The release by Peter Halmos of all rights and claims against NOAA was a pre-condition and predicate for NOAA to enter into the Agreement with IYC. Transcript of Bench Trial –  Vol. 3 (May 5, 2011), Thomas Campbell testimony at 139:13-24.

245.    On or about January 5, 2007, Peter Halmos advanced $750,000 of personal funds to IYC for IYC's escrow fund obligation, an advance for which INA never reimbursed principal or interest, but from which INA greatly benefited.

Case No. 08-10084-CIV-BROWN

246.    Peter Halmos' contributions were essential to the procurement and performance of the NOAA Agreements. Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 19:4-5; 20:3-24; 90:4-10; Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 55:12-18; 55:25-56:3; Transcript of Bench Trial – Vol. 21 (June 15, 2011), Peter Halmos testimony at 45:10-21; Trial Exhibit Nos. 175, 166 and 167.

247.    INA has acknowledged that the NOAA Agreements conferred a substantial benefit upon INA. *See* Transcript of Bench Trial – Vol. 16 (June 1, 2011), Pamela Harting-Forkey testimony at 127:1-9; 156:14-157:7; Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:8-17; Transcript of Bench Trial – Vol. 3 (May 5, 2011), Thomas Campbell testimony at 155:13-156:25; Trial Exhibit No. 168 and 170; Trial Exhibit No. 516 at INA 000020228; Trial Exhibit No. 147 at INA 000004244 and INA 000004245; and Trial Exhibit No. X20.

248.    INA acknowledges that the value of the benefit conferred upon INA with respect to the NOAA Agreement is equal to the $25 million policy limits available for such coverage. Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:8-17.

249.    INA authorized Peter Halmos' efforts with regard to the procurement and performance of the NOAA Agreements. Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 56:21-57:3; 58:24-59:9; Trial Exhibit Nos. 174, 170, 186, 207 and 499 at PH-IYC-HPC 032370.

250.    On January 10, 2007, INA acknowledged and indicated its approval of the execution of the NOAA Agreement.  Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 77:15-25.

251.    Mr. Halmos was required to retain the services of attorneys skilled in dealing with this type of claim and delaying with the federal agencies involved.

252.    IYC, through Peter Halmos,  has paid and incurred far more than its $2 million NOAA Agreement obligation beyond the amount reimbursed by INA, including, for expenses relating to the investigation, negotiation, execution, and performance of the NOAA Agreement and its Subject Matter, the amount of $11,308,513.00 (excluding the period from November 1, 2008 to June 17, 2010) not fully recovered by IYC. *See* Trial Exhibit Nos. 166, 167, A-4. Z-19, 289, 289-B, 255, 255 parts 2 and 3. Of this amount, $3,973.427.00 (s*ee* Trial Exhibit No. Z-19) is abated to the separate bad faith case against INA pursuant to the Court's Order (D.E. 1221). The outstanding balance in this case under Part B: Liability Coverage of $7,335,086 (excluding the  period from November 1, 2008 to June 17, 2010):

(a)    In addition, performance of the NOAA Agreement remediation of the "Rotation Area" at $6,000,000.00. *See* Trial Exhibit Nos. 166, 167, A-4, 289, 289-B, 255, 255 parts 2 and 3.

253.    Performance of the NOAA Agreement relating to remediation of the "rotation area" at Legacy's grounding site is an incomplete and continuing NOAA Agreement obligation. But, as a consequence of INA's repudiation of its consent to the NOAA Agreements, Peter Halmos has been unable to honor the terms of the Agreements and remains liable for same.

254.    Because of the due care that Peter Halmos used in managing the Legacy "recovery/removal/salvage" operation to get Legacy to Open Water pursuant to the NOAA Agreements, including the purchase of the Toyo Pump and re-depositing the pumped sea bottom ahead of Legacy immediately behind to fill the removal path (Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 116:5-117:8), the amount of uncompleted

remediation for which Plaintiffs, and thus INA, are liable is comparatively minimal to NOAA's $84 million "Habitat Equivalency Analysis." *See* Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 116:5-117:8.

255.   To date, INA has not compensated Peter Halmos for the fair value of the benefit Peter Halmos conferred upon INA through the procurement and performance of the NOAA Agreements, the value of which INA has both acknowledged and accepted.  Trial Exhibit No. 256 (demonstrating INA's post-litigation partial payment of a portion of NOAA negotiation fees).

256.   INA has nonetheless retained the benefits of the Agreements.

257.   INA has benefited from Peter Halmos' procurement and performance of the NOAA Agreements to the extent that the NOAA Agreements avoided: (a) INA's admitted liability for the $25 million Part B: Liability Coverage for any and all natural resource damage liability; and, (b) INA's unlimited defense cost coverage of the NOAA litigation to which Plaintiffs were undeniably. *See* Transcript of Bench Trial - Vol. 9 (May 17, 2010), at p. 94).

258.   In addition to these amounts INA owes Peter Halmos up to $25 million for the benefit he conferred upon INA and is also obligated to reimburse Peter Halmos for the remainder of the attorney's fees that Peter Halmos incurred in the negotiation and performance of all contracts and services required by the NOAA Agreements including remediation of the Legacy "rotation area."  Transcript of Bench Trial – Vol. 20 (June 14, 2011), Pamela Harting-Forkey testimony at 34:16-17; and ¶ 187 and 190, *supra*.

259.   Accordingly, Count 16 seeks compensation from INA for the value of its obligation under the NOAA Agreements in the amount of $6,000,000.00.

Case No. 08-10084-CIV-BROWN

**D.   Conclusions of Law Related to Count 16 (Quantum Meruit)**

260.     A claim for quantum meruit exists where:  (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.  *Posely v. Eckerd Corp.*, 433 F.Supp.2d 1287, 1313-14 (S.D. Fla. 2006); *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co. Inc.*, 695 So.2d 383, 386 (Fla. 4th DCA 1997).

261.     The facts on record establish:  (1) that Peter Halmos conferred a benefit upon INA with respect to the negotiation and performance of the NOAA Agreement; (2) that INA acknowledged the benefit conferred upon it by Peter Halmos; (3) that INA accepted and retained the benefit conferred upon it; and (4) that the circumstances are such that it would be inequitable for INA to have the benefit of the NOAA Agreement without compensating Peter Halmos for the substantial expenditures he made conferring said benefit. Accordingly, judgment on Count 16 should be awarded in favor of Peter Halmos.

## VI.   <u>INA'S DEFENSES</u>

**A.   Findings of Fact Related to INA's Seaworthiness Defense and the 2005 Letter**

262.     The Legacy-Wilma loss was a fortuitous loss and its proximate cause was Hurricane Wilma. Joint Pre-Trial Stipulation [D.E. 1273] at 11. *See also Int'l. Ship Repair & Marine Services v. St. Paul Fire & Marine Ins. Co.*, 944 F. Supp. 886, 892 (M.D. Fla. 1996); *Great Lakes Reinsurance PLC v. Soveral*, 2007 U.S. Dist. LEXIS 13261 (S.D. Fla. 2007); *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424 (5th Cir. Fla. 1980); *Sipowicz v. Wimble*, 370 F. Supp. 442, 446 (S.D.N.Y. 1974); *Insurance Co. of North America v. United States Gypsum Co.*, 678 F. Supp. 138, 141 (W.D. Va. 1988); *Standard Oil Co. v. United States,*

340 U.S. 54, 58 (U.S. 1950); *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556, 563 (U.S. 1938); *Tillery v. Hull & Co., Inc.*, 876 F.2d 1517, 1519 (11th Cir. 1989); *Blaine Richards & Co. v. Marine Indemn. Ins. Co.*, 635 F.2d 1051, 1054-1055 (2d Cir. N.Y. 1980).

263.    IYC and Peter Halmos exercised due diligence during the Legacy's construction, through her 1995 launch, thereafter spending an additional $7 million (including $4 million just prior to the 2001 SOL collision) on warranty and completion issues, excluding maintenance and repair.[31] In addition to selecting reputable repair and maintenance facilities after the Legacy's launch, IYC and Halmos continued to engage the American Bureau of Shipping (ABS) to routinely inspect Legacy and inspect all work being performed, whether it be warranty, completion, repair, maintenance, and/or improvement. Accordingly, Legacy maintained "in-class" ABS certification not only during her construction, but continually thereafter including at the time of Hurricane Wilma.

264.    Legacy was ABS certified at all times prior to the August 1, 2005 policy renewal and at all times through the date of her grounding and "total loss" caused by Hurricane Wilma on October 24, 2005. (Trial Trs. May 4, 2011, pp.16-27, 31, 110; May 9, 2011, pp. 46-47, 50-51, 53, 74, 117; May 16, 2011, pp. 22-25, 33-34, 145-146; June 13, 2011, pp. 19-20, 39, 41-42, 44-47, 50-51, 53, 58, 60-61; Trial Exhibit Nos. V18, 08, I12.

265.    INA nonetheless asserts that the Legacy was unseaworthy as a result of and/or prior to the Sol collision and that Plaintiffs failed to disclose the unseaworthy condition of the Legacy prior to the issuing of the 2005 Policy, thereby rendering the Policy void.  Joint Pre-Trial Stipulation [D.E. 1273] at 20.

---

[31] See Trial Exhibit No. 86 (wherein Peter Halmos states: "I spared no expense maintaining Legacy in better-than-new condition; maintenance records attest to that.")

Case No. 08-10084-CIV-BROWN

266.   The "construction defects" identified by Mr. Halmos in his March 16, 2005 Letter to Perini Navi USA, Inc. ("the 2005 Letter") (Trial Exhibit No. B20) were addressed and fixed by Mr. Halmos prior to issuing that letter:

(a)   With respect to the Fresh Air System, Mr. Halmos' initial complaint was that the bilge/sewage "stench rendered the cabin impossible to use and intermittently, the other staterooms, dining room bar and salon areas." *Id.* at 1.  A short term solution was found by Mr. Halmos and since doing "this, [there] is no sewage/bilge stench invading the interior." *Id.* at 6.

(b)   With respect to the Halon System, "[t]he ABS Inspector found that the *Legacy's* Halon 1301 system [was] three years older than the 1995 launch date." *Id.* at 7. As a result, Mr. Halmos was required to do 12-year servicing.  During the "servicing" it was discovered that "the system was short 60 lbs in each tank." *Id.* As a result, it was fixed.  In the Letter, Mr. Halmos goes as far as informing Perini that it should notify "other Perini boats to check the weight of Halon in each tank . . . as a remedy." *Id. at 8.*

(c)   With respect to the Sailing System, Mr. Halmos' stated that the *"Legacy's* sailing system has not been operational since 2001." *Id*. Mr. Halmos made "extensive repairs [and] replaced components..." Eventually, Mr. Halmos figured out that "[t]he engine room heat and computer break-downs destroyed the software." *Id*. As a result, Mr. Halmos "produced [his] own software on ROM…" as a solution. *Id.*

All of these items existed prior to or as of 2001 – the bilge since 1995, the Halon system since the inception, and the sailing system since 2001. *Id.* at 1, 7 and 8. During these times, and after

66

2001, the vessel was used extensively, and sailed to New England, Bahamas, and Miami. Transcript of Bench Trial – Vol. 2 (May 4, 2011), Capt. James Cooper testimony at 37:14-22. All of these items were remedied, and none of these defects rendered the vessel unseaworthy.[32]

267.    After the Sol collision, the Legacy was repaired and made operational.  Transcript of Bench Trial – Vol. 2 (May 4, 2011), Capt. James Cooper testimony at 46:7-23; 48:9-18; 115:9-18; 118:2-8.

268.    The ABS inspected the vessel twice in 2005: the first, in January 2005, wherein ABS "recommended that this vessel be retained as Classed with this Bureau." *Id.* at ABS-Legacy-013-024; the second, in August of 2005, wherein the ABS surveyed the hull and machinery of the Legacy and "were satisfactorily carried out with no deficiencies noted." *Id.* at Legacy-ABS 002-009.  As a result, the ABS certification was extended through October 31, 2005. *Id.*

269.    INA obtained ABS certification documents with regard to the underwriting of the Legacy.  Transcript of Bench Trial – Vol. 19 (June 13, 2011), Len Algigi testimony at 39:17-42:1.

---

[32] Not even an inoperable "sailing system" would render the vessel unseaworthy, as there are redundancies built into the vessel.  "The sailing system is kind of unique . . . to Perini. . . she's still a conventional sailing yacht, she has an additional system kind of, like you would use remotes for TV. . . ."  Transcript of Bench Trial – Vol. 1 (May 3, 2011), Capt. James Cooper testimony at 200:22-201:4.  However, the "the basic way for bringing the sails up and down is always manual." *Id.* at 201:7-8.  As a result, "to operate them [the sails], we could either do it with a winch handle, fully manually, or we could do it using control boxes, or we could use it using the Perini Navi sail system." *Id.* at 201:7-13.  During races, the captain would use the "control boxes" and not the sail system. *Id*. 203:8-20.  Lastly, the "sail system" did not control all the sails on the Legacy. *Id*. at 204:5-6.

270.    The Legacy was insurable and seaworthy at the time it was insured in 2005. Transcript of Bench Trial – Vol. 19 (June 13, 2011), observation by the Court at 43:13-15.[33]

271.    In 2004, INA performed a "valuation" survey on the Legacy, resulting in an increase in Policy limits from $14,000,000 to $16,000,000 for each of the property damage, salvage charges, and protection against loss coverages.

## B.    Conclusions of Law Related to INA's Seaworthiness Defense and the 2005 Letter

272.    The warranty of seaworthiness has been held to mean "that the vessel is reasonably fit for the intended use." *Aguirre v. Citizens Casualty Co.,* 441 F.2d 141, 144 (5th Cir. 1971).  An insured warrants to the insurer the seaworthiness of the vessel at the inception or attachment of the policy. *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 945 (11th Cir. 1986); *Saskatchewan Government Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385, 388 (5th Cir. 1957); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 983 (5th Cir. 1969).  The negative modified warranty of the American Rule is not that the vessel shall continue absolutely to be seaworthy, at the commencement of each voyage or at departure from each port, but "that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition."  *Spot Pack,* 242 F.2d at 388; *Lloyd's U.S. Corp. v. Smallwood*, 719 F.Supp. 1540, 1549 (M.D. Fla. 1989).

---

[33] There is no legitimate dispute Legacy was seaworthy when launched in 1995, in August 2005 (when INA again renewed the Policy) and on October 23, 2005, when Hurricane Wilma grounded Legacy after savagely pounding her for about seven hours. Despite being aground for over two years, and then being pulled over a mile, when Legacy reached flotation depth, she floated, did not leak, and has remained afloat. The only post-flotation mechanical problem prior to Legacy's transport to safety to the Bradford yard in Grand Bahama was her 40-ton, 26-foot swinging keep failed to remain retracted, delaying her Key West departure.

273.   An insurer bears the dual burden of establishing as a defense that an insured vessel was unseaworthy and that the unseaworthiness of the vessel was the proximate cause of a loss. *Lloyd's U.S. Corp. v. Smallwood*, 719 F.Suppp. 1540, 1549 (M.D. Fla. 1989).

274.   The "seaworthiness" issue thus only becomes relevant if the "construction defects" identified in the 2005 Letter were: (1) not fixed; and (2) somehow missed by ABS in their inspections, and then only if the items listed in the Letter were intentionally hidden and the proximate cause of the damage to the vessel.   INA has offered no evidence establishing that the defects were either intentionally hidden or the proximate cause of the loss.

275.   None of the claimed defects from the 2005 letter were hidden, even if they had not been repaired prior to the issuance of the 2005 Policy, which they were INA cannot both survey and then value a vessel at a higher insurable rate and then simultaneously claim it is unseaworthy.

276.   INA has failed to establish that the Legacy was unseaworthy prior to the inception of the 2005 Policy.

277.   As the Court has duly noted, the Legacy was insurable and seaworthy at the time it was insured.  Transcript of Bench Trial – Vol. 19 (June 13, 2011), observation by the Court at 24:11-24; and 43:13-15.  Accordingly, judgment on INA's defense of unseaworthiness should be entered in favor of Plaintiffs.[34]

---

[34] INA's expert on seaworthiness proffered on what constituted seaworthiness that while perhaps a laudable personal standard for a ship-owner, bears no relationship to any legally-recognizable definition of seaworthiness.

Case No. 08-10084-CIV-BROWN

## C.   Findings of Fact Related to INA's Fraud Defense

278.   INA asserts that Plaintiffs breached the INA Policies' "Concealment, Misrepresentation or Fraud" provision.  Joint Pre-Trial Stipulation [D.E. 1273] at 31.

279.   The "Concealment, Misrepresentation or Fraud" provision of the INA Policies provides:

> All coverage provided by us will be voided from the beginning of the Policy Period if you intentionally conceal or misrepresent any material fact or circumstance relating to this contract of insurance, or the application for such insurance, whether before or after a loss.

Trial Exhibit Nos. 1, 2, 4 & 5.

## (i) The Island Runner Fraud Claim

280.   With respect to the Island Runner Claim, INA claims to have made payment on the Island Runner without knowing the condition of the Island Runner at the time of payment, and further that IYC misrepresented the condition of the Island Runner's engine prior to its loss. The weight of the evidence does not support INA's accusations.

281.   INA's payment was made based on its own surveyor report, prepared by Mr. Hutchenson, which identified that the Island Runner's engine had been dissembled for repairs prior to the loss.  Trial Exhibit No. I9.

282.   Mr. Hutchenson testified that he spoke to Captain Collins who did in fact inform him of the condition of the Island Runner's engine on the date she was lost.   In fact, not only did Captain Collins "admit" to the condition of the vessel, Mr. Hutchenson testified that the condition of the engine would have made no difference to the end result as it was still a constructive loss. Transcript of Bench Trial – Vol. 18 (June 3, 2011), Stewart Hutcheson testimony at 40:5-16.

70

283.    The Captains' note, written the day after the Island Runner was lost at sea, identifies how and when the Island Runner was lost and the fact that the Captain called INA to notify it of the "the knocking engine, whether or not it hand any coverage for machinery." *See* Trial Exhibit No. A20.  INA thus knew of the condition of the Island Runner prior to issuing any payment of insurance proceeds.

284.    Peter Halmos never told INA that the Island Runner was in pristine condition; Mr. Halmos simply referred to the Island Runner as "One Sweet Boat."

285.    Statements made by the hired captain of the Legacy do not constitute statements made by Plaintiff(s). Pursuant to the Policy's terms, the hired captain of the insured vessel is not considered the "named insured" for purposes of the Policy's fraud provision. The Policy clearly distinguishes between the named insured (*i.e.,* "you") and other "covered persons," which includes "any person or legal entity operating your vessel(s)…for private pleasure use with your direct and prior permission." *See* Windjammer Policy, Agreements and Definitions, p. 3 of 12. The Policy's fraud provision only prohibits misrepresentations made by the named insured (*i.e.,* "you"). Statements made by other persons do not constitute a fraud or misrepresentation by the named insured.[35]

---

[35] The policy elsewhere amends the definition of "covered person" (with respect to Liability Coverage) to include "the paid Captain (Master) and paid Crew while acting in their capacity as Captain and Crew of the insured vessel." *See* Windjammer Policy, Inner Circle Endorsement, p. 1 of 2. Although this amended definition is specific to Liability Coverage, the amendment indicates that a paid captain and crew member would not otherwise fall within the definition of "covered person," as distinguished from "you," the named insured. It follows that the captain is not considered to be one and the same as IYC, or else the Policy's distinction would have been unnecessary. Thus, under the express terms of the policy, coverage for IYC should not be rendered void by any misstatements made by the captain.

**(ii) The Mongoose Fraud Claim**

286.   With respect to the Mongoose Claim, INA claims that Plaintiffs submitted fraudulent claims for reimbursement which resulted in INA's over-payment of the Mongoose's property damage Claim. The record evidence establishes that, contrary to Ms. Harting-Forkey's testimony, the Mongoose payment included only hurricane-related damages and was based on an independent survey performed by INA.

287.   On February 20, 2009, INA issued two separate payments, each in the amount of $196,517.17, to HPC, as payment for the property damage related to the Mongoose Claim. Trial Exhibit No. 256.

288.   On April 20, 2009, counsel for INA, Kenneth Engerrand wrote an email to counsel for HPC and Mr. Halmos explaining the partial Mongoose payments.  Trial Exhibit No. Q13.  In that email, Mr. Engerrand explains that in INA's view, the Merritt repair estimate "was not limited to the damage resulting from the hurricanes, but rather outlined the work required to restore the vessel to its original condition." *Id*. at PH-IYC-HPC 065051.  Mr. Engerrand further explains that as a result of the extended scope of the Merrit estimate, "INA retained another surveyor, Rand & Associates, Inc., at its own expense, to review the scope of work contained in the Merritt repair estimates and to provide INA with guidance about which damages may have been hurricane related. . . . Ms. Harting-Forkey reviewed both the repair estimates prepared by Merritt and the evaluation undertaken by Rand & Associates." *Id*.

289.   In April 2007, INA conducted its own survey of the Mongoose damage, with surveyor Randy Roden of Rand & Associates. Trial Exhibit No. 513.

290.    According to Ms. Harting-Forkey, INA's payment would be based upon "an updated estimate" from Merritt, "[her] own inspection, as well as the attached two reports from surveyor Roden."  Trial Exhibit No. C20 at PH-IYCV-HPC 030548-030549.

291.    Ms. Harting-Forkey's estimate for payment included "exceptions" based on the updated Merritt estimate which removed the non-hurricane-related damage.  *Id*. at PH-IYC-HPC 030549.

292.    Thus, the Mongoose payment was based not based on a "fraudulent" submission by Plaintiffs, but on: (1) Ms. Harting-Forkey's visit to the vessel with her own surveyor; and (2) an updated Merritt estimate which was directed by Ms. Harting-Forkey.

**(iii) The Fraudulent Invoices Claim**

293.    With respect to the invoices, INA claims that the invoices submitted by IYC for costs incurred to Intelligence Services Corporation (Trial Exhibit No. Z20), Peter Halmos & Sons, Inc. (Trial Exhibit No. Z19), and the Meredith Law Firm (Trial Exhibit No. A4), were fraudulent.  The record evidence establishes that: (1) the invoices encompass charges for work that was actually performed and for expenses that were actually incurred; (2) INA knew that Mr. Halmos would be charging for the time associated with these entities; (3) INA never paid any of these invoices; and (4) INA suggested a daily rate for Mr. Halmos to charge.

294.    Contrary to INA's testimony, INA knew of the various entities and was made aware that the entities would be charging for their services.  *See* Trial Exhibit No. 157  at INA 000005847 (where Peter Halmos states: "add in the 2006 rates the D.C. law firm in which I'm a partner charges for my time, and it's all lunacy"); Exhibit No. B2 (wherein Peter Halmos states: "[p]lease let me clarify as I mistakenly thought you knew I'm not a lawyer . . . In Washington,

D.C.  non-lawyers are allowed to be partners in a law firm . . . ."); *see also*  Trial Exhibit Nos. 515 and 526 (identifying the entity Peter Halmos & Sons to Ms. Harting-Forkey)

295.    INA, through Ms. Harting-Forkey, offered to pay Mr. Halmos a "daily rate." *See* Trial Exhibit No. X16 at PH-IYC-HPC 032581 (regarding expenses that would go against Salvage and Protection Against Loss); and Trial Exhibit No. P17 at PH-IYC-HPC 032058 (with respect to "gathering costs, charges, billings, etc., you've incurred over the last two plus years . . .).

296.    Mr. Halmos, through various entities, charged for his time and that of his crew and staff.  Transcript of Bench Trial – Vol. 12 (May 25, 2011) Peter Halmos testimony at 146:24-147:22.

297.    Mr. Halmos was required to "take all steps necessary" and did so.  Trial Exhibit Nos. 74 and 276.

298.    INA and its representatives were extremely complimentary of the efforts and services provided by Plaintiffs. *See* Trial Exhibit No. 83 (wherein Mr. Hutcheson states: "I can attest to the extra ordinary efforts by yourself and your crew in mitigating loss."); Trial Exhibit No. 172 (wherein Ms. Harting-Forkey states: "you noticed these delays so quickly and corralled.  None of us had realized these folks have no open water experience. . . . You were the first to get us all fired up and coordinate . . . . You did a MAGNIFICENT JOB managing that contract . . . ") (emphasis in original).

299.    Peter Halmos did not tell anyone at INA that he was a lawyer.  Transcript of Bench Trial – Vol. 13 (May 26, 2011), Peter Halmos testimony at 147:16-18.

300.    Peter Halmos told Pamela Harting-Forkey that he was a non-lawyer partner in the Meredith law firm.  Transcript of Bench Trial – Vol. 13 (May 26, 2011), Peter Halmos testimony

at 147:19-25; Trial Exhibit No. B2.

301.    Peter Halmos told Pamela Harting-Forkey that INA would be billed by the Meredith law firm.  Transcript of Bench Trial – Vol. 13 (May 26, 2011), Peter Halmos testimony at 147:19-33; Trial Exhibit No. 157 at INA 000005847.

302.    The Meredith law firm invoices related to services rendered pertaining to the NOAA Agreement, problems caused by agents of ACE, regulatory matters, and the conferring with counsel as to salvage operations and the risks of towing.  Transcript of Bench Trial – Vol. 13 (May 26, 2011), Peter Halmos testimony at 146:1-25.

303.    INA was kept continuously informed as to the services being performed and costs being incurred by Plaintiffs throughout the Legacy-Wilma extraction process.  Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 175:25-176:9; 177:10-15; Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 68:24-69:6; Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 90:25-92:3.

**(iv) The Allegedly Fraudulent Attorneys' Fees Claim**

304.    INA accuses Plaintiffs of submitting improper attorney's fee bills from the Pillsbury law firm. Trial Exhibit No. E17.

305.    The Exhibit I3 invoices, which Ms. Harting-Forkey claims led her to conclude that the requests were fraudulent, were never submitted to INA for payment.[36] The Exhibit I3 invoices have "control" numbers, and were produced as a result of a third party subpoena to INA.  What was submitted to INA for payment and requested as damages in this action are contained in Trial Exhibit No. 255, which are the same group of invoices, but are redacted for items not requested to be paid. Trial Exhibit No. 255.

306.    With respect to the check register submitted by Mr. Halmos on October 30, 2007 (Trial Exhibit No. E17), the agreement was two-fold. First, any submissions for reimbursement and payments by INA were "subject to reservations of all rights, claims and defenses." Trial Exhibit No. E17 at PH-IYC-HPC 030217.  Thus, on November 29, 2007, Mr. Halmos received a check for $557,000.  *See* Trial Exhibit No. M17.  The check was a partial payment of the Pillsbury invoices and was not to be applied to any given invoice subject to the invoices being reviewed.  *See* Trial Exhibit No. K17 (where Ms. Harting-Forkey states: "at my request, [INA] granted authority to immediately pay 50% without benefit of the actual billings or detail.").   For the remainder, INA needed the actual invoices to review after they had been redacted.  *Id.* That review was to occur at Mr. Halmos' accountant's office, along with the review of all outstanding reimbursement requests.  *See* Trial Exhibit No. 219 at INA 000027765 (wherein Ms. Harting-Forkey states: "[y]ou are correct and (*sic*) apologize for the confusion" with respect to Mr. Halmos' outline of the agreed upon procedure for payment); *see also* Trial Exhibit No. 223 at

---

[36] Neither IYC nor Peter Halmos requested that INA pay the Pillsbury invoices, thus INA's allegation of fraud with respect to the submission of these invoices is misplaced. *See* Trial Exhibit No.  168 at HL 023249 (wherein Pamela Harting-Forkey states: "[b]ehind the scenes I approached my management about Mr. Campbell's bills in connection with obtaining the NOAA agreement. I know you haven't asked for this consideration, and I apologize for not consulting with you.")

INA 000052307 (where Peter Halmos states: "[w]e had agreed to a procedure regarding receipts, whereby ACE et al will go to my accountant's office to audit."); Trial Exhibit No. 224 (where Peter Halmos states: "[t]he back-up for each line item is available for inspection and copying at our accountant's office in West Palm Beach assuming ACE intends to proceed in the manner we discussed and agreed.").

307.   Plaintiffs did not intentionally misrepresent or conceal any material facts to INA or its representatives.   Transcript of Bench Trial – Vol. 21 (June 15, 2011), Peter Halmos testimony at 54:20-22.

308.   INA has set forth no evidence that any Plaintiff intentionally misrepresented or concealed any material facts to INA.

**D.   Conclusions of Law Related to INA's Fraud Defense**

309.   A party alleging fraud must demonstrate the following elements to sustain a claim for fraud:   (1) a material misrepresentation or omission of fact; (2) knowledge that the representation was false; (3) intent by the person making the statement that it will induce another to act on it; and (4) reliance on the representation to the injury of the plaintiff.   *Waters v. Intl. Precious Metals Corp.*, 172 F.R.D. 479, 501 (S.D. Fla. 1996).

310.   An insured's misstatement or over-valuation of the value of property does not constitute fraud where such misstatement stems from a disagreement as to the value of the property and where there was no evidence of any intent to deceive the insurer.   *J & H Auto Trim Co., Inc. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1372-73 (11th Cir. 1982) (Reversing lower court's judgment in favor of the insurer where evidence was sufficient to sustain a jury finding that although insureds may have overvalued the property, there was no purposeful and willful misrepresentation to the insurer as to the value of property following a loss).

Case No. 08-10084-CIV-BROWN

311.    INA has failed to establish that Plaintiffs intentionally concealed or misrepresented any material facts or that INA relied on any such misrepresentation to their detriment.   Accordingly, judgment on INA's defense of fraud should be entered in favor of Plaintiffs.

**E.   Findings of Fact Related to INA's Failure to Mitigate Defense**

312.    In defense of Plaintiffs' action for insurance benefits, INA asserts that Plaintiffs failed to mitigate their damages with respect to the claims asserted in this action.  Joint Pre-Trial Stipulation [D.E. 1273] at 37.

313.    The determination of when a vessel is seaworthy and safe to move is to be made by the insured.  Clear instructions on prior occasions were given to Mr. Halmos that "as long as you, the vessel owner, ascertain that the vessel is seaworthy and can safely be moved, you may take the vessel to any yard you choose."  *See* Trial Exhibit No. V10.

314.    INA placed the burden on Mr. Halmos to determine when the vessel was safe to move. *Id*.

315.    Salvage coverage under the policy would continue where: (1) there was reasonable apprehension of future damage to the vessel (Trial Exhibit No. 215 at INA 000027844); (2) "a boat is no longer navigable by its own power" (Trial Exhibit No. 291 at PH-IYC-HPC 075887); and (3) "a vessel is stranded" (Trial Exhibit No. 309 at 1 of 5); and would conclude "upon the delivery of the Legacy to Thunderbolt in Savannah." (Trial Exhibit No. 374 at INA 000044425).

316.    The Legacy could not be moved from its ungrounded location until September 15, 2005.

317.    From the date of "ungrounding" to the date that the vessel was moved to open water, IYC was incurring expenses directly related to rescuing the Legacy at a time in which she was unable to safely navigate under her own power.  The reasons are three-fold:

(1) the Legacy's systems, which would be needed in case something went wrong during tow, were all inoperable at the time of the "ungrounding." *See* Trial Exhibit No. 422 at INA 000227741 (where Ms. Harting-Forkey states: "Perini rep wasn't too heavy on advice, other than his eyebrows rose to his hair line when we talked about [powering up Legacy and moving her].");  *Id.* at INA 000227742 (wherein Ms. Harting-Forkey states: "I would not attempt to operate her under her own power."; *Id.* at INA 000227743 (wherein Ms. Harting-Forkey states: "Would recommend against power her up or attempting to operate until alongside in a yard and inspected.  Too many things can go wrong.").

(2) the Legacy would need to be prepared and insurance obtained for the vessel to be accepted by the limited number of yards that could accept a vessel like the Legacy.  *See also* Transcript of Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 123: 3-15; Trial Exhibit No. 209 at INA 000005124 ("Legacy is not seaworthy until all these improvisations are undone"); and Trial Exhibit No. 422 at INA 000227747 ("is ACE prepared to assume total risk?").

(3) during the preparations to move the Legacy to a yard and finding a yard and tow that would accept the Legacy without insurance, the keel of the Legacy dropped.  The vessel could not be moved with the keel in a down position.  Transcript Bench Trial – Vol. 6 (May 10, 2011), Peter Halmos testimony at 125:3-4; Transcript Bench Trial – Vol. 21 (June 15, 2011), David Byrd testimony at 15:2-13.  Thus, IYC worked to lift the keel and

prepare the vessel for transport.  Trial Exhibit No. 212.  As of July 8, 2008, INA knew of the issues and the gravity of the situation when it stated: "Go, and appreciate your keep (*sic*) us aprised (*sic*) of costs and what you're doing.  There are no other choices."  Trial Exhibit No. D13 at PH-IYC-HPC 031946.

318.    On several occasions throughout the Legacy extraction process, representatives of INA commended Plaintiffs on their extraction efforts, the services they provided, and the measures they undertook to mitigate their losses.  Trial Exhibit Nos. 83, 88, 170, 174, 181, 186, 207.

319.    Whenever a defect to Legacy was established by any known and customary test, any such defect was promptly and properly repaired. At all material times, prior to Legacy's 1995 launch and through the October 23, 2005 Hurricane Wilma loss, IYC and Peter Halmos exercised reasonable care and due diligence in the operation and maintenance of Legacy. At significant annual expense, IYC and Peter Halmos exercised the highest due diligence by continuing in full force – without lapse – Legacy's ABS certification after her 1995 launch.

320.    ABS certification is voluntary, not required for insurance coverage, and requires Legacy to be inspected by ABS surveyors numerous times each year. Legacy was hauled in January 2005 at the Bradford yard in Grand Bahama for ABS inspection of her hull, running gear, anchor systems, among others. Additional ABS inspections were done in August, 2005. By voluntarily submitting to ABS standards and requirements, regardless of cost, to assure Legacy is seaworthy and fit for intended use, IYC and Peter Halmos exercised the "care, caution, the attention and care required by a person in a given situation."

Case No. 08-10084-CIV-BROWN

**F.   Conclusions of Law Related to INA's Failure to Mitigate Defense**

321.   The facts on record establish that Plaintiffs mitigated their damages by undertaking all reasonable and necessary actions, which actions were directed or encourage by and approved of by INA.  No evidence has been advanced indicating that Plaintiffs failed to mitigate their damages.  Accordingly, judgment on INA's defense of failure to mitigate should be entered in favor of Plaintiffs.

## VII.   INA'S DECLARATORY JUDGMENT ACTION

322.   INA seeks a declaration from the Court stating that INA has fully paid all amounts due and owing to Plaintiffs under the various insurance Policies at issue in the instant action.[37]

323.   For the reasons set forth above and below, this Court finds that INA owes additional monies to Plaintiffs in relation to the above-referenced Claims.

324.   Accordingly, judgment should be entered in favor of Plaintiffs with regards to INA's Declaratory Judgment action.

## VIII.   GENERAL CONCLUSIONS OF LAW

**A.   Plaintiffs' Damages**

325.   With respect to the Sol Claim, Plaintiffs' covered property damages total $1,253,332.89, plus pre-judgment interest. Transcript of Bench Trial – Vol. 8 (May 16, 2011), Peter Halmos testimony at 111:5-18; 114:9-13; Trial Exhibit Nos. 8, 10 and 288.

---

[37] In addition, INA seeks an order requiring Plaintiffs to cooperate and comply with their obligations under the Policies.

Case No. 08-10084-CIV-BROWN

326.    With respect to the Island Runner Claim, Plaintiffs' remaining covered salvage costs total $59,131.17, plus pre-judgment interest. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 151:10-16.

327.    With respect to the Mongoose Claim, Plaintiffs' remaining covered salvage costs total $86,977.25, plus pre-judgment interest. Transcript of Bench Trial – Vol. 5 (May 9, 2011), Peter Halmos testimony at 169:17-170:4; Trial Exhibit Nos. 286A and 256.

328.    With respect to the Legacy-Wilma Claim, Plaintiffs' remaining covered removal and salvage costs total $2,823,111.17, plus pre-judgment interest. Transcript of Bench Trial – Vol. 9 (May 17, 2011), Peter Halmos testimony at 42:15-22.  Trial Exhibit No. 289.

329.    With respect to the Count 15 Unjust Enrichment Claim, Plaintiffs' unpaid damages total $7,335,086.00 (excluding the period from November 1, 2008 to June 17, 2010) except as recovered by IYC, plus pre-judgment interest.

330.    With respect to the Count 16 Quantum Meruit Claim, Plaintiffs unpaid damages total the $25 million that INA was exposed to under its policy for repairs to the environment, together with Plaintiffs' legal service fees $6,000,000.00, plus pre-judgment interest.

**B.   Attorney's Fees**

331.    If judgment is entered in favor of Plaintiffs and against INA, Plaintiffs are entitled to attorneys fees and costs pursuant to Fla. Stat. §627.428.  *All Underwriters v. Weisberg*, 222 F.3d 1309, 1315 (11th Cir. 2000) (A federal district court may award attorney's fees, pursuant to Fla. Stat. §627.428, which allows an insured or named beneficiary under an insurance policy to recover attorney's fees on a judgment in the insured's favor and against an insurer in a maritime insurance contract case).  Such fees are typically determined and assessed post-judgment.

Case No. 08-10084-CIV-BROWN

## C.   Prejudgment Interest

332.    Plaintiffs are entitled to prejudgment interest from the date of the loss. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla. 1985); *Chalfonte Condo. Apartment Ass'n, Inc. v. QBE Ins. Corp.*, 526 F.Supp.2d 1251, 1261 (S.D. Fla. 2007) (Holding that under Florida law, when damages are liquidated on a plaintiff's out-of-pocket pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest from the date of that loss); s*ee also SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir. 2007) (Holding that in diversity cases, federal courts follow state law governing the award of prejudgment interest).

Respectfully submitted,

VER PLOEG & LUMPKIN, P.A.
100 S.E. 2nd Street
30th Floor
Miami, FL  33131
(305) 577-3996
(305) 577-3558 *facsimile*

s/Stephen A. Marino, Jr.
**Stephen A. Marino, Jr.**
Florida Bar No. 79170

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on August 15, 2011 on all counsel or parties of record on the Service List below.

s/Stephen A. Marino, Jr.
**Stephen A. Marino, Jr.**

Case No. 08-10084-CIV-BROWN

**SERVICE LIST**

Frank J. Sioli, Jr., Esq.
Zascha B. Abbott, Esq.
Brown Sims, P.C.
Datran One - Suite 908
9100 South Dadeland Boulevard
Miami, FL  33156
Telephone:  (305) 274-5507
Facsimile:  (305) 274-551
fsioli@brownsims.com
*Counsel for INA*

Kenneth G. Engerrand, Esq.
Michael A. Varner, Esq.
P. Michael Bowdoin, Esq.
Brown Sims, P.C.
1177 West Loop South
10th Floor
Houston, TX  77027-9007
Telephone:  (713) 629-1580
Facsimile:  (713) 629-5027
kengerrand@brownsims.com
mvarner@brownsims.com
mbowdoin@brownsims.com
*Counsel for INA*

Scott A. Bassman, Esq.
Dara L. Jebrock, Esq.
Cole, Scott & Kissane, P.A.
Dadeland Centre II
9150 South Dadeland Boulevard
Suite 1400
Miami, FL  33156
Telephone:  (305) 350-5303
Facsimile:  (305) 373-2294
scott.bassman@csklegal.com
dara.jebrock@csklegal.com
*Counsel for Strickland Marine Insurance, Inc.*

David P. Horan, Esq.
Horan, Wallace & Higgins, LLP
608 Whitehead Street
Key West, FL  33040
Telephone:  (305) 294-4585
Facsimile:  (305) 294-7822
dph@horan-wallace.com
*Counsel for INA*

Clinton Sawyer Payne, Esq.
DeMahy Labrador Drake Payne & Cabeza, PA
Alhambra Center – Penthouse
150 Alhambra Circle
Coral Gables, FL  33134
Telephone:  (305) 443-4850
Facsimile:  (305) 443-5960
cpayne@dldlawyers.com
*Counsel for INA*

Hugh J. Morgan, Esq.
Law Office of Hugh J. Morgan
317 Whitehead Street
Key West, FL  33040-6542
Telephone:  (305) 296-5676
Facsimile:  (305) 296-4331
hugh@hjmorganlaw.com
*Counsel for Peter Halmos, International Yachting Charters, Inc., and High Plains Capital*

Case No. 08-10084-CIV-BROWN

Joseph P. Klock, Esq.
Rasco, Klock, Reininger, Perez, Esquenazi,
Vigil & Nieto
283 Catalonia Avenue
Suite 200
Coral Gables, FL  33134
Telephone:  (305) 476-7100
Facsimile:  (305) 476-7102
jklock@rascoklock.com
*Counsel for International Yachting Charters,*
*Inc., and High Plains Capital*

Brenton N. Ver Ploeg, Esq.
Stephen A. Marino, Jr., Esq.
Ver Ploeg & Lumpkin, P.A.
100 S.E. 2nd Street
30th Floor
Miami, FL  33131
Telephone:  (305) 577-3996
Facsimile:  (305) 577-3558
bverploeg@vpl-law.com
smarino@vpl-law.com
*Counsel for International Yachting Charters,*
*Inc., and High Plains Capital*