UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

### CASE NO. 08-10084-CIV-MARTINEZ/BROWN

PETER HALMOS, et al.,

                                    *Plaintiffs,*

vs.

INSURANCE COMPANY OF NORTH
AMERICA, et al.

                                    *Defendants.*

_____

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the period beginning in 2001 and ending in 2005, Plaintiffs, IYC, HPC and Peter Halmos (*pro se*), allegedly suffered a series of losses with respect to certain vessels insured by Defendant, Insurance Company of North America ("INA"). On October 22, 2008, Plaintiffs filed suit against INA seeking both coverage and the recovery of expenses incurred as a result of the various losses under INA's insurance policies. Peter Halmos sought damages for unjust enrichment and quantum meruit as a result of the alleged time spent and expense incurred by Mr. Halmos in his efforts to protect the insured vessel *S/Y Legacy* and to negotiate, procure and comply with Agreements with NOAA for the release of all natural resource damage claims concerning the vessel after Hurricane Wilma.

The operative pleading is the Fourth Amended Complaint, filed May 5, 2010 ("FAC") [D.E. 688]. Defendant has maintained several defenses throughout this litigation, as offered most recently in the Answer and Counterclaim to the Fourth Amended Complaint [D.E. 976].  On January 18, 2011, judgment was entered on various claims and affirmative defenses asserted in the instant action.  *See* Order on Motions for Summary Judgment [D.E. 1237].  The claims that

proceeded to trial were:  (a) the *Sol* Claim; (b) the *Island Runner* Claim; (c) the *Mongoose* Claim; (d) the *Legacy* – Wilma Claim; (e) Count 15 (Unjust Enrichment); and (f) Count 16 (Quantum Meruit). This lawsuit was tried before the Court, without a jury, from May 3 to June 15, 2011.

In rendering judgment following a non-jury trial, Rule 52(a) requires a district court to make specific findings of fact and to state conclusions of law separately. *See Inspiration Yacht Charters, Inc., v. Inspiration Yacht Charters, II*, No. 09-CIV-20472, 2010 WL 5014371 (S.D. Fla. Dec. 12, 2010). The Rule "'does not require a finding on every contention raised by the parties, but requires the court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decisions and providing 'sufficient particularity' to facilitate meaningful review." *Id. (citing Feazell v. Tropicana Prods., Inc.,* 819 F. 2d 1036, 1042 (11th Cir. 1987)).

There was considerable conflicting testimony and the Court has utilized and considered the Eleventh Circuit instruction regarding Credibility of Witnesses in analyzing same. In addition, on numerous occasions during the testimony of Mr. Halmos, disagreement arose regarding whether plaintiffs had documentation to support his testimony that had been given to INA. Defense counsel demanded to see said documentation and the Court refused to order same - leaving the production of such documentation, if it existed, to the discretion of the plaintiffs. The Court made clear that the failure to produce would not result in a negative inference. Of course, the failure to produce left the Court with the evidence it had before it . . . in many cases simply the testimony of Mr. Halmos, to evaluate. *See, e.g., infra* ¶ 53, n.8.

To be sure, this was a most unusual and unique case. The saga endured by plaintiffs might well make a script for a book. The ensuing claims addressed by defendant were as far from "run of the mill" as anyone could imagine. The Court is not without sympathy for the ordeal

plaintiffs went through. Indeed, the record is full of indicators of sympathy on several fronts - including that of at least one of the adjusters handling this case. This clearly contributed to the most unusual happenstance of - on more than one occasion - the defendant paying claims without supporting documentation, simply on the "say-so" of Mr. Halmos, and in the end resulted in more than one substantial overpayment. The uncontroverted evidence is that an almost symbiotic relationship developed between Mr. Halmos and the primary INA adjuster, Pamela Harting-Forkey . . . until supporting materials for claims were requested and claims began to be questioned. It then turned quite adversarial - at least on the part of plaintiffs. Notwithstanding said sympathy, however, the Court reaches its decisions herein without being "influenced in any way by sympathy, or by prejudice, for or against anyone." Eleventh Circuit Standard Instruction regarding Consideration of The Evidence.

In accordance with the requirements of Rule 52(a), and having heard and considered all of the testimony, evidence, and arguments presented at trial, the Court makes the following findings of fact ("FF") and conclusions of law.  The Court will address the claims as previously outlined.

## BACKGROUND FACTS

1.  Plaintiff International Yachting Charters, Inc. ("IYC") is a Cayman Islands corporation with its principal place of business in Florida.  Plaintiff Peter Halmos ("Halmos") is the President of IYC and its sole shareholder.  Plaintiff IYC owned the *S/Y Legacy* ("*Legacy*"), a 158-foot Italian-built sailing vessel, and *Island Runner*, one of *Legacy*'s tenders.

2.  Plaintiff High Plains Capital ("HPC") is a Wyoming corporation, with its principal place of business in Florida.  Peter Halmos is the President of HPC and its sole shareholder. Plaintiff HPC is the owner of *M/V Mongoose* ("*Mongoose*"), a motorized sport fishing vessel.

3.  Defendant Insurance Company of North America ("INA"), a Pennsylvania

corporation, issued insurance policies on the foregoing vessels.

4.  INA issued an insurance policy bearing Policy # YWR Y06973504 to IYC to insure *Legacy*.  The policy contained a Dinghy-Tender Endorsement extending coverage for *Island Runner*.  The total insured value of *Island Runner* as indicated on the policy was $88,690.

5.  INA also issued an insurance policy bearing Policy # Y05031205 to HPC to insure *Mongoose*.  The policy coverage period extended from December 7, 2004 through December 7, 2005.

6.  The policies were issued and delivered to representatives of IYC and HPC.  The claims described below occurred during the applicable INA policies' coverage periods.

7.  At the time of trial, INA had made $24,873,620.00 in payments on the *Island Runner*, *Mongoose*, and *Legacy* claims.  Although not all of those payments were for property damage, those payments did resolve, in full, plaintiffs' property damage claims, except for the *Sol* allision claim.  The only claims (other than the *Sol* allision claim) that remained for consideration by this Court involve claims for salvage and protection against loss.

8.  To find for plaintiffs on their claims in this case would require this Court to rely substantially, if not entirely, on the testimony of Mr. Halmos, which this Court simply cannot do.[1]  His inconsistencies, if not outright contradictory actions and words, combined with more credible and believable testimony of other witnesses and documentary evidence in this case, make that an impossibility.[2]

---

[1] For example, in considering ¶¶ 38 and 39, *infra*, the only evidence of the damages or worth of the *Island Runner* are the words of Mr. Halmos.

[2] Not atypical of the situation is Mr. Halmos' testimony that he remained on *Legacy* after the NOAA Agreement because "I wanted to" (Trial Tr. vol. 6, 89 May 10, 2011), but in the very next breath he testified "I told her I wanted to go home" (*id.* at 90). Furthermore, he stated "there would be recriminations" (*id.*) which were in an e-mail that the Court would see (*id.* at 107), but no such e-mail has been identified.  Plaintiffs' proposed finding of fact on this matter (¶150) does not cite any such e-mail for support.  Unlike the production issue addressed in the preamble, this

9. This case was tried to the Court in a bench trial, as plaintiffs asserted unspecified claims invoking this Court's admiralty jurisdiction.

## I.   THE *SOL* CLAIM

10. Plaintiff IYC asserts a breach of contract claim against INA for failing to pay for damages allegedly incurred by *Legacy* as a result of a 2001 allision with the vessel *Sol*. The factual and legal disputes underlying this claim concern whether IYC provided sufficient proof of its damages; whether it properly filed an insurance claim; and whether the claim and the lawsuit were timely asserted and filed.

11. On September 15, 2001, a storm caused the anchor of *Sol* to drag, and *Sol* allided with *Legacy* as a result.

12. More than seven months later, on April 30, 2002, IYC, through its insurance broker Bill Meyers, provided notice of the incident to Vance Barker of Strickland Marine Insurance, Inc. ("Strickland"). Bill Meyers and Strickland were the "'agents' [Halmos] ha[d] 'for [the] purpose' of dealing with ACE/INA." Trial. Tr. vol. 9, 112:2-17 May 17, 2001. Halmos testified that Strickland was "our agent who[m] we relied on 100 percent" (*id.* at 114:11-22), and that "Strickland was hired, engaged by IYC as an agent to represent IYC in the procurement of insurance." *Id.* at 111:21-25-112:1; *see also* FAC, ¶ 12 (referring to Strickland as IYC's "agent"). Bill Meyers was Halmos' general insurance broker, and Strickland was a "specialist" he used to handle marine matters. Nowhere does the policy applicable to the *Sol* allision (issued to IYC in 2001) state that Strickland is the authorized agent for INA. It further should be noted that this Court finds, without resolving the agency question in the legal sense, that plaintiffs were of the belief (and manifested same on numerous occasions) that they were communicating at that

_____

is an example of a document promised, but never produced.

time with their own agent (Strickland) and not an agent of the defendant.  Another example of this belief, although later in time, is represented by Exhibit J-10.

13.  In the April 30, 2002 communication, Bill Meyers did not make any claim against INA related to the incident.

14.  Bill Meyers also contacted Strickland to discuss a limitation of liability action filed by the owner of *Sol*.  Again, Bill Meyers did not make a claim against INA for any property damage to *Legacy*.

15.  It is undisputed that, as of the end of 2002, IYC had not submitted a claim to INA because IYC was "attempt[ing] to have the *Sol*'s owner's insurance company pay for the repairs, rather than [having them paid] under [IYC's] policy." Trial Tr. vol. 5, 82:12-21 May 9, 2011.

16.  On March 31, 2003, IYC sent another notice to Strickland.  In that notice, Halmos acknowledged that he had not yet made a claim, but stated that he was "going to make one now." Ex. 12, p. 1 (admitted for notice purposes only).

17.  Over the next month, Bill Meyers communicated twice more with Vance Barker of Strickland. The communications indicate that no claim against INA was being made or pursued. In one communication, Bill Meyers asked what was going on "re the claim" (Ex. 15), and Vance Barker responded that "[w]e are all trying to avoid a claim being posted against this policy" (Ex. 14). Indeed, Barker testified that he "had gotten specific instructions not to report a claim." D.E. 1224 (Ex. 8), p. 70:10-12.

18.  Despite providing notice of the incident to Strickland, IYC never made a claim under the INA insurance policy.   Instead, IYC told Strickland not to make a claim.

19.  Further, Bill Meyers never sent a sworn statement of the loss to Strickland or to INA, as required by the terms of the applicable insurance policy.

6

20. In subsequent communications with INA on other matters, Halmos was asked to provide the claim number for the *Sol* claim, but failed to do so.

21. In two separate sets of interrogatories propounded in 2004 in different litigation involving the parties to the *Sol* allision, both IYC and Halmos stated that they had *not* filed insurance claims involving the *Sol* allision.

22. In two separate depositions conducted in different litigation involving the *Sol* allision, Halmos swore under oath that he made no claim upon the INA policy.

23. INA has no records of any claim having been made based on the *Sol* incident. In fact, INA searched its records in an effort to obtain a complete inventory of all claims made by IYC and HPC in any policy year – no claim arising out of the *Sol* incident was located.

24. IYC's failure to make a claim prejudiced INA's ability to adjust the claim that IYC now asserts.

25. IYC failed to provide INA with any information regarding damages sustained by *Legacy* or damage estimates for the repair of *Legacy* until June 2010, almost nine years after the allision. The first time IYC presented INA with any back-up for the amounts claimed for the *Sol* incident was in January 2011.

26. The only repair estimate IYC ever offered showed that the cost of repairs was below the $70,000 property damage deductible found in the applicable insurance policy. IYC did not offer any admissible evidence that this estimate was reasonable and necessary to repair *Sol*. IYC did not offer any other evidence of damages at trial.[3]

_____

[3] IYC offered a letter from attorney Bob Arnold to *Sol*'s insurance carrier, but the letter was admitted only for purposes of notice. Arnold was not listed or qualified as an expert at trial and no testimony was received from Arnold. Viewed in a light most favorable to plaintiffs, this hearsay letter was written by a West Palm Beach attorney, who was not called to testify, to a different insurance claims office (not INA) purporting to have ascertained damages (as a result of the *Sol* collision) by reviewing work done on *Legacy* prior to the collision, and putting together numbers from yet other unknown sources. While it does, indirectly, refer to the damages set forth

27.   IYC also offered no evidence of any reasonable and necessary costs related to protection against loss or salvage with respect to the *Sol* allision.

## II.   THE *ISLAND RUNNER* CLAIM

28.   Plaintiff IYC also asserts a breach of contract claim against INA for failing to pay for the costs of salvaging *Island Runner* after it was lost at sea.   The factual and legal disputes involved in the claim are whether the claimed costs constitute salvage, whether IYC proved its claimed damages, and whether IYC voided the policy by failing to cooperate with INA, or committed fraud during the claims process.

29.   Plaintiff IYC originally asserted a property damage claim, but INA paid its policy limit, and IYC presented no evidence at trial that it was entitled to any additional damages on its property damage claim or that INA breached the contract in paying the property damage claim. To the extent that IYC contends that the property damage claim was not paid in timely fashion, the Court rejects same.  *See infra* ¶¶ 37-42.

### A.     Prior to Being Lost at Sea, *Island Runner* Was Unseaworthy

30.   On or about July 28, 2003, *Island Runner* was lost at sea while in the tow of *Legacy*.

31.   Before it was lost, *Island Runner* was suffering from significant mechanical issues. Its engine was "obviously aged" and "slightly corroded" (Trial Tr. vol. 17, 93:15-17 June 2, 2011), and the engine had seized in the days before *Island Runner* was lost.[4]   The boat's

_____

in Exhibit J-8, there is no evidence that said document is attached to the letter.

  [4] Although Halmos testified that the engine was fixed in the five days before the boat was lost,  the Court does not find that testimony credible, in light of the fact that the replacement parts for the crankshaft had to come from Japan, vessel logs do not demonstrate that the repairs were made prior to the tender being lost, and IYC has presented no documents, receipts, or other proof that the repairs were made.

hydraulic steering and fuel filtration systems had both been disconnected immediately prior to the boat's loss. The boat was also experiencing oil leaks and corrosion.

32.   Due to these severe mechanical issues, *Island Runner* was unseaworthy as of July 2003.

### B.   IYC Did Not Salvage *Island Runner*

33.   After *Island Runner* was lost, IYC made an unsuccessful search for the vessel. The effort lasted less than one day.

34.   On or about August 3, 2003, *Island Runner* was salvaged by Harold Walkin, and was placed in a customs office lot in South Caicos.

35.   In January 2004, IYC took *Legacy* on a fourteen day cruise to South Caicos to inspect *Island Runner*.

36.   Neither the costs incurred by IYC in the initial search nor those incurred during the South Caicos cruise qualify as "salvage charges" under INA's policy because IYC did not salvage *Island Runner*. Additionally, *Island Runner* had already been salvaged and was in no maritime peril when IYC took *Legacy* on the two week cruise to inspect it. IYC presented no evidence at trial of any other alleged salvage charges or protection against loss costs.

### C.   IYC Withheld Material Evidence Related to the *Island Runner* Property Damage Claim

37.   On February 24, 2004, IYC submitted a notice of loss to Strickland and made a claim for salvage and property damage.[5]  On March 2, 2004, INA received the notice of the loss.

---

[5] Halmos testified that he instructed Bill Meyers to provide notice of the *Island Runner* claim before January 2004 when *Legacy* went to South Caicos to inspect the vessel. That testimony is not credible, because Meyers retired in 2003, prior to the loss of *Island Runner*. Halmos also testified that he did not make the claim earlier because *Island Runner* had not been found, and that had the vessel not been found, no claim would have been made. The Court also does not find this testimony credible.

38.   In attempting to resolve the property damage claim, INA requested information regarding *Island Runner*'s location, as well as evidence of its value.  IYC did not respond at all to the first three of these requests.  IYC represented in response that *Island Runner* was "one sweet boat," was in great/pristine condition, and had a value exceeding $200,000.00.  Ex. 65.  In fact, IYC represented it would obtain replacement cost information but, as it turns out, never did.  No credible evidence was ever offered to support these claims, much less any evidence that corroborating support was ever sent to INA.  While Halmos later claimed that there was no supporting documentation of the boat's value, he clearly knew who built it and could have obtained a declaration from that source.  There is no evidence he ever attempted to do so.

39.  IYC did not disclose, and intentionally withheld, *Island Runner*'s severe mechanical and other problems during the claim submission process.[6]  IYC's claim that "I maintain my equipment in as close to perfect condition as possible" (Ex. 65) is rejected in light of more credible evidence to the contrary.

40.   In addition to affirmatively misrepresenting the condition of *Island Runner*, IYC failed to provide other information INA needed to adjust the claim.  For example, IYC never provided the replacement cost estimates.  Finally, INA sent Stewart Hutcheson ("Hutcheson"), an expert marine surveyor, to survey the vessel to try to get a handle on the damages claim.

41.   The withheld information was material to the claims adjusting process.  INA relied upon IYC's misrepresentations as to the condition of *Island Runner* when it issued payment on the property damage claim.  Ultimately, INA paid IYC $88,690.00, without ever receiving any supporting documentation of the vessel's value.  Although it was not required to make this

---

[6]  Although an entry in the vessel's daily log indicated that IYC "contacted the insurance" about a "knocking engine" around the time *Island Runner* was lost (Ex. A-20, p. 3), no evidence was presented at trial that "the insurance" was INA, and the call did not disclose to "the insurance" that it was related to *Island Runner*.

10

payment under the terms of the policy, this action on the part of INA does not expand or alter coverage, as discussed further *infra*.

42. IYC's failure to provide requested information and its withholding of other material information, while misrepresenting the condition and value of the vessel, prejudiced INA's ability to accurately adjust the claim for property damage. INA paid the claim in full, even though it would not have done so had INA known the truth about *Island Runner*'s condition and value.

**D.     IYC Also Withheld Information Necessary To Adjust the Claim for Salvage Costs, But INA Nonetheless Attempted To Settle the Claim**

43. IYC's *Island Runner* claim included a request for salvage costs, representing expenses incurred on the unsuccessful search for *Island Runner* during the hours after it was lost, as well as on the subsequent fourteen day journey to South Caicos to inspect the vessel. IYC requested $8,066.40 in costs for the initial search and $56,464.77 in salvage costs for the fourteen day cruise.

44. In 2005, INA requested that IYC provide information related to the salvage claim, but Halmos claimed that the inquiries were "bad faith per se" and that he would "turn this over to lawyers and tell them to do whatever it takes" if the matter was not resolved in ten days. Ex. G-9. Halmos did not provide the requested information.

45. On June 3, 2006, despite the lack of information from IYC, INA offered IYC $5,400.00 because that amount of money had been offered as a "reward" in other circumstances. INA also invited IYC to support its claim for reimbursement with back-up documentation. IYC never responded to the $5,400.00 offer to resolve the salvage claim. While it is arguable that this "payment" was late, it was not really an owed claim so the "lateness" of same is irrelevant. *See supra* ¶ 36.

46. Over four years later, on June 9, 2010, IYC for the first time provided some

11

documents regarding its claimed salvage expenses during discovery in this case. No information, support, or explanation was provided by IYC or Halmos before that date. Additional supporting documents were not sent until January 2011. This was over five full months after the discovery cut-off date in this case. *See* D.E. 706 (adopting the deadlines proposed in D.E. 698).

47. Despite INA's belief that the only information presented demonstrated that the charges sought were not covered by the applicable insurance policy, INA paid $5,400.00. Although it was not required to make this payment under the terms of the policy, this action on the part of INA did not expand or alter coverage, as discussed further *infra*.

48. IYC's failure to provide the requested information prejudiced INA's ability to adjust the salvage claim that IYC now asserts.

### III. THE *MONGOOSE* CLAIMS

49. Plaintiff HPC asserts a breach of contract claim against INA for failing to pay for certain salvage costs incurred in connection with *Mongoose* as a result of Hurricanes Katrina and Wilma. INA did pay $28,000 for the costs of towing and securing *Mongoose* after she was grounded by Katrina. INA also ultimately paid almost $400,000 in property damage costs for *Mongoose. See infra* ¶ 71. HPC contends, however, that INA owes an additional $86,569.43 in salvage costs. The factual and legal disputes relevant to this claim are whether the additional costs claimed qualify as salvage costs, whether HPC showed that the costs were reasonable, necessary, and covered, and whether HPC voided the applicable policy by committing fraud.

50. Plaintiff HPC also originally asserted a breach of contract claim for property damage, but as INA paid all necessary and reasonable costs related to that claim, HPC withdrew its property damage claim, and HPC presented no evidence at trial that it was entitled to any

additional damages on that claim.[7]

## A.   *Mongoose*'s Initial Grounding in Hurricane Katrina

51.   On August 25, 2005, *Mongoose*, a sport fishing vessel, was grounded in the Great White Heron National Marine Sanctuary during Hurricane Katrina.

52.   HPC made a claim on the applicable insurance policy. The claim was promptly acknowledged by INA.

53.   On September 15, 2005, *Mongoose* was removed from the sanctuary and towed to Peninsula Marine, a repair yard in Key West.  HPC and Halmos picked Peninsula Marine as the "best reasonable choice to protect against further damage." Ex. R-10; Ex. P-10, p. 1; Ex. Q-10, p. 1; Ex. V-10; Ex. X-10.  INA played no role in that decision,[8] but it paid $28,000 for the costs of extracting the vessel and towing it to the shipyard.

54.   From the time *Mongoose* was delivered to Peninsula Marine until Hurricane Wilma, the vessel was on blocks or in a sling, was secure, and was not in maritime peril.

55.   The Peninsula Marine estimate prepared as part of the Part A: Property Damage Coverage claim allocated sixty days for storage and repair of *Mongoose* at a cost of $24,620.11.

56.   INA dispatched Hutcheson to survey *Mongoose* while it was at Peninsula Marine. Hutcheson's survey, conducted on September 16, 2005, concluded that Peninsula Marine's estimate of $24,620.11 for hurricane repairs was fair and reasonable.   HPC rejected the estimate.

57.   At no time prior to Hurricane Wilma did HPC submit its own estimate regarding damages caused by Hurricane Katrina.  INA tendered payment to HPC for the damages related to Hurricane Katrina that were reported by Hutcheson.  HPC rejected that payment.

---

[7] To the extent plaintiff HPC claims that the payment was not timely, that claim is rejected in light of the findings of fact herein.

[8] Although Halmos testified that "Mr. Hutcheson ordered that the vessel be taken to a yard in Key West, that I objected to for numerous reasons" (Trial Tr. vol. 8, 105:22-106:1 May 16, 2011), the Court discounts that testimony in light of the conflicting documentary evidence.

**B.    Subsequent Damage to *Mongoose* from Hurricane Wilma**

58.   On October 24, 2005, while *Mongoose* was still on dry-land and up on blocks at Peninsula Marine, Hurricane Wilma struck Key West.

59.   In mid-December 2005, HPC made a claim on the applicable insurance policy for damage to *Mongoose* allegedly caused by Hurricane Wilma. The claim was promptly acknowledged by INA, and Hutcheson immediately conducted another survey. HPC consulted with Multihull Technologies regarding the cost to repair the hurricane damage to *Mongoose*.

60.   On February 15, 2006, Multihull provided HPC with a damage estimate of $84,935.75 related to damages incurred in both Hurricane Katrina and Hurricane Wilma; this figure consists of $29,295 for repairs for Katrina-related damage, $26,265 for repairs for Wilma-related damage, plus expenses for hauling, blocking, and launching. Halmos was also notified of a separate repair estimate for damages that existed prior to the two hurricanes. HPC rejected that estimate as well.

61.   Based on his own survey, Hutcheson concluded that the Multihull Technologies estimate was reasonable, and INA accordingly made several offers to resolve the Hurricane Katrina and Hurricane Wilma damage claims based on that estimate. The Court agrees that Hutcheson's and INA's reliance on the Multihull Technologies estimate was reasonable.

62.   In response to INA's offers to resolve the claims, Halmos stated: "If you issue and send the check over my objections, by copy of this e-mail to Gail Meyers I am instructing her to not deposit the check and return it to you [INA]." Ex. G-11, p. 1.

63.   In February 2006, INA sent HPC a check in the amount of $23,463.38 to cover repair costs incurred in connection with Hurricane Katrina damage. HPC returned the check.

64.   Rather than have *Mongoose* repaired at Peninsula Marine or Multihull, HPC decided to take the vessel to Merritt Boat and Engine Works, Inc. ("Merritt"), the builder of the vessel,

14

and *Mongoose* traveled to Merritt under its own power.

65.   HPC received a survey dated August 17, 2006, from SuperYacht Technologies demonstrating that most of the damage to *Mongoose* was unrelated to the hurricanes. Specifically, this survey found a lack of general maintenance, observing: "Due to no apparent maintenance being carried out at all on the boat over the years either cosmetically or technically the overall condition of the vessel has deteriorated to that of very poor. I believe that its market value now would be around $250,000 USD as 'a fixer-upper.'" Ex. B-12, p. 3.   The report continued that "[t]he vessel has been neglected over a long period of time and the evidence on board shows this in every way." *Id.*.   The report concludes that "[o]verall . . . there is no evidence of any hurricane or wind damage." *Id.*   HPC and Halmos failed to disclose this survey or its underlying facts to INA. This amplified and reinforced the prior pre-hurricane damage report referenced in paragraph 60.

66.   Throughout 2006 and into early 2007, after HPC rejected the estimates from Peninsula Marine and Multihull Technologies, INA repeatedly requested a *Mongoose* repair estimate from HPC so that the claim could be adjusted.   HPC did not respond until April 2007.

67.   On or about April 9, 2007 HPC had a new damage estimate performed by Merritt. The Merritt estimate was $467,851.00—more than five times the Multihull estimate. The Merritt estimate was provided fourteen months after the Multihull estimate was issued and twelve months after Peninsula Marine represented that it could have completed the Katrina repairs.

68.   Even after receipt of the April 9, 2007 Merritt estimate, HPC still refused to repair *Mongoose*.   Merritt had a bay open to repair the vessel around May 2007, but HPC would not permit the repairs to occur. In an effort to work with HPC and Halmos to have the vessel quickly repaired, INA even offered to advance certain repair costs so the work could commence, but HPC rejected that offer as well.

69. Instead of having *Mongoose* repaired, HPC allowed the vessel to sit moored and unattended, unmaintained, and unrepaired for a substantial length of time. The vessel continued to deteriorate in the absence of repairs.[9]  Halmos even told his own son to "keep [his] nose out of the Mongoose situation" and its deteriorating condition (Ex. H-1), and he acknowledged to INA that the failure to repair the *Mongoose* was "not an ACE issue but rather a Halmos issue" (Ex. C-20, p.1).

70. Notwithstanding HPC's failure to cooperate in the repair of the vessel, it requested payment for the full amount of the Merritt invoice.  HPC represented to INA that this estimate comprised the costs necessary to repair items damaged by Hurricane Katrina and Hurricane Wilma.  INA relied upon this representation in continuing to adjust the claim.

## C.    HPC Withheld Information Material to the Claim for *Mongoose* Repair Costs

71. On February 27, 2008, INA offered to pay HPC $572,712.01 in exchange for a full policy release of claims involving hurricane damage to *Mongoose*.  HPC agreed to the amount, but ultimately (after several follow-up inquiries from INA) refused to agree to the terms of the release.

72. When HPC would not agree to the settlement, INA ultimately paid HPC $393,034.34 under the Part A: Property Damage Coverage provision.

73. INA made that payment in reliance on Halmos' representation that the Merritt estimate reflected Merritt's assessment of the amount of damage attributable to the hurricanes. INA later learned that Halmos knowingly misrepresented the nature of Merritt's estimate.

74. In fact, Halmos knew that the Merritt estimate included not only costs for repairing

---

[9] Halmos testified that he wrote Roy Merritt disputing Merritt's statements that *Mongoose* was being left unattended and permitted to deteriorate. Halmos offered to present those communications to the Court, but never did.  The Court finds Roy Merritt's letters to be credible.

hurricane damage, but also costs for making general renovations to *Mongoose*. The portion of the Merritt estimate related specifically to hurricane damage was only $58,000, an amount consistent with INA's own previous surveys and estimates.

75. HPC also failed to disclose to INA communications from *Mongoose*'s builder, Roy Merritt, who confirmed that most of the damage sustained by *Mongoose* was unrelated to either hurricane.[10]   Specifically, on May 30, 2006, Merritt wrote Halmos that the "majority of the repairs needed by the Mongoose are the result of general wear and neglect and not directly related to hurricane damage." Ex. Q-6. HPC knew that the Merritt estimate reflected the fact that the majority of needed repairs were occasioned by general wear and tear but failed to disclose that fact to INA. Instead, HPC continued to represent that *Mongoose* was always properly maintained and in excellent/pristine condition before the hurricanes.

76. The information Halmos failed to disclose to INA would have been material to the claims adjusting process. INA relied upon these material misrepresentations and would have adjusted and paid the claim differently had the true information been timely disclosed.

**D.     HPC Also Withheld Information Material to the Claim for *Mongoose* Salvage Costs**

77. In addition to the foregoing repair costs claim, HPC submitted a claim of $55,093.57 for salvage costs on November 8, 2007, more than two years after *Mongoose* was secured at Peninsula Marine. This was the first submission of salvage costs by HPC.

78. HPC's claim for *Mongoose* salvage costs simply contained a list of dates and amounts, with the generic title "*Mongoose* Salvage Charges." Ex. V-11, pp. 2-3. No detail or

---

[10] Although Halmos testified that this communication was sent to INA during the claims adjustment process, the Court finds more credible Pamela Harting-Forkey's testimony on this matter.

supporting documentation was presented, even though Halmos understood that he had an obligation to provide additional supporting documents.

79.  In response to the November 8, 2007 submission, Pamela Harting-Forkey responded with a list of the types of supporting documents INA needed.  This list included the invoices/bills and a description of how the item was used.  HPC did not provide the requested documentation or descriptions.[11]

80.  In January 2011, five months after the close of discovery, HPC first produced documents allegedly supporting its claims for incurred salvage costs in Exhibit 286-A (admitted for demonstrative purposes only).  That exhibit claimed roughly $86,000 in costs - approximately $30,000 more than HPC originally claimed.  HPC also submitted Exhibit 286-C, a box of receipts purportedly corresponding to the claimed expenses in Exhibit 286-A.

81.  The costs listed in Exhibit 286-A include, among other things, a claim for the annual renewal of the boat registration, and costs incurred long *after Mongoose* had been secured at Peninsula Marine and was not in peril. *See* Ex. 286-C.  HPC did not demonstrate at trial what these non-descriptive bills were for, much less how each of the expenses claimed on Exhibit 286-A or each receipt found within Exhibit 286-C was a reasonable and necessary expense either for salvage or protection against loss, and whether these expenses were covered under the INA Policy.

---

[11] Halmos testified that he "believed" he responded to this email (Trial Tr. vol. 11, 77:6-11 May 23, 2011), but he declined to show the Court that response when provided the opportunity to do so.

## IV.  THE *LEGACY* CLAIM

82.  Plaintiff IYC asserts a breach of contract claim against INA for failing to pay costs incurred to salvage and repair *Legacy* after Hurricane Wilma.  The factual and legal disputes relevant to this claim are whether the claimed costs constitute salvage and protection against loss costs (and whether there was a failure to mitigate); whether IYC proved its damages; whether the charges submitted by IYC are covered under the policy; whether IYC voided the applicable policy by failing to cooperate, by breaching either its contract with INA or the implied warranty of seaworthiness, or committing fraud; and whether, by partially paying selected attorney fees, INA waived a defense that such a claim did not fall within the scope of coverage.

83.  IYC had also asserted a property damage claim, but INA paid the $16 million policy limit on the *Legacy*, so that claim is no longer before the Court.

### A.      Prior to the Events at Issue, *Legacy* Was Unseaworthy

84.  On October 24, 2005, Hurricane Wilma struck south Florida, damaging *Legacy*. Prior to the storm, *Legacy* was experiencing several mechanical and other problems.  On March 16, 2005, Halmos detailed, in writing, extensive conditions that rendered *Legacy* not "fit for use," as he put it.  Ex. B-20, p. 9.  Halmos reported that *Legacy* had improper gauges for measuring halon in the vessel's fire-fighting system, and that as a result the system "was short 60 lbs. [of halon] in each tank," which "render[ed] the system insufficient for the intended fire-fighting purpose." *Id.* at 7-8.  A "major engine room fire," he reported, "would have jeopardized all aboard and likewise *Legacy*." *Id.* at 7.[12]  Halmos also observed that *Legacy*'s "sailing system" was not operational and "ha[d] not been operational since 2001." *Id.* at 8. There was also a "bilge/sewage stench" that "rendered [the master] cabin impossible to use and, intermittently, the

---

[12] It should be noted that Policy # YWR Y06973504 insuring *Legacy* has a specific Fire Extinguishing System Agreement that requires the insured to have "a built in and automatic system of fire extinguishing apparatus . . . maintained in good and efficient working order."  Ex. 1, p. 7.

other staterooms, dining room bar and salon areas." *Id.* at 1. Halmos continued: "The stench is intolerable and has caused nausea, headaches, eye irritation, vision impairment, and respiratory/allergy problems, among others." *Id.* The fresh-air system was "used only into the crew area and [was] 100% blocked for the crew area aft." *Id.* at 6. Halmos also reported that valves in the bilge system leaked and lacked necessary alarms and pumps to avoid flooding. Failure of one of the valves flooded the forward-port stateroom. *Id.* at 9. Caulking between the teak deck planks was insufficient, causing rotten wood and corroded steel. *Id.* at 7.[13]

85.    The foregoing conditions rendered *Legacy* unseaworthy when the policy was renewed on August 7, 2005.[14]

86.    The unseaworthy conditions were material to INA. Had the condition of *Legacy* been disclosed to INA prior to the policy's renewal, INA would not have renewed the policy or would have placed the vessel on port risk until it was repaired.[15] Had IYC refused to repair these conditions, the policy would not have been renewed.

### B.    The Grounding and Salvage of *Legacy*

87.    Hurricane Wilma struck on October 24, 2005, causing *Legacy* to become grounded in

---

[13] There is no credible evidence that this document or the contents thereof were disclosed to INA prior to the policy's renewal.

[14] This Court ruled that plaintiffs could not attempt to rebut the March 16, 2005 letter with evidence of *Legacy*'s condition as of August 2005. Trial Tr. vol. 8, 141-150 May 16, 2011. Notwithstanding this ruling, plaintiffs were permitted to offer several pieces of evidence that they contended rebutted the letter and, by extension, a potential finding the vessel was unseaworthy. For example, the Court admitted into evidence that *Legacy* was ABS certified in August 2005. This ABS certification, however, does not definitively establish that the vessel was seaworthy. *See, e.g., Sabine Towing Co. v. Brennan,* 72 F.2d 490, 494 (5th Cir. 1934), *made binding by, Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981); *Kuithe v. Gulf Caribe Maritime, Inc.,* C.A., 08-0458-WS-C; 2010 WL 3419998, at *3 (S.D. Ala. Aug. 26, 2010). Most importantly, there is uncontroverted testimony that, even with knowledge of said certification, the underwriting opinion on the *Legacy* would still have resulted in a non-renewal of the policy.

[15] "Port risk" is a term used to describe the situation in which a vessel is sent to a safe, INA-approved location to allow it to be repaired or stored pending repair.

an environmentally sensitive nature preserve (the "Sanctuary").

88.  IYC made a claim on the applicable insurance policy.  The claim was promptly acknowledged by INA.

89.  Because *Legacy* was grounded in a federally protected nature preserve, it was necessary for IYC to work with the National Oceanic and Atmospheric Administration ("NOAA") to determine how the boat could be moved without damaging the Sanctuary.

90.  From August 2006 through January 2007, IYC and Halmos, through their chosen counsel, Thomas Campbell with Pillsbury Winthrop Shaw Pittman, L.L.P. ("Pillsbury"), negotiated with NOAA.

91.  On January 5, 2007, IYC and Halmos finalized settlements with NOAA, entering into two separate agreements.  IYC and Halmos insisted on these agreements, even though no evidence was presented that NOAA or the State of Florida had ever pursued, or was intending to pursue, a remediation claim against Halmos or IYC.

92.  The first agreement settled the claims between NOAA and IYC; the second settled the claims between NOAA and Halmos.  IYC and Halmos were separately released from all liability, including fines, penalties, and natural resource damage caused by the grounding of *Legacy*.  Specifically, the NOAA agreements released IYC and Halmos from any remediation obligations for which INA had not already paid.

93.  Plaintiffs contend that NOAA required remediation of the Sanctuary.[16]  However, plaintiffs have produced no evidence of any communication from NOAA requiring any remediation.  Despite the lack of any such requirement from NOAA, Robert Nailon, IYC's

---

[16] Although Halmos testified that a 38,000 square foot hole had to be remediated, this testimony is contradicted by the testimony of plaintiffs' own remediation expert, Robert Nailon. In any event, IYC offered no evidence regarding the cost to remediate that area.

remediation expert, testified at his May 11, 2010 deposition that remediation would cost $16,000. INA issued a check to IYC in that amount in July 2010.

94.   While the negotiations with NOAA were ongoing and after the agreements were executed, several unsuccessful attempts were made to salvage *Legacy*.  It ultimately took eight to nine months to extract *Legacy* from the Sanctuary.

95.   During these efforts, INA neither dictated which salvor should be used nor hired any salvor of its own. INA paid for all salvage efforts that were reasonable, necessary, properly documented, and covered under the applicable INA policy.

96.   Ultimately, on February 24, 2008, *Legacy* was freed from the Sanctuary.

97.   Once *Legacy* was freed, it was towed to a secure anchorage off of Key West.  After being extracted and towed from the Sanctuary on February 24, 2008, *Legacy* was safe, securely anchored, and out of peril in Key West Harbor.

98.   Halmos himself repeatedly asserted, in contemporaneous writings, that *Legacy* was secured immediately after being removed from the Sanctuary.  On March 7, 2008, Halmos wrote that "Legacy is in a secure anchorage . . ." and the "[o]nly risk is other boats moored nearby get loose and collide with Legacy in a storm." Ex. Z-12, p. 1.  A week and a half later, he reiterated that "Legacy is in a secure location, the primary risk being smaller craft nearby breaking loose in a storm and colliding with Legacy.  There is no comparably safe anchorage I know of along the eastern Florida coast." Ex. A-13, p. 1.  On April 3, 2008, Halmos wrote that "[t]he Byrd clan has safely, without any known additional damage, salvaged Legacy and moored her in the anchorage just north of the Historic Seaport." Ex. M-13, p. 1.  The next day, Halmos again wrote that "Legacy is safely at anchor." Ex. P-17, p. 2.  On May 3, 2008, Halmos wrote that "Legacy is as safe and secure as anyone can reasonably make her, and this is the best place for her . . . ." Ex. 243, p. 2.

99.  Accordingly, salvage ended on February 24, 2008 when *Legacy* was freed from the Sanctuary, was safely anchored, and was no longer in peril.[17]

### C.   IYC Failed to Mitigate Damages to *Legacy* Following Salvage

100.  Given the damage *Legacy* sustained during Hurricane Wilma, it should have been towed to a repair yard as quickly as possible to prevent further deterioration.  When it was extracted, there were multiple repair yards where *Legacy* could have been taken.

101.  Upon its extraction from the Sanctuary, it would have taken two to three days to prepare *Legacy* for towing and only a day or two to complete the tow.  There was no condition on the vessel that prevented it from being towed at that time.  On June 17, 2008, Halmos wrote that the "keel is securely up" and that major systems were functional. Ex. B-13, p. 1.

102.  Indeed, at that time, Halmos told INA his intention was to have *Legacy* towed to port for repairs.  INA did not dictate any towing company or repair yard for IYC to use for *Legacy* repairs.

103.  Halmos, however, did not have *Legacy* towed to a repair yard for reasons that are unrelated to the salvage issue.  One reason he chose not to move *Legacy* was that he believed that the NOAA release was effective only as long as *Legacy* remained around Key West. Throughout this process Mr. Halmos wanted to be the only one making decisions with regard to *Legacy*. For example, on April 6, 2008, Halmos declared:  "Again with all due respect, only one person decides what preparations for towing are of benefit. Me. It's my boat, my crew on the boat, and it's my wretched rear-end on the boat with them.  When, based on the best advice I can get, I conclude Legacy is towable it's then I'll be ready for due diligence on P&L towing." Ex. 209, p. 1.

---

[17] This finding is supported by uncontroverted expert testimony from both INA and plaintiffs' witnesses.

104. On July 7, 2008, Halmos reported that *Legacy*'s keel had dropped and could not be retracted. *Legacy* was still secure at its anchorage, and thus was not in marine peril at that time.

105. Even with a "dropped" keel, the vessel could have been towed to a repair yard. On July 9, 2008, Halmos wrote that *Legacy* could be towed to Tampa Bay Shipbuilding & Repair "with the keel down." Ex. 212, p. 1. On August 26, 2008, Halmos wrote that IYC was preparing to tow *Legacy* "regardless of [her] keel being up or down." Ex. G-13, p. 1.

106. The keel and other equipment were repaired by October 2008 at the latest, and the vessel could have been towed at that time. IYC nevertheless did not tow *Legacy* to a repair yard until June 2010. Regardless of whether *Legacy* could be towed, however, the vessel was securely anchored and the boat was not in peril after February 24, 2008.

### D.   INA Made Efforts To Obtain Estimates of *Legacy*'s Damage

107. Stewart Hutcheson surveyed *Legacy* in 2005 while it was hard aground. He issued a reserve estimate of $5 million and a field estimate of $4.5 million, subject to receiving a repair estimate from the shipyard. Halmos vigorously disputed these figures, and as early as January 8, 2006, IYC instructed INA not to issue checks based upon Hutcheson's field estimates for any matter involving Halmos.

108. INA repeatedly requested any estimates or surveys that IYC had regarding repair costs for *Legacy*. Gail Meyers, the owner of the CPA firm that handled plaintiffs' finances, testified she was told five months after the hurricane to delay sending invoices requested by INA. She admitted that at least as of May 2007, one and one-half years after the hurricane, she was still sending requests for reimbursement in monthly lump sums without supporting documentation or explanation. Lisa Feagans of her office admitted that in 2009 she sent documents that had been requested two years earlier. INA specifically requested any estimates or surveys from Perini Navi ("Perini"), the vessel's builder. IYC and Halmos provided nothing to INA. INA finally

requested estimates directly from Perini, but was told that they could be released only with Halmos' permission.

109.   By May 2006, Halmos was expecting to receive an estimate of property damage from Perini.   On or about June 23, 2006, Perini sent Halmos an estimate of $4,804,047.60,[18] representing that this estimate "can be considered valid for insurance purposes." Ex. V-12, p. 1.

110.   This estimate was not sent to or disclosed to INA. In fact, Halmos denied receiving same.  INA was unaware of its existence until January 2011 when Perini responded to INA's subpoena.  In the intervening time period, IYC represented that *Legacy*'s hull damages exceeded $16 million - the liability limit for property damage under the applicable policy.   IYC and Halmos made this representation knowing that the undisclosed Perini estimate was almost 75% lower than the policy limit.

111.   The Perini estimate contained material information that was essential to the claims adjustment process and would have been utilized during the process had it been disclosed to INA.  Had INA known of this estimate, it would have paid the hull claim because the Perini estimate was consistent with Hutcheson's estimate and contained the necessary pricing information from a repair yard.  Instead, INA had to wait until 2008 to perform a full survey, in concert with Perini - after *Legacy* was out of the Sanctuary. By that point, the vessel had deteriorated, causing a higher damage evaluation.

112.   Based upon Halmos' representations that Perini and others determined that *Legacy* was a total loss, INA (coupled with Knowles' survey reports many years later) paid the $16,000,000 policy limit, far in excess of the damage valuation contained in the concealed Perini estimate of $4.8 million.

---

[18] On June 23, 2006, the conversion factor between Euro and USD currencies was: $1.26290 USD = 1 Euro.  Therefore, the € 3,803,981.00 estimate was equal to $4,804,047.60.

### E.    IYC Obstructed and Misled INA During the Claims Adjustment Process

113.   In June 2006, INA and IYC (through its attorney, John Kimball) agreed to a set of "ground rules" to govern the claims submission process.  The parties agreed that IYC would submit periodic accountings to INA of IYC's expenses, and INA would have the right to audit the backup documentation.

114.   The parties further agreed that all communications affecting the rights of the parties would be in writing.  This was done to ensure that there were no misunderstandings between the parties.

115.   During the claims submission process, INA made clear that John Kimball's (Healy & Baillie, L.L.P./Blank Rome) and Bruce McAllister's (Alley Maass) attorneys' fees were not covered by the applicable policy.  INA also made clear that Halmos' time and that of his companies was not covered.

116.   Although not obligated to do so under the applicable insurance policy, INA did agree to pay the legal expenses IYC incurred in the negotiation of the NOAA agreement.  INA agreed only to those specific expenses.  It did not agree to pay for any Pillsbury expenses unrelated to execution of the NOAA agreement, nor did it agree to pay other firms for any expenses.  INA was not aware of the alleged involvement of Blank Rome and Healy & Baillie, L.L.P. in the NOAA negotiations, and IYC presented no evidence that these firms were involved in the NOAA agreement negotiations.

117.  Pursuant to the parties' agreement, INA repeatedly requested accountings from IYC. Pamela Harting-Forkey even volunteered to go to Florida to assist IYC in the claims submission process.  Halmos never informed his accountants of this offer of assistance.  Instead, Halmos viewed INA's requests for accountings and offers to pay vendors directly as unreasonable attempts to "grind him down."  Trial Tr. vol. 11, 160:17-161:10 May 23, 2011.

118. IYC continued to request additional time to submit accountings and supporting documents.

119. Around that time, INA also repeatedly requested that IYC provide invoices from Pillsbury. Halmos told INA that the invoices would be forthcoming. Pillsbury never sent any fee bills to INA for payment.

120. It was not until Pamela Harting-Forkey read an October 5, 2007 article in the *Charlotte Observer* that she discovered that IYC was spending in excess of $1 million per month on the "salvage efforts."[19] Trial Tr. vol. 16, 170:25-171:2 June 1, 2011; Ex. B-17, p. 1.

121. On October 8, 2007, INA again wrote Halmos and requested an accounting. In response, Halmos conceded that INA had repeatedly requested an accounting and that IYC had not provided it. Yet no accounting was forthcoming (despite more promises to send invoices for reimbursement). Instead, Halmos sent a list of expenses, but the list contained only the date, a reference column, an amount, and an identical description for each entry: "Legacy salvage charges and expenses to protect." Ex. L-17. No further description or supporting documentation was provided.

122. Later that month, on October 30, 2007, INA received its first document summarizing payments IYC had made to Pillsbury. On November 3, 2007, IYC first advised INA of IYC's claim that Blank Rome and Jorden Burt, two additional law firms, were involved with the NOAA negotiations. At that point, IYC submitted its internal check register related to the apparent payment of the legal invoices for those two firms. This check register stated that $184,345.60 had been paid to Blank Rome and that $144,357.20 had been paid to Jorden Burt, but it provided INA with no information regarding the work that was completed or how it related

---

[19] In contrast to IYC's contention that Pamela Harting-Forkey ratified or approved all of IYC's expenses, Halmos admitted that expenditures were made without knowing whether they were covered under the policy or whether INA would reimburse them.

to the NOAA negotiations. Because IYC provided no supporting documentation or explanation, INA could not adjust the claim from the information provided.

123. Pamela Harting-Forkey promptly responded and indicated that while she was unfamiliar with each firm's involvement with the NOAA negotiations, she was willing to review invoices if they were submitted to her. Despite this request, IYC provided no legal invoices or supporting documentation for Blank Rome or Jorden Burt. IYC presented no evidence that INA ever agreed to reimburse any legal expenses related to the negotiation of the NOAA agreement other than those of Pillsbury.

124. The only information Meyers was permitted to release to INA was a check register of payments made to Pillsbury. These check registers stated that (ostensibly cumulative) payments of $1,114,141.32 and $1,398,813.93 were made to Pillsbury. The check registers contained no information upon which a reasonable insurance adjuster could evaluate the submission for payment and/or coverage under the applicable insurance policy. The check registers were accompanied with a request for reimbursement.

125. Based upon Halmos' promise to forward the supporting invoices and documents and the representation that these fees were related to the negotiation of the NOAA agreement, INA agreed to reimburse half of the Pillsbury invoices that IYC submitted for reimbursement. INA issued a check for $557,070.66, which Halmos acknowledged receiving in November 2007. INA's attempts to obtain the supporting invoices and documentation continued

126. In response to INA's repeated requests for supporting documents, Halmos acknowledged, at least six months prior to filing suit, that INA was trying to "settle up." Trial Tr. 95:17-19, 101:19-20 May 25, 2011. Indeed, immediately prior to filing suit, Halmos requested an extension of the statute of limitations. Pamela Harting-Forkey granted Halmos' request to file claims under the INA policy, noting that the contract statute of limitations in

Florida is five years and that period had not yet expired.  She refused to grant an extension of time for asserting extra-contractual claims without IYC providing an explanation of those claims so that INA could work out such issues with IYC.  Halmos responded by instructing his counsel to "timely file papers" against INA.  Ex. N-21, p. 1

127.  IYC failed to provide any accountings with supporting documentation until after the present suit was filed in October 2008.

128.  Unbeknownst to INA, Halmos told his accountant, Gail Meyers, not to release the "intercompany" invoices and legal bills and supporting documentation.  He gave the same instructions to Lisa Feagans

129.  On November 20, 2008, Halmos wrote INA and explained that for more than a year IYC had been compiling documents to be submitted.  Unbeknownst to INA, Halmos had instructed Meyers to keep track of all expenses having anything to do with the vessels, and to bundle the expenses into an omnibus INA claims submission.  However, he instructed Meyers to limit the information provided to INA to just date, vendor name, and check number/wire identification.

130.  On December 4, 2008, after the lawsuit was filed, IYC sent a list of expenses for reimbursement.[20]  This list too was essentially a check register, containing only the name of the vendor, a date, and an amount.  IYC did not provide supporting documentation necessary for INA to adjust the claim.

131.  At the same time, IYC submitted to INA a multi-million dollar reimbursement request for work Halmos' companies Intelligence Services Corporation ("ISC") and Peter Halmos & Sons ("PHS") allegedly provided.  IYC and Halmos represented that the ISC invoices

---

[20] Although Halmos testified that Pamela Harting-Forkey only requested a list of what was being spent and "[n]ot so much accounting support and explanations" (Trial Tr. vol. 8 163:11-20 May 16, 2011), the Court credits Harting-Forkey's testimony that she repeatedly requested back-up documentation.

  
were for "Administration, Staff Support and Allocated Overhead," and the PHS invoices were for "Administration and Logistical Support" related to salvage and protection against loss of *Legacy* due to Hurricane Wilma.  Ex. Z-20; Ex. Z-19; Ex. 226.  IYC had never disclosed ISC's and PHS's involvement prior to the December 4, 2008 reimbursement request.

132.  The ISC and PHS invoices were not based upon actual time incurred, expenses, or other tangible items.  Instead, the invoices were based upon a variety of vague, ambiguous, and subjective factors that Halmos considered in determining the amount to be placed on each month's bill.  Gail Meyers would then create the invoices based upon what Halmos told her, without any supporting documents.  When asked to provide the backup information supporting the invoices, Halmos provided random papers, none of which demonstrated how the invoices were actually calculated.  There is no evidence that IYC ever actually paid the invoices from ISC and PHS for which IYC requested "reimbursement."

133.  The ISC and PHS invoices contained misrepresentations, including that they were for "administration, staff support and allocated overhead" and "administration and logistical support" related to the salvage of *Legacy* and her protection against loss.  IYC and Halmos also intentionally concealed from INA that the invoices were not based upon actual time incurred, expenses, or other tangible items.  IYC and Halmos intentionally submitted this false and misleading information to INA for the purpose of inducing reimbursement for expenses that were not due and owing.  Indeed, Lisa Feagans testified that Halmos instructed her not to produce inter-company invoices such as from PHS.

134.  In October 2008, IYC offered to permit INA to inspect records at the office of IYC's accountant.  In December 2008, INA retained George Uhl, a forensic accountant, to help organize and track various materials (including spreadsheets and documentation) related to the claimed expenses.  INA sent Uhl to Florida to meet with Gail Meyers at her office to attempt to

determine what had been submitted and to obtain the information INA had been requesting so that INA could determine whether the charges were covered under INA's policy. When Uhl arrived in Florida, however, IYC refused to permit him to meet with Meyers.[21]

135.  INA continued to forward material to Uhl, who would attempt to correlate the lists of expenses to the backup information provided. Uhl could not find any backup documentation for many of the entries on the IYC list of expenses, such as the Porsche or motorhome rentals.

136.  Based on the work done by Uhl, Pamela Harting-Forkey determined whether sufficient backup documentation existed to warrant payment and whether that documentation established that the charges were covered under the INA policy, that is, whether they constituted "salvage" or "protection against loss." She determined that sufficient backup documentation did not exist to determine whether many of the requests were reasonable, necessary, and covered under the INA policy.

137.  INA was ultimately required to subpoena records from all the law firms whose charges are at issue in this litigation. After Halmos had instructed Gail Meyers and Lisa Feagans not to produce the legal bills, IYC and IYC's counsel, Pillsbury, vigorously fought the production of those invoices in both this Court and in a Texas federal court. Production of the complete invoices was only made after this Court ruled that privileges had been waived for these records. When Pillsbury turned over invoices and some supporting documentation, its claim for attorneys fees dropped by half a million dollars. Unbeknownst to INA, the invoices for which INA reimbursed IYC contained work that was wholly unrelated to the negotiation of the NOAA agreement, such as work on a contract dispute with Patton Marine, work on a contract dispute

---

[21] Although Halmos testified that he had an "open door policy" with INA and it "could send anyone down at any time, with or without notice" to his accountant's office to review the backup documentation, the Court credits Uhl's testimony that he was not permitted to meet with Meyers after he traveled to Florida for that purpose.

with Rybovich Marine,[22] the ACE Insurance matter, Monroe County Citations, and the Halmos dispute with Alan Cutler. The ACE insurance work for which reimbursement was sought included "work on bad faith aspects of ACE claim" and even development of an "ACE 'playbook.'" IYC's reimbursement requests included researching Florida law on unfair claim practices and bad faith as early as November 2006. IYC and Halmos intentionally submitted these reimbursement requests for items that were not covered under the INA policy to obtain amounts that were not due and owing, and accepted INA's payment for amounts that were not due and owing.

138.   These legal invoices demonstrate that the $557,070.66 already paid by INA exceeded the total amount of Pillsbury's legal fees through January 5, 2007, the date the NOAA agreement was executed, for all work done by Pillsbury on "the yacht Legacy" matter, whether related to the NOAA negotiations or not.

139.   Had INA known that the check register included unrelated matters that were not covered under INA's policy, INA would not have advanced the $557,070.66 in legal fees.

140.   On or about February 19, 2009, after this lawsuit was filed, IYC began shipping unorganized boxes of documentation to INA.  This was the first time that IYC sent supporting documentation for its salvage and protection against loss reimbursement requests to INA.

141.   On February 24, 2009, March 4, 2009, and August 11, 2009, IYC sent INA additional submissions.  These boxes contained no description, organization, or manner by which INA could determine what was being submitted, why it was being submitted, and how it related to any coverage under INA's policy.  Per Halmos' specific instruction, legal bills and inter-company invoices were not produced.

---

[22] Though Halmos testified at trial that these billings were related to the Hurricane Wilma claims, he admitted that the litigation related to the Patton and Rybovich claims had commenced prior to Hurricane Wilma.

142. IYC submitted additional documentation as the present litigation continued. Seven more lists of expenses were also sent by IYC. INA forwarded these documents to Uhl for review and inclusion in a spreadsheet he compiled from all of the information he was reviewing. INA then reviewed the Uhl spreadsheet to determine if sufficient information existed to permit payment. This process continued through February 2011 and INA continued to make payments as it obtained documentation from IYC.

143. During the course of this litigation, Gail Meyers created a spreadsheet reflecting costs incurred by IYC in connection with *Legacy*. Meyers admitted that she did not know when these charges were submitted to INA. This spreadsheet did not assist INA in adjusting the claim because it, too, failed to include supporting documentation. Further, Halmos never informed Meyers that Pillsbury reduced its previously paid bills by half a million dollars, and thus Meyers' spreadsheet did not reflect the deduction.

144. INA paid for all claimed salvage charges and protection against loss expenses for which IYC provided sufficient supporting documentation or adequate explanation to establish that a charge was a reasonable and necessary salvage charge or protection against loss expense under the policy. When payment was made, Uhl would update his spreadsheet, and a copy of the spreadsheet was forwarded to IYC so it could determine what was being paid.

145. IYC did not provide both spreadsheets and supporting documents in any organized and understandable format until September 2010 and January 2011 - after the close of discovery in July 2010. The information contained in those documents existed prior to the discovery cut-off date, but Halmos did not authorize its disclosure until this point. The only explanation IYC offered as to why the claimed costs were covered under the policy was Halmos' general statement at trial that the expenses were for "necessary steps to protect Legacy and - and relocate her from the marine sanctuary." Trial Tr. vol. 8, 90:24-91:3 May 16, 2011.

146.   Not atypical of the claims made were many of those in Exhibit 286-A as "supported" by Exhibit 286-C. Numerous items therein were for charges incurred prior to Hurricane Katrina, the bill for the annual renewal of the boat registration and other items either obviously not covered or not supported with any relationship to hurricane damage.

147.   Plaintiffs presented no evidence establishing that any specific charge was reasonable and necessary for salvage of *Legacy* or for protection against further loss. Plaintiffs also failed to offer any expert testimony supporting their claimed charges for salvage and protection against loss.[23]

148.   In addition to withholding information necessary to adjust the *Legacy*-Wilma claim, IYC and Halmos attempted to seek reimbursement for costs they knew were not recoverable. IYC and Halmos submitted approximately $4 million in legal bills from Merideth Law Firm to INA for reimbursement. IYC and Halmos represented that those fees were for "Legal and Legal Support Services" related to salvage and protection against loss of *Legacy* due to Hurricane Wilma. Ex. A-4. This was the only description provided on each legal bill.

149.   The Merideth invoices, however, were not for legal services at all. David Merideth admitted that he did not perform this work, that he did not know anything about it, that he did not supervise it, that his office did not generate the invoice, and that he was not paid for the work. In fact, he had never even seen the invoices.

150.   The Merideth invoices instead were for Peter Halmos' own time, as well as time spent by his employees purportedly under the supervision of Robert Arnold, a Florida lawyer.

---

[23] Where IYC did provide INA with evidence that a claimed cost was reasonable and necessary to salvage, INA quickly agreed to the cost and even offered to pay the cost directly. Where IYC paid the costs directly, INA would provide prompt reimbursement, assuming IYC provided the required documentation and complied with the terms of the authorization to make the expense. In the case of the Toyo pump, for example, IYC failed to provide information about how much it was used and failed to return the pump to INA after its use. Nonetheless, INA reimbursed IYC for the pump.