Halmos did not provide any documents reflecting Arnold's own work and billing on the matter, though he was specifically given the opportunity to do so.[24] Halmos is not a lawyer.

151. Halmos did not provide any credible explanation for how he determined the amount of each invoice for his and his employees' time. Time was not kept on an hourly basis or at an hourly rate. Halmos instead listed a variety of vague, ambiguous, and subjective factors that he considered in determining the amount to be placed on each month's bill. When asked to provide the backup information supporting the invoices, Halmos showed random papers that did not demonstrate how the invoice was calculated. He had no time slips or other supporting invoices/information.

152. Halmos also never informed INA that the invoices for his and his employees' time were never actually paid by Plaintiffs. Halmos instructed Gail Meyers not to provide any supporting documents related to these claims to INA.

153. Only after David Merideth admitted in a deposition that he had nothing to do with the work reflected in the Merideth invoices - as Halmos knew all along - did plaintiffs withdraw the claims related to those invoices.

## V. HALMOS' PERSONAL CLAIM FOR REIMBURSEMENT OF EXPENSES ALLEGEDLY INCURRED TO SALVAGE AND PROTECT *LEGACY*

154. Halmos did not have his own insurance policy with INA, but he alleges that INA told him that he was personally required to protect *Legacy* and her crew following Hurricane Wilma, and that he is due reimbursement for his efforts.

155. On October 24, 2005, the day Hurricane Wilma hit, Halmos spoke with Janet Thomas ("Thomas"), who was then a marine claims specialist for ACE. Thomas stated her interaction with Halmos was in his capacity as a representative of the corporation.

---

[24] As noted, *supra*, Arnold was not called as a witness.

156.   In said capacity, Halmos requested assurances that INA would make certain payments before he incurred charges associated with rescuing the vessel and crew.

157.   In response, Thomas sent IYC a letter, addressed to Halmos as IYC's authorized agent, confirming their conversation. The letter lists the insured as "International Yachting Charters, Inc." Ex. G-12.   Thomas confirmed her intent to send the letter to IYC through its authorized agent.

158.   Thomas never told Halmos that he, in his personal capacity, had to take any steps or actions to protect *Legacy* and her crew. To the contrary, all of INA's communications were directed to Halmos as IYC's authorized agent. After all, who else could INA communicate with as it regards the insured?

159.   In fact, although Halmos remained with *Legacy*, he was not personally involved in the salvage activities.[25]   Halmos made statements to Harting-Forkey consistent with Exhibit A-1 wherein he is quoted as saying, "we fish, we scuba-dive, we look for shells" - "all in all, it's not a bad way to live." Trial Tr. vol. 16, 146:16-21 June 1, 2011 (referring to Ex. A-1, p. 7).

160.   Further, INA made clear to Halmos that he could leave *Legacy*. Harting-Forkey even offered to discuss INA taking over the salvage operation with her superiors, but IYC refused.[26]

161.   In short, INA never required Halmos to remain at the salvage site.   He remained there only because he chose to. *See supra.* ¶ 8, n. 2.

---

[25] Although Halmos testified that he participated in the salvage work, the Court finds credible Allen Byrd's contrary testimony that Halmos did not.  Halmos did observe or supervise remediation work John Coffin performed after *Legacy* was extracted from the nature preserve, but this was "post-salvage" work.

[26] Halmos pointed to an e-mail Harting-Forkey sent him in June 2007 as evidence that he was not allowed to leave *Legacy,* but the Court disagrees with Halmos' characterization of the e-mail.

162.  Moreover, as discussed above, Halmos never provided adequate documentation for any personal expenses he claims to have incurred to salvage and protect *Legacy* following Hurricane Wilma.  Nor did Halmos provide documentation sufficient to establish that any such expenses were reasonable and necessary for salvage and protection against loss or that Halmos' expenses were covered under the INA policy.

## VI.    HALMOS' PERSONAL CLAIM FOR UNJUST ENRICHMENT RELATED TO NOAA NEGOTIATIONS

163.  Halmos alleges that INA was unjustly enriched by his efforts to negotiate a settlement agreement with NOAA.

164.  As noted above, because *Legacy* was grounded on a nature preserve, Halmos and his attorneys negotiated agreements with NOAA to govern the removal of *Legacy*.  Halmos, individually, is not a party to the agreement between NOAA and IYC, and he provided no consideration for that agreement.

165.  Neither NOAA nor the State of Florida ever filed suit against Halmos, Halmos is not insured under the INA policy, and Halmos presented no evidence that such a claim would have been covered under the applicable insurance policy.  The release of such claims, which are not covered under INA's policy, conferred no benefit on INA.

166.  Halmos also failed to present any evidence that any amount would have been due and owing to NOAA or the State of Florida due to the grounding of *Legacy*.

167.  Even if this Court were to accept that INA received some sort of indirect benefit from the NOAA contracts, there can be no dispute that plaintiffs also received a benefit.

## CONCLUSIONS OF LAW

**I.     BURDEN OF PROOF**

1.      The policies involved in this case are maritime insurance contracts.   In the absence of an applicable substantive admiralty rule, state law governs the disputes.  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321 (1955).   With respect to procedural matters, federal law governs.  28 U.S.C. § 2072.

2.      Under Florida law, to prevail on a breach of contract claim, the plaintiff must establish: (1) a valid contract; (2) a material breach; and (3) damages.  *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008).

3.      In the context of a breach of contract claim involving an insurance policy, the plaintiff bears the burden of proving that a particular claim is covered by the policy.  *See LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997); *N. River Ins. Co. v. Broward County Sheriff's Office*, 428 F. Supp. 2d 1284, 1288 (S.D. Fla. 2006); *E. Fla. Hauling, Inc. v. Lexington Ins. Co.*, 913 So. 2d 673, 678 (Fla. 3d DCA 2005); *Hollywood Flying Serv., Inc. v. Compass Ins. Co.*, 597 F.2d 507, 508 (5th Cir. 1979).

4.      The plaintiff also bears the burden of proving his damages.  *See, e.g., Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977) ("It is elementary that in order to recover on a claim for breach of contract the burden is upon the claimant to prove by a preponderance of the evidence the existence of a contract, a breach thereof and damages flowing from the breach."); *Exhibitor, Inc. v. Nationwide Mut. Fire Ins. Co.*, 494 So. 2d 288, 289 (Fla. 1st DCA 1986) ("In a suit to recover under an insurance policy, the insured must prove that the loss did occur and that it was within the coverage of the policy."); *cf. USAA Cas. Ins. Co. v. Shelton*, 932 So. 2d 605, 608 (Fla. 2d

DCA 2006) (noting, in the context of uninsured motorist coverage, that the "insured bears the entire burden to prove that her claimed damages were reasonable, necessary, and related to the accident").

## II.     IYC'S CLAIM RELATED TO THE *SOL* ALLISION FAILS

### A.     IYC Produced No Evidence In Support of Damages for Its Property Damage or Protection Against Loss Claims

5.     As noted above, the insured bears the burden of proving its damages.

6.     The only evidence concerning the *Sol* allision property damage claim that had any semblance of credibility was a repair estimate from Rybovich Spencer, dated October 12, 2001, for $40,800.00. However, even regarding that estimate, IYC presented no evidence that the estimate was reasonable, necessary, or covered under the policy. Further, the estimate fell below the $70,000 property damage deductible provided in the applicable insurance policy (*see* FF ¶ 26), and thus INA had no duty to pay it. IYC presented no other evidence of damage from the *Sol* allision, and no evidence at all that any expenses for protection against loss were reasonable or necessary.

7.     Given the complete absence of any damage beyond the policy deductible, IYC's breach of contract claim related to the *Sol* allision fails as a matter of law.

### B.     IYC Never Filed a Claim Related to the *Sol* Allision

8.     It is undisputed that IYC never filed a claim directly with INA. Instead, IYC contends that it filed a claim when it provided Strickland with notice of its loss. For IYC to prevail on this claim, IYC must prove that (1) Strickland was INA's agent and (2) the notice IYC provided Strickland qualifies as a "claim." IYC failed to establish either proposition.

9.     Under both Florida and maritime law, an insurance broker is presumed to be the agent of the insured, *not* the insurer. The presumption can be rebutted if the insured

39

demonstrates that the insurance broker was, in fact, the insurer's agent. *See, e.g., Essex Ins. Co. v. Zota*, 985 So. 2d 1036, 1048-49 (Fla. 2008); *Amstar Ins. Co. v. Cadet*, 862 So. 2d 736, 739–40 (Fla. 5th DCA 2003); *see also Certain Underwriters at Lloyd's, London v. Giroire*, 27 F. Supp. 2d 1306, 1313 (S.D. Fla. 1998) ("the general rule in the context of marine insurance [is] that a broker acts as agent for the insured"); *Great Lakes Reins. (UK) PLC v. Morales*, 760 F. Supp. 2d 1315, 1324 (S.D. Fla. 2010) (same).

10.    IYC failed to present credible evidence sufficient to prove that Strickland was acting as INA's agent.  The only evidence IYC offered that would even suggest that Strickland was INA's agent was Halmos' testimony to that effect.  But that testimony was contradicted by Halmos' own repeated prior statements under oath as well as substantial contradictory documentary evidence.   Because Strickland was not acting as INA's agent, IYC's communications with Strickland did not represent submission of a claim to INA. The fact that Strickland was authorized to issue policies for INA (and other companies as well) does not change that fact. There is no evidence in this record that Strickland did anything regarding the making or handling of claims other than to forward same to the insurance company . . . acting as agents for the insureds.

11.    Even if Strickland were INA's agent, IYC failed to present evidence establishing that IYC's communications with Strickland constituted a claim, rather than merely providing notice of loss.  The evidence instead consistently showed that IYC was specifically avoiding making a claim against INA. *See* FF ¶¶ 12-22.

12.    Because IYC failed to demonstrate that it submitted a claim to INA with respect to the *Sol* allision, IYC failed to establish that INA breached the policy by not paying IYC for costs resulting from that allision.

40

### C.   IYC Unreasonably Delayed In Providing Notice of the Loss and Bringing a Claim

#### 1.   IYC Breached The Policy's "Notice of Loss" Provision Requiring IYC To Notify INA "As Soon As Possible"

13.   The policy governing the *Sol* claim contains terms specifying how claims should be reported.  The policy requires an insured to "report *in writing to us, or our authorized agent, as soon as possible* after the occurrence of any accident, loss, damage or expense that may be covered under this policy." Ex. 1, p. 24 (emphasis added).  The provision continues: "If you do not provide the notice to us as required by this section as soon as possible, any claim for such loss under this policy will be voided." *Id.*

14.   Under Florida law, an insured's failure to comply with a policy provision requiring timely notice of loss is a valid basis for denying recovery under the policy. *See Ideal Mut. Ins. Co. v. Waldrep*, 400 So. 2d 782, 785 (Fla. 3d DCA 1981).  The insurer must be prejudiced by the lack of timely notice, but prejudice is presumed, so the burden is on the insured to prove that failure to give timely notice did *not* prejudice the insurer. *Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1218 (Fla. 1985) ("If the insured breaches the notice provision, prejudice to the insurer will be presumed, but may be rebutted by a showing that the insurer has not been prejudiced by the lack of notice.").

15.   "Prompt notice" under Florida law means notice "given with reasonable dispatch and within reasonable time in view of all the facts and circumstances of the particular case." *Palma Vista Condo. Ass'n of Hillsborough County v. Nationwide Mut. Fire Ins. Co.*, No. 8:09-CV-155-T-27EAJ, 2010 U.S. Dist. LEXIS 118262, at *7–8 (M.D. Fla. Oct. 7, 2010) (citing *Laster v. U. S. Fidelity & Guar. Co.*, 293 So. 2d 83, 86 (Fla. 3d DCA 1974)).  Whether notice is reasonable is a question of fact.  *Id.* (citing *Renuart-Bailey-Cheely Lumber & Supply Co. v. Phoenix of Hartford Ins. Co.*, 474 F.2d 555, 557-58 (5th Cir. 1972)).

41

16.     IYC did not provide the prompt notice required by the policy.  Although IYC knew of the *Sol* allision in 2001, it did not provide INA with notice of the loss until at the very earliest - viewed in a light most favorable to plaintiffs - on or about March 31, 2003, eighteen months after the allision.  This notice was not "prompt" by any definition.

17.     Given IYC's delay in giving notice, prejudice to INA is presumed, and IYC presented no evidence to rebut that presumption.  By contrast, INA presented ample evidence *confirming* the presumption and showing that IYC's failure to provide timely notice prevented it from adjusting the claim.  FF ¶ 23.

### 2.     IYC's *Sol* Claim Is Not Barred By Laches Because of IYC's Unreasonable Delay in Bringing a Claim

18.     INA also asserted the affirmative defense of laches.  *See* D.E. 976, p. 29.  INA bears the burden of proof on this issue.  *Steward v. Int'l Longshoreman's Ass'n*, 306 F. App'x 527, 530 (11th Cir. 2009); *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 974 (11th Cir. 2007).

19.     To establish laches, a party must demonstrate "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused . . . undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005) (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)).  "'A suit in admiralty' . . . 'is barred by laches only when there has been both (1) unreasonable delay in the filing of the libel and (2) consequent prejudice to the party against whom suit is brought.'"  *Fidelity & Casualty Co. v. C/B Mr. Kim*, 345 F.2d 45, 51 (5th Cir. 1965) (citing *Akers v. State Marine Lines, Inc.*, 344 F.2d 217, 220 (5th Cir. 1965)).

20.     The Court finds that the evidence supports a finding that IYC inexcusably delayed in asserting a claim as to the *Sol* allision, but that INA has failed to provide sufficient proof of prejudice due to the delay.

21.     Because the defense of laches is only relevant, however, if the claim is one that is otherwise covered under the policy, and because the Court has found that the *Sol* allision is not covered due to the failure of IYC to give INA timely notice of loss and to file a claim, INA still prevails.

### III.    IYC'S CLAIM RELATED TO *ISLAND RUNNER* FAILS

#### A.     IYC's Claims for Salvage and Protection Against Loss Fail Because the Claimed Costs Are Neither Salvage Nor Protection Against Loss

##### 1.     IYC's Claimed Costs Are Not Salvage Costs Because IYC Did Not Rescue *Island Runner* from Maritime Peril

22.     The applicable policy covers "salvage charges . . . incur[red] arising from a covered loss." Ex. 1. IYC bears the burden of showing that the claimed costs qualify as "salvage charges." *See supra* p. 43.

23.     "Salvage" is defined as the compensation allowed to persons who assist a ship at sea, its cargo, or both, and whose efforts result in saving the vessel or cargo, in whole or in part, from an imminent maritime peril. *See The Jefferson*, 215 U.S. 130, 139-40 (1909); *The Blackwall*, 77 U.S. 1, 12 (1869); *Fine v. Rockwood*, 895 F. Supp. 306, 308-09 (S.D. Fla. 1995). This Court has recognized that "[t]he existence of [a] maritime peril is a necessary element for a valid salvage claim." *Fine*, 895 F. Supp. at 309.

24.     "Marine peril" exists when a ship is "in a situation that might expose her to loss or destruction." *Id.* To establish maritime peril, it must be shown that "the vessel [was] in a situation that might expose it to loss or destruction *at the time the services are rendered.*" *New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp. 2d 101, 112 (D. Mass. 2003) (emphasis added). There are many situations that can qualify as marine peril - "[a] vessel driven aground, on rocks, shoals or reefs is a classic example" - but the common feature is that "destruction appeared

imminent or almost inevitable." *Fine*, 895 F. Supp. at 309.  Thus, for example, a vessel is in "marine peril" where it "is at the mercy of the sea and winds either as a result of collision or lack of motive power; where there is widespread fire aboard ship; where explosions are likely; where the vessel is leaking with the possibility of sinking; where a vessel is stranded and being pounded by waves." *Id.* "Other examples of peril include a listing fishing boat with a shifting cargo of herring; a vessel moored to a buoy that was blown adrift; vessels in tow that have broken loose during storms; a ship drifting near shoal water flying distress signals; an ancient abandoned shipwreck." *Id.*

25.     The fact that a vessel may *recently* have been in "marine peril" is irrelevant if the peril no longer exists.  Thus, the Eleventh Circuit recently concluded that a vessel was not in "maritime peril," even though there were strong winds from a recent hurricane and the yacht was located next to several broken concrete pilings, because the hurricane was moving away, the adverse weather conditions were ending, and the yacht was afloat and secure in a marina.  *Cape Ann Towing v. M/Y "Universal Lady,"* 268 F. App'x 901, 903 (11th Cir. 2008); *see also Fine*, 895 F. Supp. at 310 (concluding that a submerged boat with a hole in her hull was not in maritime peril because the weather was clear, the sea was calm, the boat was secured to a dock and had settled on a channel bottom).

26.     None of the claimed salvage expenses here qualify under the applicable policy.  Neither the costs of the initial search nor those of the fourteen day South Caicos cruise to inspect *Island Runner* qualify as salvage expenses because these efforts failed to actually salvage the vessel.  *See FF* ¶¶ 33-36; *see, e.g., Klein v. Unidentified Wrecked & Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir. 1985) ("A claim for a salvage award requires that three elements be shown," including "[s]uccess in saving, or in helping to save at least part of the property at risk."); *see also Bemis v. RMS Lusitania*, No. 95-2057, 1996 U.S. App. LEXIS 24373, at *10-11 (4th Cir. Sept. 17, 1996) ("It is not what salvors offer or attempt to do that entitles them to

compensation, but what they succeed in doing to the benefit of the property." (internal quotation marks omitted)).

27.     Additionally, the costs of the fourteen day South Caicos cruise do not qualify because *Island Runner* was no longer in "marine peril" when the trip was taken. The cruise occurred after IYC knew the vessel was secured at Customs and Excise in Cockburn Harbor, South Caicos. *See* FF ¶ 34.

28.     Accordingly, these costs are not salvage expenses as a matter of law, and INA did not breach the applicable insurance policy by not paying them.

### 2.     The Claimed Costs Do Not Qualify as Protection Against Loss

29.     The applicable policy provides that "[i]f [the] vessel or other property covered by this policy is damaged, [the insured] must take all reasonable steps to protect it from further damage" and that "[INA] will reimburse [the insured] for reasonable expenses for protecting the property from further damage." Ex.1, p. 24.

30.     IYC did not offer any evidence showing that the claimed costs were reasonable and necessary to protect the vessel from further damage. *See* FF ¶ 36.

31.     IYC therefore was not entitled to these costs as "protection against loss," and INA did not breach the applicable insurance policy by declining to pay them.

### B.     IYC's Claim is Also Barred Because It Materially Breached it Contract By Failing to Cooperate with INA During the Claims Adjustment Process

32.     It is well established under Florida law that the insured must cooperate with its own insurer. If the failure to do so "constitutes a material breach and substantially prejudices the rights of the insurer in defense of the cause,' the insurer will be 'release[d] . . . of its obligation to pay." *Rolyn Cos, Inc. v.. R & J Sales of Tex. Inc.,* 412 F. App'x 252, 255 (11th Cir. 2011) (quoting *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC,* 601 F.3d 1143, 1150 (11th Cir.

2010)).  To invoke this rule, the insurer must "exercise[] diligence and good faith in seeking to bring about the cooperation of the insured" and must "in good faith compl[y] with the terms and conditions of the policy." *Mid-Continent Cas. Co.*, 601 F.3d at 1150 (citations omitted); *see also Ramos v. Nw. Mut. Ins. Co.*, 336 So. 2d 71, 75 (Fla. 1976).

33.     This obligation is confirmed in the terms of the applicable policy, which provides that "[a]ny person making a claim must," among other things, "cooperate with us [i.e., INA] in the investigation, settlement or defense of any claim or suit under this policy." Ex. 1, p. 24.

34.     IYC failed to cooperate regarding the property damage claim regarding the value of the vessel as noted, *supra*.

35.     INA was substantially prejudiced by IYC's failure to cooperate because it was impossible - six years after the fact - to meaningfully assess the claimed costs and whether they were reasonable and necessary under the applicable policy provisions.

36.     Accordingly, IYC's failure to cooperate with INA constituted a material breach of its contract and relieved INA of its obligation to pay under the policy.

## C.     IYC's Claim Is Also Barred Because It Voided the Policy by Committing Fraud

37.     INA asserted the affirmative defense of fraud.  *See* D.E. 976, p. 37.  INA has the burden of proof on this issue, *Steward*, 306 F. App'x at 530; *Tello*, 494 F.3d at 956, and must establish each of the elements by clear and convincing evidence.  *See Fla. Assocs. Capital Enters., LLC v. Sundale, Ltd.*, No. 07-21016-BKC-LMI, 2010 Bankr. LEXIS 3642, at *37 (Bankr. S.D. Fla. Oct. 8, 2010).

38.     The applicable insurance policy contains a "Concealment, Misrepresentation or Fraud" provision, which provides, in pertinent part, that "[a]ll coverage provided by us will be voided from the beginning of the Policy Period if you intentionally conceal or misrepresent any material fact

46

or circumstance relating to this contract of insurance, or the application for such insurance, whether before or after a loss." Ex. 1, p. 23.

39.     IYC breached this provision because it misrepresented the condition and value of *Island Runner* prior to the loss. IYC did not disclose the serious mechanical issues that had arisen in the days before the loss, even though it knew those mechanical issues would dramatically reduce the value of the vessel. *See* FF ¶¶ 31, 37-39.

40.     INA detrimentally relied upon these material misrepresentations and failures to disclose in investigating, adjusting, and paying the *Island Runner* property damage claim. As a result, INA paid policy limits on the claim when it otherwise would not have done so. *See* FF ¶¶ 41-42.

41.     IYC's intentional misrepresentation and concealment of *Island Runner*'s condition and value voided the policy, vitiating any duty on INA's part to pay IYC's claimed costs.

## IV.     HPC'S CLAIM RELATED TO *MONGOOSE* FAILS

42.     HPC's *Mongoose* claim seeks additional payments for salvage costs, beyond what INA already paid for the repair of *Mongoose* and to tow and secure *Mongoose* after her grounding during Hurricane Katrina. HPC has presented no evidence that INA breached its contract with respect to the payment of the repair and salvage expenses, and HPC is entitled to no further payments.

### A.     *Mongoose* Was Not in Peril When the Claimed Costs Were Incurred and HPC Failed to Show the Claimed Costs Were Reasonable and Necessary and Covered Under the Policy

43.     As explained above, to meet its burden concerning coverage under the applicable policy's "Salvage Charges" provision, HPC must prove that it incurred expenses that were reasonable and necessary to save the vessel, in whole or in part, from an imminent maritime peril. *See supra* at ¶¶ 23-26.

44.     HPC did not carry its burden of proof.  Every cost claimed by HPC at trial was incurred either *before* Hurricane Katrina or *after Mongoose* was already safe and secure at Peninsula Marine.  *See* FF ¶ 81.  Therefore, none of these charges resulted in saving *Mongoose* from an imminent maritime peril.

45.     HPC also failed to establish that any of the claimed expenses - even assuming they were somehow related to saving *Mongoose* from peril - were reasonable and necessary.  At trial HPC simply listed various expenses, without making any effort to establish why they were incurred, and how they resulted in saving the vessel, in whole or in part, from an imminent maritime peril.  *See* FF ¶ 81. Nor did HPC offer testimony from any witness qualified to explain why the charges were reasonable and necessary to save *Mongoose* from an imminent maritime peril.  In *Tampa Bay Shipbuilding. & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213 (11th Cir. 2003), the Eleventh Circuit affirmed a finding that ship repair expenses were reasonable, where extensive testimony concerning reasonableness was provided by witnesses with "particularized knowledge" of shipping repair issues "garnered from years of experience in the field." *Id.* at 1223.  There was no such evidence presented with respect to the reasonableness of HPC's asserted expenses for *Mongoose*.  There is therefore no evidentiary basis for concluding that any of the approximately $86,000 in claimed expenses was reasonable and necessary to save *Mongoose* from an imminent marine peril or to protect the vessel from further loss.

46.     HPC also failed to produce any documents supporting its salvage charge claims (other than the November 8, 2007 check register) until January 2011 - over five years after the incident - despite INA's specific and reasonable requests. *See* FF ¶ 79-80. Even the January 2011 submission, which was sent five months after the close of the discovery period, did not provide sufficient supporting documentation to establish that the claimed costs were reasonable, necessary, and covered

48

by the policy.  HPC's failure to cooperate in the claims process precludes recovery under the policy. *See supra* ¶ 32.

47.     Accordingly, INA did not breach the policy by failing to pay the claimed costs.

### B.     HPC Cannot Recover the Additional Claimed Costs Because It Failed to Mitigate Its Damages

48.     INA asserted the affirmative defense of failure to mitigate.  *See* D.E. 976, p. 34.  INA has the burden of proof on this issue.  *Steward*, 306 F. App'x at 530; *Tello*, 494 F.3d at 956.

49.     It is well established that an insured has an obligation to mitigate its damages, i.e., minimize its insured losses.  *See Am. Home Assur. Co. v. Merck & Co.*, 386 F. Supp. 2d 501, 516-17 (S.D.N.Y. 2005); *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488 n.11 (5th Cir. 1960).  The applicable policy here had a "Protection Against Loss" provision, which required the insured to "take all reasonable steps to protect [the vessel] from further damage."  Ex. 4, p. 22.

50.     Following Hurricane Katrina, *Mongoose* was on blocks at Peninsula Marine until Halmos decided to move the vessel to Merritt.  The only admissible evidence at trial was that HPC failed to repair the vessel promptly.  If *Mongoose* were in "peril," it was not because of any extrinsic circumstances; it was only because of the boat's need for repairs.  *See* FF ¶¶ 54, 58, 69.  Thus, HPC's claimed "salvage" costs continued to accrue well after the initial Hurricane Katrina damage only because of its failure to timely make repairs.  HPC should not be rewarded for its own negligence. Furthermore, with respect to a "salvage" claim, it is difficult to fathom how a vessel on blocks in a yard could be subject to an imminent maritime peril.

51.     Accordingly, even if any of the claimed costs were for "salvage" or protection against loss, HPC's claim would still fail because it failed to prevent the need for additional costs by having the boat timely repaired.

### C.    HPC's Claim Is Barred Because It Voided the Policy By Committing Fraud

52.    INA asserted the affirmative defense of fraud.  *See* D.E. 976, p. 37.  INA has the burden of proof on this issue.  *Steward*, 306 F. App'x at 530; *Tello*, 494 F.3d at 956.

53.    As above, the applicable insurance policy contains a "Concealment, Misrepresentation or Fraud" provision which provides, in pertinent part, that "[a]ll coverage provided by us will be voided from the beginning of the Policy Period if you intentionally conceal or misrepresent any material fact or circumstance relating to this contract of Insurance, or the application for such insurance, whether before or after a loss." Ex. 2, p. 23.

54.    In the process of asserting claims for property damage to *Mongoose*, HPC engaged in multiple acts of intentional concealment or misrepresentation of material facts, voiding the policy outright under the foregoing provision, and thereby precluding recovery for the additional salvage costs HPC now claims.

55.    First, HPC failed to disclose the SuperYacht Technologies liability survey concluding that the vessel had not been properly maintained, that it had been neglected over a long period of time, and that there was no evidence of any hurricane or wind damage.  *See* FF ¶ 65.

56.    Second, HPC misrepresented that the Merritt estimate was to repair only damage incurred as a result of the hurricanes, even though HPC knew that the estimate also included costs to *renovate* the vessel, as well as costs for repairs not covered by the applicable insurance policy, such as general maintenance and to repair pre-existing damage.  *See* FF ¶¶ 74-75.

57.    Third, HPC failed to disclose communications from Roy Merritt that the majority of the repairs needed by *Mongoose* were the result of general wear and tear and were not directly related to hurricane damage.  *See* FF ¶¶ 74-75.

58.    Fourth, HPC misrepresented that *Mongoose* was always properly maintained and in excellent/pristine condition before the hurricanes.  *See* FF ¶ 75; *see also* Ex. D-11, p. 4.

59.     INA detrimentally relied upon these false and misleading statements and omissions of material facts in adjusting the claim and ultimately paying HPC almost $400,000 for property damage to *Mongoose*.  As a result, INA paid HPC much more than it otherwise would have had HPC been truthful and forthright in the claims process.

60.     The intentional concealment, misrepresentation, and fraud committed by HPC during the claims process voids the policy under its clear terms, and precludes recovery of any of the additional alleged costs HPC claims.

## V.     IYC'S CLAIM RELATED TO *LEGACY'S* WILMA GROUNDING FAILS

### A.     IYC's Claims for Additional Salvage Costs Fail Because the Claimed Costs Were Not for Salvage and IYC Failed To Prove Damages

#### 1.     The Claimed Costs Are Not Salvage Costs

61.     As discussed above, to meet its burden concerning coverage under the applicable policy's "Salvage Charges" provision, IYC must prove that it incurred expenses because of assistance rendered to *Legacy* that resulted in saving the vessel, in whole or in part, from an impending sea peril. To carry this burden, IYC must prove that salvage was continuing as of the time when the claimed expenses were incurred.  *See supra* ¶¶ 23-26.

62.     Salvage of *Legacy* following Hurricane Wilma ended on February 24, 2008, when *Legacy* was removed from the Sanctuary.  All witnesses agreed that the vessel was brought to Key West and placed in a secure anchorage.  The vessel therefore was no longer in imminent peril after that date.  *See* FF ¶ 96-99.   INA paid all reasonable and necessary expenses incurred to remove and secure *Legacy*. *See* FF ¶ 95.

63.     Even after *Legacy's* keel "dropped," the boat remained secure and was clearly not in marine peril.  FF ¶¶ 104-05.

64.     IYC is not entitled to reimbursement for alleged salvage charges that accrued after February 24, 2008.  Therefore, INA did not breach its policy by failing to pay costs incurred after *Legacy* was removed from the Sanctuary and secured at the Key West port.

2.      **Even if *Legacy* was Still in Peril After its Removal from the Sanctuary, IYC's Claim Fails Because IYC Did Not Demonstrate That Each Cost Was a Reasonable and Necessary Salvage Expense**

65.     As noted above, IYC bears the burden of proof to establish its damages, i.e., INA's failure to pay costs that were reasonable and necessary to salvage *Legacy*.

66.     Notwithstanding its burden, IYC failed to present evidence sufficient to establish the amount of its damages.  Rather than presenting the Court with itemized expenses attached to backup documentation, IYC simply directed the Court to unorganized boxes of materials that purportedly contain support for IYC's claimed damages.  *See* FF ¶ 140-42.

67.     That method of proof does not suffice to establish damages.  A plaintiff cannot impose on the Court the burden of sorting out the evidence and proving plaintiff's claims.  *See, e.g.,* *Ondine Shipping Corp. v. Cataldo*, 24 F.3d 353, 356 (1st Cir. 1994) ("[I]n our adversary system of justice it is the parties' responsibility to marshal evidence and prove their points.  Litigants cannot expect the court to do their homework for them."); *Foley v. City of Lowell*, 948 F.2d 10, 21 (1st Cir. 1991) ("When, as here, a fee target has failed to offer either countervailing evidence or persuasive argumentation in support of its position, we do not think it is the court's job either to do the target's homework or to take heroic measures aimed at salvaging the target from the predictable consequences of self-indulgent lassitude.  As we have written before, 'courts, like the Deity, are most frequently moved to help those who help themselves.'") (citation omitted); *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 609-10 (7th Cir. 2005) ("The interrogatory answer was included in the record before the district court—it was attached as an exhibit to Experian's motion for summary judgment—but Ruffin-Thompkins had the burden to point to this information to show that

52

a genuine issue of fact existed; the district court 'need not scour the record' to find such evidence."); *Lawfinders Assocs., Inc. v. Legal Research Ctr., Inc.*, 193 F.3d 517 (5th Cir. 1999) ("These documents were buried in the Appendix to Lawfinders' brief in support of its motion, which contained over one thousand pages of documents. Because the district court was not required to comb through Lawfinders' voluminous appendix in search of evidence on this element, the district court's finding was not clearly erroneous."). Indeed our own local rules embrace this very concept. *See* Local Rule 7.5(c)(2).

68.     IYC also failed to provide the Court with testimony of any witness qualified to explain why the claimed expenses were reasonable and necessary to salvage the vessel. *See supra* ¶ 45 (discussing *Tampa Bay*). A shipowner cannot simply submit an expense and announce that it was reasonable and necessary to save the ship. Only testimony from a person sufficiently experienced in salvage operations could assist the Court in understanding whether, how, and why certain expenses were necessary for salvage, and reasonable in amount. IYC offered no such testimony here.

69.     Because IYC failed to establish during trial that each claimed expense is a reasonable and necessary salvage charge, there is no basis for concluding that INA breached the policy by failing to pay them.

**B.     IYC's Claims for Protection Against Loss Costs Fail Because IYC Failed to Prove that the Claimed Costs Were Reasonable and Necessary for Protection Against Loss**

70.     As noted above, IYC bears the burden of proof to establish its damages, i.e., INA's failure to pay costs that were reasonable and necessary to protect *Legacy* from further damage.

71.     The applicable Policy had a "Protection Against Loss" provision, which required the insured to "take all reasonable steps to protect [the vessel] from further damage." Ex. 5, p. 25.

72.     This Court previously found that there was no "Protection Against Loss" coverage available under the 2005 policy for expenses IYC incurred after October 27, 2008. D.E. 1237, p.

16.   Therefore, the only issue before the Court is whether unreimbursed protection against loss expenses existed before that date.

73.    "Protection Against Loss" clauses, like "Sue and Labor" clauses in commercial hull policies, are designed to ensure that an insured owner exercises the same care as a prudent uninsured owner would.   To that end, they promise reimbursement for those expenditures which are made to reduce or eliminate a covered loss.   *Reliance Ins. Co.*, 280 F.2d at 488; *see also Cont'l Food Prods., Inc. v. Ins. Co. of N. Am.*, 544 F.2d 834, 837 n.1 (5th Cir. 1977) (following *Reliance*); *Am. Merch. Marine Ins. Co. of N.Y. v. Lib. Sand & Gravel Co.*, 282 F. 514, 519–20 (3d Cir. 1922); *Biays v. Chesapeake Ins. Co.*, 11 U.S. 415, 419 (1813).   This Court has previously recognized the purpose underlying such a clause: "A sue and labor clause makes express the implied correlative duties between insured and insurer regarding losses compensable under an insurance policy . . . . [T]he insured has the duty of preventing a threatened insurable loss and mitigating such loss when it does occur. An insured who avoids or minimizes insurable loss acts for the benefit of the insurer.  It is the benefit conferred which creates the duty on the part of the insurer to reimburse the insured for prevention and mitigation expenses." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 139 F. Supp. 2d 1374, 1382 (S.D. Fla. 2001), *aff'd*, 331 F.3d 844 (11th Cir. 2003).

74.    IYC presented no evidence that any specific expense it incurred was primarily for the benefit of the insurer to reduce or eliminate a covered loss and that the expense was reasonable and necessarily related to protecting *Legacy* from further damage prior to October 27, 2008.   *Tillery*, 717 F. Supp. at 1486.   Consequently, there is no basis for concluding that INA breached the policy by failing to pay these claimed costs.

54

**C. Even if IYC Had Proven Its Damages, Its Claim Would Still Be Barred Because It Failed to Cooperate**

75.     As noted above, IYC had an obligation under law and the applicable policy to cooperate with INA in adjusting the claim. *See supra* ¶ 32. Failure to comply with that obligation is a breach of the policy that vitiates any duty on INA's part to play the claimed expenses. *Id.*

76.     IYC breached its duty to cooperate, repeatedly ignoring INA's numerous requests over the course of years for information and documentation that would enable INA to adjust the claim. *See* FF ¶¶ 107, 117-19, 121-24, 126-30, 134, 140. During the claims process before this suit, IYC failed to identify or describe any of the following essential elements with respect to a single claimed expense: (1) when it was incurred; (2) whether the charge was reasonable and necessary; (3) when it was presented to INA (other than at trial); (4) the explanation or supporting documentation that accompanied the charge; and (5) how each charge fell within the scope of coverage and why. It was not until after this litigation was underway, three years after the last incident involved in this lawsuit, that IYC began to produce the requested documentation, and at that point, it only produced boxes of unorganized documents without accompanying explanation of what those documents meant and why they merited reimbursement, as just discussed, much like they presented at trial. Even after documentation was finally submitted, IYC showed merely that it incurred and paid some expense for some, usually unsubstantiated thing, and that some form of documentation was sometimes (far from always) ultimately provided to INA. What the expense was, what the documentation was, how it related to the expense, or why it showed that the expense was covered, were matters IYC never bothered to address. They were, however, crucial to establishing coverage for the claimed expenses.

77.     IYC's failure to cooperate with INA's efforts to adjust the *Legacy*-related salvage, protection against loss, and property damage claims relieves INA of any obligation to pay those claims.

**D.      Even if IYC Had Established Damages, IYC's Claim Is Barred Because It Breached the Warranty of Seaworthiness and Violated the Policy's Fire Protection Requirement**

**1.      IYC Breached the Absolute Implied Warranty of Seaworthiness**

78.      INA asserted the affirmative defense of breach of the absolute implied warranty of seaworthiness. *See* D.E. 976, pp. 36-37.

79.      Federal admiralty law implies an absolute warranty of seaworthiness into marine insurance contracts. *See Conn. Indem. Co. v. Palivoda*, No. 8:04-CV-1044-T-24MSS, 2004 U.S. Dist. LEXIS 28709, at *10-11 (M.D. Fla. Aug. 24, 2004). The warranty "is an 'absolute, continuing, and nondelegable' incident of vessel ownership." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 181 (5th Cir. 1981) (quoting *Allen v. Seacoast Prods., Inc.*, 623 F.2d 355, 364 (5th Cir. 1980)). Under this warranty, the insured "warrants to the insurer the seaworthiness of the vessel at the inception or attachment of a time policy." *Lloyd's U.S. Corp. v. Smallwood*, 719 F. Supp. 1540, 1549 (M.D. Fla. 1989) (citing *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 945 (11th Cir. 1986)). "The warranty of seaworthiness has been held to mean 'that the vessel is reasonably fit for the intended use.'" *Id.* at 1549 (quoting *Aguirre v. Citizens Cas. Co.*, 441 F.2d 141, 144 (5th Cir. 1971), *cert denied*, 404 U.S. 829 (1971)).

80.      An insured that breaches the absolute implied warranty of seaworthiness voids the policy *ab initio* as a matter of law. *See Certain Underwriters at Lloyd's, London v. Johnson*, 124 F. Supp. 2d 763, 771–72 (D.P.R. 1999).

81.      Under the absolute implied warranty, "[t]he shipowner is liable for unseaworthiness, regardless of negligence, whenever the ship *or its gear* is not reasonably fit for the purpose for which it was intended." *Italia Societa per Azioni di Navigazione v. Or. Stevedoring Co.*, 376 U.S. 315, 317 n.3 (1964) (emphasis added). A ship is unseaworthy when,

for example, it does not have proper footwear for seamen to go ashore in the snow and ice, *see Webb v. Dresser Indus.*, 536 F.2d 603, 607 (5th Cir. 1976), when it does not have a bathroom and fails to instruct about the use of life preservers, *see Deal v. A.P. Bell Fish Co.*, 674 F.2d 438, 442 (5th Cir. 1982), or when a staging gives way because it contains a piece of defective rope, even though there is sound rope on the vessel, *see Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 105 (1944). Living quarters that are unsafe because of noxious fumes, like those on *Legacy*, are unseaworthy. *See Smith v. Ithaca Corp.*, 612 F.2d 215, 219 (5th Cir. 1980).

82.     To establish breach of this warranty, an insurer need not demonstrate that the insured had knowledge of the unseaworthy condition or that the insured was at fault for failing to discover the unseaworthy condition. *Palivoda*, 2004 U.S. Dist. LEXIS 28709, at *10-11.

83.     Furthermore, it makes no difference whether the unseaworthy condition was a proximate cause of the loss. *See Axis Reins. Co. v. Henley*, No. 4:08cv168-WCS, 2009 U.S. Dist. LEXIS 98718, at *43-44 (N.D. Fla. Oct. 22, 2009) (citing *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957)) (explaining that breach of absolute warranty voids policy "altogether" regardless of proximate cause); *accord Royal Indem. Co. v. Deep Sea Int'l*, 619 F. Supp. 2d 14, 27 (S.D.N.Y. 2007) ("The negative implied warranty of seaworthiness is narrower than the absolute warranty . . . [because] it invalidates coverage only for loss or damage proximately caused by the unseaworthy condition."). Instead, the mere fact that "the vessel is in fact not seaworthy at the inception of the policy" is itself "enough to discharge the insurer" of liability. *Axis Reins. Co. v. Resmondo*, No. 8:08-cv-569-T-33TBM, 2009 U.S. Dist. LEXIS 122778, at *15 (M.D. Fla. May 8, 2009) (internal citation omitted).

84.     The unrebutted testimony at trial showed that *Legacy* was unseaworthy at the inception of the policy. The conditions outlined in the March 16, 2005 letter established the

Legacy's unseaworthiness.  FF ¶ 84. That fact itself voids the policy under the absolute implied warranty of seaworthiness.

**2.      IYC Breached the Policy's Express Fire Protection Warranty**

85.      Maritime law also recognizes and enforces express warranties in maritime insurance policies.  An insured's failure to comply with an express warranty contained in the policy will void the policy and relieve the insurer of all liability for any asserted loss - even if compliance with the warranty would not have avoided the loss. *Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364, 1366 (11th Cir. 1988); *Aguirre v. Citizens Cas. Co. of N.Y.,* 441 F.2d 141, 143 -145 (5th Cir. 1971).[27]

86.      IYC voided the policy by violating the policy's express "Fire Extinguishing System Agreement."  That agreement provides: "You [IYC] agree that your yacht is equipped with a built-in and automatic system of fire extinguishing apparatus, properly installed in the engine room and maintained in good and efficient working order." Ex. 5, p. 10.  That provision required IYC to have a "built-in and automatic system of fire extinguishing apparatus." *Id.*

87.      The Eleventh Circuit, examining a provision *identical* to the "Fire Extinguishing System Agreement," has held that the insurer was justified in denying coverage because of the insured's failure to comply with the provision. *See Stammel v. Ace Am. Ins. Co.,* 375 F. App'x 945, 946 (11th Cir. 2010).

88.      As described by Halmos himself in his March 16, 2005 letter, *Legacy* was not equipped with a properly maintained fire prevention system. Ex. B-20.  *Legacy's* halon system "was short 60 lbs. of halon in each tank.   The shortage renders the system insufficient for the

---

[27] Although INA did not expressly plead this affirmative defense, it is not waived because IYC improperly failed to produce the March 16, 2005 letter, which is the basis for this defense. *See* D.E. 1319.  In any event, it is part and parcel of the unseaworthiness issue.

58

intended fire-fighting purpose. A major engine room fire would have jeopardized all aboard and likewise Legacy." *Id.* at 7.

89.     In failing to have a properly maintained "built-in and automatic system of fire extinguishing apparatus," IYC failed to comply with and breached the "Fire Extinguishing System Agreement."

90.     Accordingly, the applicable policy was void. *See Stammel*, 375 F. App'x at 946.

### E.     IYC's Claim Is Also Barred Because It Committed Fraud and Voided the Applicable Policy

91.     INA asserted the affirmative defense of fraud. *See* D.E. 976, p. 37. INA has the burden of proof on this issue. *Steward*, 306 F. App'x at 530; *Tello*, 494 F.3d at 956.

92.     The applicable insurance policy contains the same "Concealment, Misrepresentation or Fraud" provision discussed above. Ex. 5, p. 37.

93.     IYC committed multiple acts of intentional concealment or misrepresentation in the process of claiming salvage, protection against loss, and property damage costs for *Legacy*'s grounding as a result of Hurricane Wilma, voiding the policy and precluding any recovery for those costs.

94.     First, IYC misrepresented *Legacy*'s condition prior to the hurricane, failing to disclose Exhibit B-20 and the facts contained within it at the insurance renewal and during the claims process. *See* FF ¶¶ 84-85.

95.     Second, IYC willfully failed to disclose to INA the June 23, 2006 Perini Navi estimate which was only a fraction of the property damage costs IYC was claiming. *See* FF ¶¶ 108-10.

96.     INA detrimentally relied upon these material misrepresentations and failures to disclose in investigating, adjusting, and paying the claim. As a result, INA paid the $16 million policy limits on the claim when it otherwise would not have done so. *See* FF ¶ 111. IYC's withholding of the Perini estimate also prevented INA from issuing a payment for property damage

until INA could conduct its survey in 2008 with estimates from Perini. Ex. V-13; Ex. O-8. IYC has presented no evidence that INA breached the contract by these property damage payments.

97.     Third, IYC intentionally misrepresented that the Merideth Law Firm invoices were "Legal and Legal Support Services" related to salvage and protection against loss of *Legacy* due to Hurricane Wilma, even though the time was for Halmos, a non-lawyer partner in the District of Columbia-based Merideth Law Firm, and his employees. *See* FF ¶¶ 148-50. The Court finds Mr. Halmos' "partnership" in Washington D.C. of no significance, as the alleged work done (and billed) was done in Florida, not in D.C., and by Mr. Halmos' own version of the facts, was done under supervision of a Florida lawyer. There is no evidence in this record of that lawyers' affiliation with the Merideth Law Firm.   In making such representations, Halmos not only violated the District of Columbia Rules of Professional Conduct, *see* D.C. R. Prof. Conduct 5.5(1) (prohibiting individuals from engaging in the unauthorized practice of law in other jurisdictions, such as Florida); D.C. R. Prof. Conduct 5.4(b)(2) & (3) (the nonlawyer in partnership with the District of Columbia law organization must "abide by [the District of Columbia] Rules of Professional Conduct"), he violated Florida law, *see* Fla. Stat. § 454.23 ("Any person not licensed or otherwise authorized to practice law in this state who practices law in this state or holds himself or herself out to the public as qualified to practice law in this state, or who willfully pretends to be, or willfully takes or uses any name, title, addition, or description implying that he or she is qualified, or recognized by law as qualified, to practice law in this state, commits a felony of the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084.").

98.     Fourth, IYC submitted fabricated invoices from Merideth Law Firm, ISC, and PHS—invoices that reflected absolutely no legitimate attempt to account for the services allegedly rendered and which requested "reimbursement" for amounts that had not been paid. *See* FF ¶¶ 131-33, 148-50.

99.     Fifth, IYC submitted invoices for attorneys' fees for reimbursement under INA's policy and accepted reimbursement for them, when in fact the invoices included fees incurred for numerous other matters.   *See* FF ¶¶ 137-38.   INA detrimentally relied on IYC's material misrepresentations in making that payment.

100.    Accordingly, IYC committed fraud, voiding the applicable policy.

### F.     Coverage Was Not Created or Expanded by Alleged Representations by Defendant's Representatives

101.    Many of Plaintiffs' claims for coverage beyond the scope of the policy terms were based on certain "representations" allegedly made by INA and its representatives.   To the extent Plaintiff relies on the doctrines of waiver and/or estoppel, under Florida law these doctrines may not be affirmatively used against an insurer to create or extend coverage otherwise lacking in the policy. *See Doe v. Allstate Ins. Co.*, 653 So. 2d 371, 373-74 (Fla. 1995); *AIU Ins. Co. v. Block Marina Inv., Inc.*, 544 So. 2d 998, 1000 (Fla. 1989); *Crown Life Ins. Co. v. McBride*, 517 So. 2d 660, 661 (Fla. 1987).   There is only one narrow exception to this doctrine - "promissory estoppel may be utilized to create insurance coverage where to refuse to do so would sanction fraud or other injustice." *Crown*, 517 So. 2d at 661.   This exception applies where the insurer engages in fraudulent conduct, and the insured relies to its detriment on that conduct. *Id.* at 662.

102.    Initially, the Court notes that the operative pleading, Plaintiffs' Fourth Amended Complaint, does not raise a claim for relief based on promissory estoppel, and although Plaintiffs did raise an affirmative defense which might encompass the doctrine of waiver, it was strictly confined to *Legacy* salvage claims.   Even if Plaintiffs had raised promissory estoppel as a claim or defense, the exception discussed above is not applicable to the facts of this case.   Indeed, Plaintiff Halmos recognized this when he testified that an INA representative requesting him to take an action outside of his policy "does not change my policy." Trial Tr. vol. 11, p. 48:16-18 May 23, 2011.   IYC has not adduced evidence establishing that INA engaged in fraud.   To the contrary, all of the conversations

surrounding INA's payment made clear that INA would only make future payments if properly supported and covered under the applicable policy. *See* FF ¶¶ 114-15. There is therefore no basis for applying waiver or estoppel to extend coverage beyond the policy's terms.

103.    There is likewise no merit to IYC's waiver argument based on INA's alleged failure to comply with Fla. Stat. § 627.426(2). That statute applies only to liability coverage, not first party coverage. *See Graham v. Lloyd's Underwriters at London*, 964 So. 2d 269, 272 n.2 (Fla. 2d DCA 2007). Moreover, the Florida Supreme Court has squarely rejected the waiver argument IYC advances here. *See AIU Ins. Co.*, 544 So. 2d at 1000 ("This court recently reiterated the general rule that . . . [estoppel] may not be used to create or extend coverage. We do not believe that it was the legislature's intent that section 627.426(2) change this long standing rule." (citations omitted)); *see also Fla. Mun. Ins. Trust v. Vill. of Golf*, 850 So. 2d 544, 551 (Fla. 4th DCA 2003). Thus, INA is not required to extend coverage beyond the policy's clear terms.

### G.    No Remediation Damages Existed

104.    The NOAA agreement released IYC and Halmos from all remediation damages. *See* FF ¶ 92. IYC presented no evidence that NOAA asserted any other remediation claim after the NOAA agreement was executed.

105.    Even had NOAA presented a remediation claim, INA paid Robert Nailon's remediation estimate as soon as INA learned of it. *See* FF ¶ 93. Further, IYC never presented any evidence that any other remediation expenses existed, were reasonable and necessary, and were covered by the applicable policy. Therefore, INA did not breach the contract related to IYC's remediation claim.

## VI.   HALMOS' PERSONAL CLAIMS ARE WITHOUT MERIT

106.    Halmos contends, in his personal capacity, that INA breached duties to him arising in quasi-contract or unjust enrichment in two respects.  First, Halmos contends that INA required him to *personally* protect *Legacy* from further loss during Hurricane Wilma and after she was grounded, which benefited INA by avoiding further losses.  Second, Halmos contends that INA was unjustly enriched by his settlement with NOAA.  Neither claim has merit.

107.    A claim for quasi contract (otherwise known as unjust enrichment) exists where "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997).

108.    A plaintiff has no claim for unjust enrichment where the defendant was only incidentally benefitted by the plaintiff's actions.  *Eller Media Corp. v. Nat'l Union Fire Ins. Co. of Pitts.*, 355 F. App'x 340, 342 (11th Cir. 2009) (per curiam); *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1007 (11th Cir. 2004); *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 807–08 (11th Cir. 1999).  "[R]estitution is not available under an unjust enrichment theory for a benefit conferred as an incident of a plaintiff's having acted primarily for his or her own benefit." *Eller Media Corp.*, 355 F. App'x at 342 (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* § 13 (2010)).  The Middle District of Florida has explained the rationale for this rule by analogy: "If [incidental benefits] were compensable, then Florida Hospital might have a valid claim against everyone every time it vaccinated a child because such vaccinations, the classic illustration of what [an incidental benefit] is, reduce the ability of viruses to exist in the population, thereby benefitting every member of the population." *Adventist Health Sys./Sunbelt Inc. v. Med. Savings Ins. Co.*, No. 6:03-cv-1121-Orl-19KRS, 2004 U.S. Dist. LEXIS 30976, at *20 n.8 (M.D. Fla. Mar. 8, 2004).

109.     For each of his personal claims, Halmos failed to demonstrate that INA obtained any non-incidental benefit from his actions.

**A.      Halmos Did Not Provide Any Benefit To INA Acting In His Personal Capacity**

110.     Halmos contends that INA was unjustly enriched because Halmos was instructed that he personally had to take actions to protect *Legacy* from further loss. There is no evidence in this record to support that Halmos had any *personal* involvement in this case at the request of, or acquiescence of INA.

111.     The uncontradicted evidence showed, however, that Thomas always interacted with Halmos only as the solely authorized agent for IYC.  FF ¶¶ 155-58.  Accordingly, any actions Halmos took to protect *Legacy* were taken in his capacity as authorized agent for IYC. The policy did require that IYC protect *Legacy* from further loss, but INA paid IYC for all actions reasonable and necessary to protect *Legacy* from further damage when the costs of such actions were submitted with sufficient documentation/explanation.  *See* FF ¶¶ 142, 144.

112.     Halmos, acting in his *personal* capacity, thus did not confer any benefit on INA. The protection against loss was provided solely by IYC, pursuant to its contractual obligation, and INA satisfied its counter-obligation by paying full value for the services IYC provided that were reasonable and necessary and submitted with sufficient documentation/explanation to establish coverage under the policy.

**B.      Halmos' Personal Claim Based on the NOAA Settlements Fails**

113.     Halmos claims INA was unjustly enriched by his negotiation of the NOAA agreements.  This claim fails for multiple reasons.

114.     First, Halmos did not confer any benefit on INA at all.  The agreement he negotiated did not extinguish any claim NOAA might have had against INA.  The agreement simply assigned such a hypothetical claim to Halmos.  Halmos remained free to assert this claim

against INA.  Halmos indeed sought the assignment specifically so he could use the claim as leverage.  *See* FF ¶¶ 90 (found at Ex. C-1, p. 7, ¶ 4.1).  Halmos' negotiation thus did not confer a benefit on INA, but instead exposed it to further liability, if anything.

115.    Second, INA did not receive any benefit from the NOAA agreement with Halmos. Halmos obtained the release of claims NOAA had against Halmos, which are not insured under INA's policy.  Moreover, any benefit INA could have received from the NOAA agreement would be wholly incidental to the benefits Halmos himself received.  Halmos negotiated his personal agreement with NOAA in order to release any claim NOAA might have been able to bring against him, and he extinguished that claim in his agreement.  *See id.*

116.    Third, the value of any alleged benefit is completely speculative.  "Whether damages are speculative must be determined by inquiry into both causation of the damage and measurement of damages."  *Aldon Ind., Inc. v. Don Myers & Assoc., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975) (Florida law).  The term "speculative" essentially characterizes the evidence introduced to prove the damages - if the evidence does not demonstrate with "reasonable certainty" that the plaintiff suffered damages as the natural and proximate result of defendant's wrongful conduct, then the asserted damages are speculative and cannot be recovered.  *Id.*  The *amount* of damages, in particular, must be proved to a reasonable certainty and not left to speculation or conjecture.  *Id.* (citing *Travelers Indem. Co. v. Peacock Constr. Co.*, 423 F.2d 1153, 1157 (5th Cir. 1970)).

117.    Neither NOAA nor the State of Florida ever brought a natural resource damage claim against Halmos.  Further, Thomas Campbell testified that the statute of limitations on the NOAA claims had expired.  Halmos therefore could not show that his settlement efforts unjustly enriched INA to any reasonable certainty, nor could he establish any amount of avoided loss by any reasonably certain amount.  The benefits, if any, were entirely speculative.

## VII.   PLAINTIFFS' DECLARATORY JUDGMENT CLAIM IS WITHOUT MERIT

118.    Plaintiffs also bring a claim for declaratory judgment, seeking a declaration that they are entitled to recovery under the applicable policies.

119.    For all of the foregoing reasons, plaintiffs' claim for declaratory judgment fails. Plaintiffs have failed to establish coverage under the applicable policies; plaintiffs have failed to prove damages; and INA has established that plaintiffs voided the policies through their failure to cooperate and their various misrepresentations.

## VIII.   INA IS ENTITLED TO A DECLARATORY JUDGMENT THAT INA HAS FULLY PAID ALL AMOUNTS DUE PLAINTIFFS

120.    INA also brought a counterclaim for declaratory judgment, seeking a declaration that it has paid all amounts due plaintiffs.

121.    For all of the foregoing reasons, INA is entitled to this declaration.  INA paid all reasonable and necessary expenses for which supporting documentation was provided, and it has thus satisfied its obligations under the policies.   INA has not breached its contracts with Plaintiffs.

## IX.   PLAINTIFFS CANNOT SUCCEED ON A CLAIM OF CONFESSION OF JUDGMENT

122.    Plaintiffs maintain that payments by INA constitute a "confession of judgment" under what they contend is applicable law that partial payment waives coverage defenses.  *See* Plf.'s Proposed Findings and Conclusions of Law [D.E. 1414] at ¶¶ 61-63.  Although this was never pled in the Fourth Amended Complaint, the answer to the Counterclaim, nor otherwise properly pled prior to trial,[28] this Court disagrees with the argument in any event.

---

[28] This, in and of itself, may be a basis for denial.

123.    Defendant has maintained coverage defenses, and alleged affirmative defenses, including fraud, throughout out this litigation. *See* D.E. 976. That makes this case distinguishable from the cases relied on by plaintiffs, such as *Saewitz v. Lexington Insurance Company*, 133 F. App'x. 695 (11th Cir. 2005) (and others), which is cited for the proposition that "money paid by an insurer to insureds as partial settlement of the insured's claim constitutes an admission of liability by the insurer" (Plf.'s Proposed Findings and Conclusions of Law at ¶61).  Plaintiffs overlook the following language in *Saewitz*: "Lexington did not preserve its right to contest coverage. Lexington could have made its partial payment with a reservation of rights, alleged an affirmative defense of fraud or mistake . . . or filed a counterclaim . . . ." *Id.* at 699.  The Florida Supreme Court case plaintiffs rely on is even less applicable. The case of *Wollard v. Lloyd's and Companies of Lloyd's*, 439 So. 2d 217 (Fla. 1983) is a situation where the case was settled.  It did not involve partial payments at all. None of the other non-binding cases cited by plaintiffs cause them to fare any better.  *See United Servs. Auto. Ass'n v. Kindl*, 49 So. 3d 807 (Fla. 5th DCA 2010), *rev. denied*, 65 So. 3d 516 (Fla. 2011); *Vanguard Fire & Cas. Co. v. Golmon*, 955 So. 2d 591, 594 (Fla. 1st DCA 2006).

## CONCLUSION

**WHEREFORE**, it is hereby **ORDERED AND ADJUDGED** that the Court finds in favor of Defendant/Counter-Claimant INA and against Plaintiffs/Counter-Defendants IYC, HPC and Peter Halmos (*pro se*) and awards no damages to Plaintiffs in accordance with the terms of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of November, 2011.

STEPHEN T. BROWN
CHIEF UNITED STATES MAGISTRATE JUDGE

cc:  Counsel of record

67